Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Bruce Highman (CA Bar No. 101760)
bruce.highman@highmanlaw.com
THE HIGHMAN LAW FIRM
582 Market Street, Suite 1212
San Francisco, CA 94104
P - (415) 982-5564
F - (415) 982-5202

Counsel for Plaintiff-Relator
Heather Widen

FILED

**Feb 23, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

<span style="color:red">SEALED</span>

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel.</u> HEATHER WIDEN, <br><br> Plaintiffs, <br><br> v. <br><br> HORNE INTERNATIONAL, INC., HORNE LLP, COUNTY OF BUTTE, COUNTY OF CONTRA COSTA, COUNTY OF EL DORADO, CITY OF FONTANA, COUNTY OF HUMBOLDT, COUNTY OF IMPERIAL, COUNTY OF KINGS, COUNTY OF LOS ANGELES, COUNTY OF MADERA, COUNTY OF MENDOCINO, COUNTY OF NAPA, COUNTY OF NEVADA, CITY OF OXNARD, COUNTY OF SAN LOUIS OBISPO, COUNTY OF SAN MATEO, COUNTY OF SANTA CRUZ, COUNTY OF SHASTA, COUNTY OF SUTTER, COUNTY OF TULARE, COUNTY OF VENTURA, COUNTY OF YOLO, COUNTY OF YUBA, GEOFFREY ROSS, LORRIE BLEVINS, SANDRA GALLAGHER, and DOES 1–30, <br><br> Defendants. | **Civil Action No. 2:22-cv-1893 AC** <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

1

First Amended Complaint

Through her undersigned counsel, *qui tam* Plaintiff-Relator Heather Widen (hereafter "Relator"), on behalf of the United States of America (the "United States" or "Government") in her Complaint against Defendants Horne International, Inc., and Horne LLP (collectively "Horne"), the Counties of Butte, Contra Costa, El Dorado, Humboldt, Imperial, Kings, Los Angeles, Madera, Mendocino, Napa, Nevada, San Louis Obispo, San Mateo, Santa Cruz, Shasta, Sutter, Tulare, Ventura, Yolo, and Yuba, the Cities of Fontana and Oxnard (collectively "Representative Option A Localities" or "ROALs"), Geoffrey Ross, Lorrie Blevins, and Sandra Gallagher (collectively "Individuals") and Does 1–30 (collectively "Defendants") alleges as follows:

## I.  INTRODUCTION AND OVERVIEW OF THE FRAUD

1. This is an action to recover damages and civil penalties for fraud perpetrated against the United States arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendants, and funds knowingly received and retained by Defendants, all in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2. From at least March 2021 through the present, Horne has knowingly presented and caused to be presented false and fraudulent claims, has knowingly made or used false records and statements material to such claims, and has knowingly concealed and avoided repaying the Government for funds wrongfully received through its fraud.

3. Specifically, Horne has knowingly failed to comply with even minimal, clearly understood grant requirements in administering for California, for other states, and for local jurisdictions the federal Emergency Rental Assistance Program and similar programs, including state-funded programs, enacted to provide economic relief from the effects of COVID-19 ("ERAP" or "ERA program"). Several states have contracted with Horne, and Horne has received substantial grant funds to properly administer ERAP. Instead of doing so, Horne has knowingly failed to follow statutory and contractual program mandates, has concealed its failures, and has falsely certified that it has complied with these material requirements.

4. For example, despite requirements to the contrary, Horne has knowingly failed to take even minimal and reasonable steps to: verify the identity of grant funding applicants, verify

2

First Amended Complaint

the tenancy or landlord interest in the rental properties for which funding was sought, and verify the existence of the rental property. As explained further below, Horne knew that it needed to provide these services, knew that it promised grantees like California that it would do so, and also knew that it did not have, and for much of the relevant period did not obtain, the necessary resources to meet these requirements.

5.      Without performing those services, Horne allowed millions of dollars of grants to be obligated and then forwarded to those who were clearly not part of "eligible households" authorized to receive grant funding.  Indeed, once Horne finally obtained basic resources to do the work it promised to do in verifying grant funding applicants, the level of funds it dispersed markedly declined - demonstrating that the previous outpouring of funds was likely tainted by substantial fraudulent payments to ineligible recipients. Faced with a deadline to obligate those funds, Horne knowingly failed to meet its requirements under the grant program and instead knowingly allowed ineligible recipients to receive the grants.

6.      Congress and state legislations enacted ERAP with required safeguards to ensure that program funds were not lost through waste, fraud, or abuse and were available to eligible recipients at risk of losing their housing. In ignoring those safeguards, Horne consistently paid grant funding to applicants who provided clearly fake identities, clearly fake addresses for property that did not exist at that address, and for supposed properties that did not exist at any address. Horne then falsely certified and caused others to falsely certify that ERAP in various states had been administered according to the federal and state requirements. The opposite is true. Through such knowingly false certifications, Horne has continued to receive and retain payments to which it is not entitled.

7.      After COVID-19 reached pandemic proportions in 2020, through the Consolidated Appropriations Act, 2021, and again through a second round of funding in the American Rescue Plan of 2021, Congress provided states, cities, and counties with federal funding for rental assistance. Congress established specific timelines by which grantees, like the State of California and other states, must provide financial assistance to qualified households. If the State grantees failed to obligate the funds by September 30, 2021, the grantees would not be eligible to receive

3

First Amended Complaint

the second round of ERAP funding. State grantees -- including Alabama, California, Colorado, Tennessee, and Texas -- contracted with Horne to administer the ERA program and ensure that *eligible* recipients timely received the funds.

8.      Prior to September 30, 2021, the California State Auditor concluded, "the likelihood of mismanagement of [ERAP] funds is great enough to create substantial risk of serious detriment to the State and its residents. … Because of the looming deadline and effect it may have on the State if critical requirements are not met, it is important to issue this first report of our audit to notify you of the urgent risk of losing federal funds that the State faces. Given the narrow time frame set by the federal government, we wanted to impress upon you the need for continued attention in order to minimize the risk and the amount of funds the State could lose beginning September 30, 2021."

9.      Representative Option A Localities conspired to commit the fraud by accepting ERAP funds and their share of the ERAP administrative fees while providing little to no fraud prevention work in violation of the program requirements. Their disregard for those requirements and the distribution of ERAP funds to ineligible recipients harmed their own populations by allowing fraudsters to deplete ERAP funds that should have been allocated to eligible and needy recipients within their jurisdictions.

10.      For its work in administering ERAP, Horne received millions of dollars pursuant to the grants' allowance for payment of administrative costs. Horne knew that it could not meet the federal deadline to commit and award rent relief to *eligible* households. At risk of losing its continued grant funding and to ensure that rental relief payments were awarded one way or another, Horne did not take basic, inexpensive, simple grant-required measures to ensure that eligible recipients received the funds. Instead, Horne knowingly allowed government funds to be squandered and provided to entirely ineligible recipients -- so that Horne could meet the deadline for obligating ERAP funds and continue to receive grant payments. By awarding grant funds to non-qualified recipients, Horne depleting funding for those facing real and imminent risk of eviction and in need of urgent rental assistance, and Horne frustrated the Government's purpose in providing the grant funds.

4

First Amended Complaint

11. Relator Heather Widen worked for the State of California, Housing and Community Development. She was hired to work specifically on the ERA program and did so as a Housing and Community Development Representative II, Emergency Rental Assistance Program, Division of Federal Financial Assistance, Housing and Community Development Department. Relator blew the whistle on Horne's knowing failure to comply with the ERAP requirements and brought to her supervisors credible and clear evidence of Horne's fraud in administering ERAP. Unfortunately, the State of California was also interested in the continued receipt of federal funding, and wanted to believe that Horne and the ROALs were fulfilling the grant and contractual requirements. Inadequate steps were taken to stop the fraud. Instead, Ms. Widen was terminated.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13. Although the issue is no longer jurisdictional under the 2010 amendments to the FCA, Relator believes that there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as that term is used in 31 U.S.C. § 3730(e). Moreover, whether or not such a disclosure has occurred, Relator qualifies under the FCA as an "original source" of the allegations in this Complaint. Before filing this action, and before any disclosure, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without Relator's knowledge.

14. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Horne and some of the ROALs, the subject of this lawsuit, can be found, reside, and have transacted business in this District.

## III. PARTIES

15. Plaintiff-Relator Heather Widen worked on ERAP grant funding in the California

5

First Amended Complaint

Department of Housing and Community Development, Division of Federal Financial Assistance. Before being hired by HCD for the ERAP position, Ms. Widen had fourteen years of experience in county and city planning projects for community development. During her work on ERAP, Ms. Widen obtained substantial knowledge and expertise on ERAP requirements, and how the grant funding was administered. On February 25, 2022, Relator submitted a whistleblower complaint to the California State Auditor to report the high prevalence of fraudulent applications approved by Horne and to report that HCD had not taken adequate steps to prevent fraud, waste, and abuse by Horne, as discussed below. Widen was placed on administrative leave later that day, and was thereafter terminated.

16. Horne International Inc. is a professional services firm headquartered in Fairfax, Virginia.

17. Horne LLP is a subsidiary of Horne International Inc., with headquarters in Ridgeland, Missouri. Horne LLP has an office in Sacramento, California, among numerous other cities. The company is one of the largest accounting and management firms in the United States. According to its website, Horne is the number one "fastest organically growing accounting firm in the U.S.;" the number two "fastest-growing accounting firm in the U.S. (All Growth);" and number sixteen in the "top 50 program management firms in the U.S." https://horne.com/recognition/. Horne boasts that its "turnkey approach to [ERAP] programs provides states a full-service solution to quickly get landlords and tenants the help they need" and that Horne's "proven methods are helping local government [and] state agencies deliver aid quickly while maintaining compliance." https://horne.com/federal-state-local-government/  and  https://horne.com/services/federal-state-local-government/covid-19/.

18. The counties of Butte, Contra Costa, El Dorado, Humboldt, Imperial, Kings, Los Angeles, Madera, Mendocino, Napa, Nevada, San Louis Obispo, San Mateo, Santa Cruz, Shasta, Sutter, Tulare, Ventura, Yolo, and Yuba and the cities of Fontana and Oxnard are local governmental entities in California. Each of these ROALs participated in ERAP, as discussed further below.

19. Geoffrey Ross is currently the Director of State and Federal Programs at Horne. At

6

First Amended Complaint

the time of the fraud alleged herein, Mr. Ross was the Deputy Director of Federal Programs at HCD. Widen reported to Sandra Gallagher who reported to Lorrie Blevins who reported to Ross. Widen is informed and believes that Ross participated in the decisions to place Widen on administrative leave on February 25, 2022 and to reject her during probation which effectively terminated her employment on April 22, 2022.

20.     Lorrie Blevins is the Section Chief of HCD. Widen reported to Gallagher who reported to Blevins. Blevins participated in the decisions to place Widen on administrative leave on February 25, 2022 and to reject her during probation which effectively terminated her employment on April 22, 2022.

21.     Sandra Gallagher is a Staff Services Manager at HCD. Widen reported to her. She participated in the decisions to place Widen on administrative leave on February 25, 2022 and to reject her during probation which effectively terminated her employment on April 22, 2022.

22.     The identities of the remaining Doe Defendants 1-20, including other Option A localities, who have knowingly submitted or caused the submission of false and fraudulent claims to the Government and have knowingly concealed and avoided repaying fraudulently obtained payments, are presently unknown to the Relator.  Relator intends to amend her complaint to name such Doe Defendants when additional information is learned. Defendants Horne, ROALs and such additional Doe Defendants 1-20 served as contractors, agents, partners, and/or representatives of one and another in the fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein. Defendants Horne, ROALs and Doe Defendants 1-20 participated in the scheme to defraud the United States for which the Defendants are jointly and severally liable.

### IV.  APPLICABLE FEDERAL AND STATE LAW

A.     **Emergency Rental Assistance Program**

23.     To support those faced with possible evictions from their homes, Congress established a nationwide Emergency Rental Assistance program through the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, in December 2020. *See* 15 U.S.C. § 9058a. This

7

First Amended Complaint

federal law required the United States Department of the Treasury ("Treasury") to provide federal grantee states and local jurisdictions -- cities and counties with populations greater than 200,000 -- with funding to provide residents with rental assistance (called "Round 1 funding"). *Id.* § 9058a(b).  In March 2021, Congress passed the American Rescue Plan Act of 2021, Pub. L. No. 117-2, which established a second round ("Round 2 funding") of ERAP funds for federal grantees. *See* 15 U.S.C. § 9058c.

24.    While the eligibility requirements for both rounds of funding were substantially the same, *id.* § 9058c(d), federal law established different timelines and requirements for Round 1 and Round 2 funding grantees. To mitigate the impact of potential widespread evictions during the pandemic, Round 1 federal grantees were to provide specific assistance to eligible households for existing debt and future rent or utilities payments. To ensure that the funds quickly got to those who needed them, the Round 1 federal program requirements specify that the Treasury Department ("Treasury"), beginning on September 30, 2021, must *recapture all funds that federal grantees had not obligated* by then. 15 U.S.C. § 9058a(d).  Of course, California and Horne were aware of this requirement.  "Treasury defined obligated funds as the total amount of funds a federal grantee has approved for payment to or for participating households and for a federal grantee's approved administrative expenses." Letter from Elaine M. Howle, CPA, California State Auditor, to Governor and Legislative Leaders (Sept. 16, 2021), available at https://www.auditor.ca.gov/pdfs/reports/2021-615.1.pdf (last visited Sept. 20, 2022).  For funds not obligated, Treasury would then reallocate those recaptured funds to other eligible federal grantees who needed them -- grantees that had obligated at least 65 percent of their original allocations and had thus demonstrated a need for the additional funds. *See* U.S. DEPT. OF THE TREASURY, *Emergency Rental Assistance Under the Consolidated Appropriations Act, 2021 Reallocation Guidance* (Mar. 30, 2022), available at https://home.treasury.gov/system/files/136/Updated-ERA1-Reallocation-Guidance%203-30-%202022.pdf. Grantees had until September 30, 2022, to then spend all of their obligated Round 1 funds and until September 30, 2025, to spend all of their Round 2 funds. 15 U.S.C.  § 9058a(e) & 9058c(g).

8

First Amended Complaint

25.     California received a total of $2.6 billion in Round 1 ERAP funding: $1.5 billion to the State and $1.1 billion directly to 49 cities and counties with a population of 200,000 or more. Using the federal allocation to the State, the California Legislature created a rental relief program, SB 91, signed into law on January 29, 2021, which directed the California Department of Housing and Community Development ("HCD") to administer the program and allocate the $1.5 billion throughout the State based on population. Cal. Health & Safety Code §§ 50897, *et seq.* ("[i]t is the intent of the [California] Legislature that the state closely monitor the usage of funding") *Id.* § 50897.6. SB 91 also granted authority to HCD to hire a vendor to implement the program and distribute funds. *Id.* § 50897.3(a)(1).

26.     Under the state program, California counties and cities ("localities") with populations greater than 200,000 people had the choice to (a) allow HCD to administer their share of the ERAP funds ("Option A"), (b) administer it themselves ("Option B"), or (c) jointly administer it with HCD ("Option C"). Cal. Health & Safety Code §§ 50897.2(a)(2)–(3) & 50897.3(b)(1)(A).

27.     Although Option A localities did not administer their own program, they each received federal funding and were subject to the same duty as Option B and Option C localities to adhere to federal ERAP requirements, particularly data sharing and fraud prevention. 15 U.S.C. § 9058a (Round 1 funding); 15 U.S.C. §§ 9058a(d)(1) & (f)(2) (Round 2 funding); *see also* U.S. DEPARTMENT OF THE TREASURY, *Emergency Rental Assistance, Frequently Asked Questions* (Rev. 8/25/21), Question 5 (guidance regarding applicant verification options); Cal. Health & Safety Code 50897.4(a)–(c) ("To the extent feasible, each [locality] shall ensure that any assistance provided to an eligible household under this chapter is not duplicative of any other state–funded rental assistance provided to that eligible household."). Up to 10% of the funds could be used for the administrative costs of the program, including any amounts allocated to the localities for that purpose. Cal. Health & Safety Code § 50897.5(b).

28.     Option A localities were further required to execute written agreements with HCD to participate in ERAP. Cal. Health & Safety Code § 50897.3(b)(3). HCD prepared a standard agreement for that purpose. Exhibit A to that agreement (attached as Exhibit A) also specified that

9

First Amended Complaint

the localities were required to provide assistance and data to HCD.

29.    The federal statutory requirements pertaining to eligibility for receipt of ERAP grant funds make clear that the payments are only for *eligible landlords and tenants* who need the funds for housing related costs:

(c) USE OF FUNDS.—
(1) IN GENERAL.—An eligible grantee shall only use the funds provided from a payment made under this section *to provide financial assistance and housing stability services to eligible households*.
(2) FINANCIAL ASSISTANCE. -
(A) [Excluding administrative costs], funds received by an eligible grantee from a payment made under this section shall be used to provide financial assistance to eligible households, including the payment of:
(i)   rent;
(ii)  rental arrears;
(iii) utilities and home energy costs;
(iv) utilities and home energy costs arrears; and
(v) other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, as defined by the Secretary.

(d) REALLOCATION OF UNUSED FUNDS.—Beginning on September 30, 2021, the Secretary shall recapture excess funds, as determined by the Secretary, not obligated by a grantee for the purposes described under subsection (c) and the Secretary shall reallocate and repay such amounts to eligible grantees who, at the time of such reallocation, have obligated at least 65 percent of the amount originally allocated and paid to such grantee under subsection (b)(1), only for the allowable uses described under subsection (c).

…

(f) APPLICATION OF ASSISTANCE BY LANDLORDS AND OWNERS.—
(2) REQUIREMENTS FOR APPLICATIONS SUBMITTED ON BEHALF OF TENANTS.—If a landlord or owner of a residential dwelling submits an application for assistance from a payment made under this section on behalf of a renter of such dwelling—
(A) the landlord must obtain the signature of the tenant on such application, which may be documented electronically;
(B) documentation of such application shall be provided to the tenant by the landlord; and
(C) any payments received by the landlord from a payment made under this section shall be used to satisfy the tenant's rental obligations to the owner.

...

(k) DEFINITIONS. In this section:
(3) ELIGIBLE HOUSEHOLD.—
(A) IN GENERAL.—The term ''eligible household'' means a household of 1 or more individuals who are obligated to pay rent on a residential dwelling and with respect to which the eligible grantee involved determines—
(i)  that 1 or more individuals within the household has
(I)  qualified for unemployment benefits or
(II) experienced a reduction in household income, incurred significant costs, or

10

First Amended Complaint

experienced other financial hardship due, directly or indirectly, to the novel coronavirus disease (COVID–19) outbreak, which the applicant shall attest in writing;
(ii)  that 1 or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability, which may include—
(I)   a past due utility or rent notice or eviction notice;
(II)  unsafe or unhealthy living conditions; or
(III) any other evidence of such risk, as determined by the eligible grantee involved; and
(iii) the household has a household income that is not more than 80 percent of the area median income for the household.
(B) EXCEPTION.—To the extent feasible, an eligible grantee shall ensure that any rental assistance provided to an eligible household pursuant to funds made available under this section is not duplicative of any other Federally funded rental assistance provided to such household.
(C) INCOME DETERMINATION.—
(i)  In determining the income of a household for purposes of determining such household's eligibility for assistance from a payment made under this section (including for purposes of subsection (c)(4)), the eligible grantee involved shall consider either
(I)   the household's total income for calendar year 2020, or
(II) subject to clause (ii), sufficient confirmation, as determined by the Secretary, of the household's monthly income at the time of application for such assistance.
(ii)  In the case of income determined under subclause (II), the eligible grantee shall be required to re-determine the eligibility of a household's income after each such period of 3 months for which the household receives assistance from a payment made under this section.

15 U.S.C. § 9058a (emphasis added).

30.    Similarly, Round 2 funding under the enabling statute also made clear that the purpose for the funds was to provide financial assistance to meet the housing needs of eligible recipients.

(d) USE OF FUNDS. -
(1) IN GENERAL.- An eligible grantee shall only use the funds provided from payments made under this section as follows:
(A) FINANCIAL ASSISTANCE.-
(1) …funds received by an eligible grantee from a payment made under this section shall be used to provide financial assistance to eligible households, not to exceed 18 months, including the payment of-
(i)   rent;
(ii)   rental arrears;
(iii) utilities and home energy costs;
(iv) utilities and home energy costs arrears; and
(v)  other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, as defined by the Secretary.

...

(f) DEFINITIONS.-ln this section:
…
(2) ELIGIBLE HOUSEHOLD.-The term "eligible household" means a household

11

First Amended Complaint

of 1 or more individuals who are obligated to pay rent on a residential dwelling and with respect to which the eligible grantee involved determines that--
(A) 1 or more individuals within the household has (i) qualified for unemployment benefits; or
(ii) experienced a reduction in household income, incurred significant costs, or experienced other financial hardship during or due, directly or indirectly, to the coronavirus pandemic;
(B) 1 or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability; and
(C) the household is a low-income family (as such term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b)).

15 U.S.C. §§ 9058a(d)(1) & (f)(2).

31.    Treasury's final grant terms for Round 1 funding provide, among other requirements:

1. Use of Funds. Recipient understands and agrees that the funds disbursed under this award may only be used for the purposes set forth in Section 501 of Division N of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) (referred to herein as "Section 501").

2. Repayment and reallocation of funds.
a. Recipient agrees to repay excess funds to Treasury in the amount as may be determined by Treasury pursuant to Section 501(d). Such repayment shall be made in the manner and by the date, which shall be no sooner than September 30, 2021, as may be set by Treasury.

…

8. Compliance with Applicable Law and Regulations.
a. Recipient agrees to comply with the requirements of Section 501 and Treasury interpretive guidance regarding such requirements. Recipient also agrees to comply with all other applicable federal statutes, regulations, and executive orders, and Recipient shall provide for such compliance in any agreements it enters into with other parties relating to this award.
b. Federal regulations applicable to this award include, without limitation, the following:
        …
        v. Recipient Integrity and Performance Matters, pursuant to which the award term set forth in 2 C.F.R. Part 200, Appendix XII to Part 200 is hereby incorporated by reference.
        …

9. False Statements. Recipient understands that false statements or claims made in connection with this award may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law.

…

13. Protections for Whistleblowers.
a.   In accordance with 41 U.S.C. § 4712, Recipient may not discharge, demote, or otherwise discriminate against an employee as a reprisal for disclosing information

12

First Amended Complaint

to any of the list of persons or entities provided below that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract (including the competition for or negotiation of a contract) or grant.

b.  The list of persons and entities referenced in the paragraph above includes the following:

      i.    A member of Congress or a representative of a committee of Congress;
      ii.   An Inspector General;
      iii.  The Government Accountability Office;
      iv.  A Treasury employee responsible for contract or grant oversight or management;
      v.    An authorized official of the Department of Justice or other law enforcement agency;
      vi.  A court or grand jury; and/or
      vii. A management official or other employee of Recipient, contractor, or subcontractor who has the responsibility to investigate, discover, or address misconduct.

U.S. DEPARTMENT OF THE TREASURY, Emergency Rental Assistance (ERA1), *Award Terms and Conditions*, ¶¶ 1, 2, 8, 9 (March 26, 2021).

32.    The ERA Round 2 funding grant terms provide similar requirements:

1. Use of Funds. Recipient understands and agrees that the funds disbursed under this award may only be used for the purposes set forth in subsection (d) of section 3201 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2 (March 11, 2021) ("Section 3201") and any guidance issued by Treasury regarding the Emergency Rental Assistance program established under Section 3201 (the "Guidance").

...

10. False Statements. Recipient understands that false statements or claims made in connection with this award is a violation of federal criminal law and may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law.

...

15. Protections for Whistleblowers
a. In accordance with 41 U.S.C. § 4712, Recipient may not discharge, demote, or otherwise discriminate against an employee as a reprisal for disclosing information to any of the list of persons or entities provided below that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract (including the competition for or negotiation of a contract) or grant.

U.S. DEPARTMENT OF THE TREASURY, Emergency Rental Assistance (ERA2), *Award Terms and*

13

First Amended Complaint

*Conditions*, ¶¶ 1, 10, 15 (May 7, 2021).

33. The Government provided substantial guidance to grantees on how to prevent fraud in the ERAP, and the steps required to ensure grant funds were provided only to eligible recipients. Among those included are ERA Frequently Asked Questions (FAQs) that provide:

> ERA funds may be used for rent and rental arrears. How should a grantee document where an applicant resides and the amount of rent or rental arrears owed?
>
> Grantees must obtain, if available, a current lease, signed by the applicant and the landlord or sublessor, that identifies the unit where the applicant resides and establishes the rental payment amount. If a household does not have a signed lease, documentation of residence may include evidence of paying utilities for the residential unit, an attestation by a landlord who can be identified as the verified owner or management agent of the unit, or other reasonable documentation as determined by the grantee. In the absence of a signed lease, evidence of the amount of a rental payment may include bank statements, check stubs, or other documentation that reasonably establishes a pattern of paying rent, a written attestation by a landlord who can be verified as the legitimate owner or management agent of the unit, or other reasonable documentation as defined by the grantee in its policies and procedures. …

U.S. DEPARTMENT OF THE TREASURY, *Emergency Rental Assistance, Frequently Asked Questions* (Rev. 8/25/21), Question 5.

34. The Legislature subsequently revised state law and, as a result, local jurisdictions that received block grants had additional time to obligate their rental assistance funds before HCD could begin to reallocate unused funds in advance of the federal September 30, 2021 deadline.

35. Specifically, the amended law required state grantees to obligate at least 65 percent of their Round 1 block grant funds by August 1, 2021. State grantees that failed to meet this requirement were required to repay any unused block grant funds not obligated or spent at that time. HCD could then reallocate those funds to other eligible local jurisdictions based on certain factors, such as unmet need. This reallocation process allowed California to obligate as much rental assistance funding as possible to eligible households before the federal deadline of September 30, 2021.

36. On October 25, 2021, the Deputy Secretary for Treasury stated: "As I wrote last month, this statutory reallocation process is a critical step towards ensuring additional funds are made available to grantees with a proven capacity to deliver ERA in jurisdictions where families

First Amended Complaint

remain at serious risk of eviction or housing instability. Treasury will begin identifying excess funds for potential reallocation in mid-November. As funds become available for reallocation, they will be distributed in tranches…." Letter from Adewale O. Adeyemo, Deputy Secretary of the Treasury, Dept. of the Treasury, to Emergency Rental Assistance (ERA) Grantee (Oct. 25, 2021), available at https://home.treasury.gov/system/files/136/Deputy-Secretary-Adeyemo-ERA-Program-Grantee-Letter-20211025.pdf.

**B.      False Claims Act**

37.      The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(l), provides for the imposition of treble damages and civil penalties against a defendant for, *inter alia*, knowingly submitting or causing the submission of false or fraudulent claims for payment to the Government. When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law. Government programs require compliance with these certifications as a material condition of both participation in the programs and receipt of payment, and claims that violate these requirements are false or fraudulent claims under the FCA.

38.      The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 ("FERA") enacted May 20, 2009, provides, in relevant part:

Liability for Certain Acts. (1) In General—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), … or (G);

… or

(G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States for a civil penalty of not less than [currently $12,537] and not more than [currently $25,076] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

15

First Amended Complaint

31 U.S.C. § 3729(a)(1).  The FCA further provides:

> Actions by Private Persons. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

## V.  HORNE'S REPRESENTATIONS AND CONTRACTUAL REQUIREMENTS

39.    As authorized by the federal grant provisions and state law, HCD contracted with Horne to implement and administer the State's rental assistance program. State law required that Horne have sufficient capacity and experience to manage the State's rental assistance program and distribute funding to eligible applicants. Cal. Health & Safety Code §§ 50897.3(a)(1) & 50897.3.1(a)(1); *see also id.* §§ 50897.2(f) & 50897.21(f). In addition, Horne made significant representations about its resources and planned work to obtain the ERAP contract in California and elsewhere.  HCD entered into a contract with Horne for ERAP services on March 4, 2021, and Horne started accepting applications in California by March 15, 2021, as the law required. From the outset, Horne knowingly failed to comply with ERAP requirements and its own representations.

### A.    Horne's Response to Request for Proposal and Bid

40.    In Horne's Response to Request for Proposal ("Bid"), Horne made several representations regarding its ability to administer ERAP and the specific measures that Horne would implement:

- "QA/QC Team Reviews Applications/Eligibility Determinations" would be ready to handle ERAP applications within two weeks of the bid acceptance in March 2021. Bid at 8.

- "100% of all applications are audited by internal quality assurance teams for compliance to validate the submission." *Id.* at 231.

- "Our system provides quality assurance dashboards and audit management tools to ensure disbursements are made to qualified recipients. The system is built with compliance at every step to avoid fraud, waste, and abuse." *Id.* at 243.

- "Our system contains checks and balances to prevent duplication of address. Each application is tied to an address and duplicate addresses cannot be added within the system." *Id.* at 244.

- "As reviews are completed, all notes, conclusions, and details will be saved in the audit log." *Id.* at 244.

16

First Amended Complaint

- "In the event of identified fraud, waste and abuse, our program director will notify HCD for next steps." *Id.* at 245.

- "Our approach will be tailored to ensure HCD's vision for prioritization is executed in accordance with SB 91 and the federal Consolidated Appropriations Act, 2021." *Id.* at 245.

- "HORNE's automated calculations are tailored to Treasury guidance and SB 91. Our Fund Disbursement portal incorporates automated calculation based on information submitted by the landlord or tenant to arrive at the eligible payment award." *Id.* at 248.

- "In addition to payment controls, HORNE's eligibility tool automatically assigns unique identifiers for landlords and tenants that dramatically reduce the potential for fraud. For example our application portal/tool requires that each landlord and/or tenant provides a unique: email address, tax ID number, and property address. Property addresses are validated with USPS integration in the portal to confirm property location and veracity. Our automated controls are supplemented by the QC team, which leverages data analytics to identify repetitive data trends that may indicate attempted fraud such as sequential tax ID numbers, duplicative or sequential phone numbers, or duplicative tenant and/or landlord names. Our manual processes enhance payment quality and protect tax payer funds in accordance with Treasury's expectations." *Id.* at 250.

41. The State of California relied upon these representations when it accepted Horne's Bid in March 2021.

**B.     Horne's Contract and Amendments**

42. Under its contract and amended contract with HCD, Horne is responsible for accepting and reviewing all rental assistance applications, including determining eligibility, and disbursing benefit funds to approved applicants for the 57 jurisdictions participating in HCD's state rental assistance program. Horne also contracted directly with other local jurisdictions within California, and with state and local jurisdictions in other states.

43. In its amended contract with HCD, among other specific agreements to accept and review all rental assistance applications, Horne agreed to the following:

A. The Contractor will provide and oversee the staffing, technology, banking and overall Program delivery required to properly disburse federally-funded HAP (housing assistance payments) on behalf of low income renters across the State, pursuant to the U.S. Emergency Rental Assistance Program outlined in the Act and Chapter 17 of SB 91.

Based on current projections, it is possible that the Department may receive ~~between 750,000 and 1 million~~ at a minimum of 1,700,000 applications. …

The Contractor will respond to inquiries, accept, and review applications, and

17

First Amended Complaint

determine eligibility based on the requirements of the Act and SB 91, any rules or guidance promulgated by the U.S. Department of the Treasury, and all other applicable federal or state laws. It is the Contractor's responsibility to remain current on all such requirements. The number of applications, level of funding, and households served are subject to change and could vary significantly based on a wide variety of factors. *However, the Contractor will be responsible for delivering all necessary services to properly disburse the funding available in compliance with the applicable rules and laws.    ...*

…

B.    Case Management

The Contractor shall develop Application Review Procedures that will include the process for case management staff and supervisors to review applications and documentation, *verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments* under the oversight of HCD. This will include developing process flow diagrams, policies and procedures, and other documents as necessary. …

1)  Case managers will perform a Primary Review to determine applicant eligibility as determined by the Act, SB 91, and based on the eligibility criteria agreed upon with HCD. …

….

3)  *The Contractor is responsible for ensuring that no duplicate payments are issued and may be held financially responsible for duplicate payments or overpayments that must be recaptured by the Contractor.* The Contractor will, at a minimum, ensure that:
a)    No individual is able to submit and have approved more than one application to the Program on behalf of the same eligible household over the same time period;
b)    No individual who submits an application is also listed as a household member on another application;
c)    No individual is counted as a household member on more than one application;
The landlord and the tenant are not the same person. The Contractor will, at a minimum, be expected to cross-reference names, addresses and social security numbers (if available) of applicants and household members. It is anticipated that the Contractor's technology solution (see requirements below) will automate this function and flag duplicate applications to the greatest extent possible. …

5)  *The Contractor will be responsible to ensure that its services rendered include responsibility for implementing measures and systems to prevent the illegal and improper payment of funds (hereafter Wrongful Payments) to putative tenants or landlords (hereafter Wrongful Recipients).* This must include measures, that among other matters, prevent fraud resulting from: tenant applicants; landlord applicants; collusion or cooperation among tenants, landlords and third parties; intrusion into the Contractor's technological and evaluation system and process; and intrusion into the payment system or methodology. The Contractor will be required to indemnify, defend and save harmless the State, HCD, their officers, agents and employees from any and all claims and losses accruing or resulting from Wrongful Payments, whether resulting from the intentional misrepresentation, negligent misrepresentation, or deceit of the Wrongful Recipients, Contractor or its agents,

18

First Amended Complaint

or any other third party.

Contract, State of California - Department of General Services, Standard Agreement, Agreement No. 19-CDBGDR17-001-A (Rev. 4/27/21), at Exhibit A (Scope of Work), §§ 5(A) & 6(B), available at: https://www.documentcloud.org/documents/21067609-20-20-015_a2_std213_executed_combined (strikeout in original and emphasis added) (the "Contract").

44.    Thus, Horne received significant federal funding and was required to build a management operation capable of achieving each of Horne's legal and contractual requirements. The contract explicitly assigns responsibility to Horne for ensuring that ERAP is deployed in compliance with federal law, including the statutory requirements regarding eligible households and landlords.

## **VI.  THE FRAUD**

45.    Horne has engaged in a pattern and practice of failing to comply with ERAP requirements, set forth in grant provisions, contracts, and related statutes, and then concealing its conduct. By doing so, Horne has continued to participate in ERAP and receive substantial Government funds. Instead of complying with those legal requirements, however, Horne has knowingly failed to meet its representations and responsibilities, as discussed below.

46.    As expected by the Government, numerous fraudsters sought to divert ERAP funding, including through submitting false ERAP applications, by posing as eligible owners/landlords, tenants, or both, using fake identities, addresses, and/or supporting documentation, etc. While some highly-sophisticated fraudsters may have been capable of creating realistic yet falsified ERAP applications, the majority of fraudulent applicants relied instead on submitting low-quality falsifications, such as using completely fabricated identities and addresses that would not match any real people or places, and by using poorly falsified supporting documentation, including fake leases, fake identifications, and the like. Had Horne provided the promised resources and motivation to administer the ERAP, as it represented and then contracted to provide, substantial diversion of funds through fraudulent applications would have been prevented.

47.    As discussed above, the State of California amended the existing contract with

19

First Amended Complaint

Horne to pay an additional $1,546,566,405.00, which included both the funding for Horne's ERAP operations and the funds to be paid to eligible landlords and tenants. Contract, at 1. However, seeking to maximize its own profits, Horne cut corners and failed to perform, including by creating a supposed "fraud detection team" that was ineffective and without necessary resources. Horne's failure to maintain even an even minimally successful fraud detection program allowed innumerable fraudsters to divert Government funds. As a result of Horne's conduct, California's ERA program has paid out millions of federal funding dollars based on ERAP applications that were inappropriately approved by Horne, causing the Government to sustain losses and potentially depriving legitimate ERAP applicants of funding necessary to secure housing throughout the pandemic.

48.     Under its contract, upon failing to ensure that only eligible recipients receive ERAP grant funds, Horne can be held financially responsible to recapture the wrongfully paid funds and to indemnify the state for such wrongful payments. Contract, Exhibit A, Section B(3), (5). By allowing payments to ineligible recipients, and then knowingly concealing the extent of such payments and disputing the ineligibility of recipients, Horne has further violated the FCA by concealing and improperly avoiding an obligation to pay money to the Government.

49.     Indeed, among Horne's other failures, in addition to its inadequate and non-compliant application review and fund disbursement process, Horne has also knowingly failed to comply with the ERAP requirements included in its contract to provide complete and accurate reports. *See, e.g.*, Contract at Exhibit A, Part D(1)(e) ("The Contractor must track payment distributions and report to HCD in writing per the Program requirements."). Instead, Horne has hidden its conduct in its various reports so that federal and state auditors would remain unaware of the number of clearly fraudulent ERAP applications Horne has paid. In doing so, Horne has caused the states to submit false certifications to the Government that the funds were obligated to eligible households in compliance with program requirements. *See* Exhibit B (template Obligated Funds Certification).

50.     As discussed above, as part of its Bid, Horne's proposal summary claimed that "QA/QC Team Reviews Applications/Eligibility Determinations" would be ready to handle ERAP

First Amended Complaint

applications within two weeks of the bid acceptance in March 2021. Bid at 8. Horne's Bid also stated that "100% of all applications are audited by internal quality assurance teams for compliance to validate the submission." *Id.* at 231. However, as discussed herein, Horne repeatedly failed to create an adequate fraud review team even through February 2022, let alone a team that could audit "100% of all applications" eleven months prior in March 2021. Had the Government been aware of Horne's decision not to create and maintain an adequate fraud detection program, the Government would not have allowed payments to Horne, and would have demanded repayment of the federal funds paid to it.

51.    Similarly, the ROALs also knowingly failed in their duties to assist in fraud prevention and to report fraud to HCD and Horne. The ROALs collected their portions of the federal funds and collected their administrative fees but disregarded the fraudulent ERAP applications in their localities, further exacerbating the housing crisis among their populations.

**A.    Horne's Fraudulent Non-Compliance**

52.    Horne only provided cursory reviews of ERAP applications, often relying on requests for information to HCD. During Relator's time at HCD, she found an alarming, consistent problem: Horne failed to secure and utilize widely available resources to conduct third-party verification of eligible tenants and landlords. Furthermore, Horne failed to consistently flag applications as potentially fraudulent, either because Horne staff ignored numerous signs of fraud or because Horne lacked the staff to conduct such reviews and instead neglected or skimmed over the review process.

53.    In December 2021, during a routine presentation by Horne Senior Manager Holly Smith to the HCD team, Horne's slideshow included a statement that "PeopleMap training scheduled today with 25 staff identified for licensing." WestLaw's PeopleMap subscription service provides verification of landlords and tenants. However, although Horne had "staff  identified for licensing," it never obtained any PeopleMap licenses for its team.  Horne later reported to HCD that it was not feasible to purchase the PeopleMap contracts. Horne instead chose to consider DataTree licenses, which provided much more cursory data than PeopleMap. While Horne eventually obtained DataTree licenses, that was accomplished only in February 2022, a month

First Amended Complaint

before ERAP was scheduled to close applications.

54.     Horne relied on post-hoc, third-party audits after it had already approved for payment or actually paid out ERAP funds on fraudulent applications. Horne's conduct demonstrates its actual knowledge, deliberate ignorance, or reckless disregard for fraud screening at an appropriate point in the process, *before* approval for payment or payment of the ERAP funds.

55.     On December 20, 2021, Horne Manager Christine Waldron sent an e-mail (attached as Exhibit C) to HCD's ERAP Staff Services Manager I Sandra Gallagher requesting: "Can you review your magical resources to determine if this LL [landlord] is living at the home? Something 'off' about this file that I want to verify through your resources." Exhibit C. The fact that a Horne management employee was unable to utilize Horne's own resources to check the residence of a landlord applicant -- because those resources did not exist at Horne -- demonstrates its knowing failure to protect Government funds by filtering and excluding fraudulent ERAP applications. Horne management was well aware that Horne had failed to employ adequate resources to confirm whether applicants were eligible tenants or landlords.

56.     In August 2022, SCO published a report regarding HCD's oversight of Horne's administration of ERAP, which was fraught with non-compliance. *See* CALIFORNIA STATE CONTROLLER, *California Department of Housing and Community Development - Review Report - State Rental Assistance Program* (August 2022), available at https://www.sco.ca.gov/Files-AUD/08_2022CADeptofHousingAndCommunityDevelopment_SRAP.pdf (herein the "SCO Review Report"). As part of its review, which may have been initiated as a result of Relator's whistleblower complaint to the California State Auditor in February 2022, SCO audited a random sample of approved ERAP applications submitted between April 14, 2021 and December 31, 2021. *Id.* at 8. SCO reviewed whether those applications complied with all statutory requirements and determined whether payments had been proper. *Id.* at 7. Of the sample reviewed (the size was not disclosed), SCO determined that Horne had approved at least 488 potentially fraudulent ERAP applications during that time period, totaling $18.1 million. *Id.* at 8. At the time of SCO's involvement, Horne had already paid out $7 million of that total -- and would have paid out an additional $11.1 million had SCO not prevented further disbursement. *Id.*

First Amended Complaint

57.    In addition to the audit above, SCO also reviewed 1,007 of the 9,911 payments from Horne to applicants between April 26, 2021 and June 28, 2021. *Id.* at 14. Of those 1,007 transactions, SCO found that: 992 of Horne's quality assurance/quality control checklists were incomplete (98.5%); 967 of  Horne's case management checklists were incomplete (96%); 309 transaction amounts had been incorrectly calculated by Horne staff and subsequently approved by a separate Horne team (30.6%); 199 failures by Horne to "[v]erify that lease and rent amounts are eligible and accurate" resulted in erroneous payments (19.8%); and at least 165 transactions were overpayments (16.4%). *Id.* at 14–15. In other words, Defendants' consistent failure to follow their *own* policies and procedures resulted in substantial overpayments to non-eligible applicants. SCO also noted that the State of California may be unable to recover the disbursed funds because numerous recipients had used false identities. *Id.* at 15.

58.    The SCO report included several additional findings:

- Horne "did not consistently perform the internal control procedure of requesting a death match verification for each application before approving the application for payment." *Id*. at 17.

- Horne "lacked adequate internal controls over the application review process … to prevent duplicate applications from being processed, to prevent duplication of benefits, or to prevent other errors resulting in improper payments" based on applications also submitted to cities or counties that elected to self-administer ERAP funds (Option C jurisdictions). *Id*. at 19.

- Horne continuously added or subtracted to the weekly pay file submitted to HCD, and Horne failed to reconcile the pay files to the amounts it actually disbursed to each applicant or the number of applicants paid. *Id.* at 22.

- Horne failed to respond to or document its corrections to the errors and issues identified by SCO and HCD. *Id.* at 29.

- Landlord and tenant documentation requirements were insufficient "to mitigate the risk of fraud and misuse of funds." *Id.* at 31.

59.    Indeed, SCO's review regularly showed problems with the lack of documentation

23

First Amended Complaint

requirements. On November 10, 2021, Amy Liu, an auditor in the State Controller's Office, sent an e-mail to HCD staff identifying problems with applications, including "[f]ake IDs, altered utility bills … out of state IDs … [a]pplications all provided the same documentation … [s]ignature of [the landlord] appears the same even though [the landlord's] name is different … [t]enants are providing only [identifying information] all in a PDF format that can be edited … documentation from a third-party is not being provided to substantiate the individual actually lives at the address … there are [landlord] case IDs that are all associated with one [landlord] name," etc. She concluded that "the lack of documentation requirements from both the [landlord] … and tenants … is allowing fraud to occur and go undetected." Ms. Liu also noted that the audit files she reviewed had cases marked with "Approved: Pending Payment" status, but actually "these applications have been PAID," demonstrating a severe discrepancy between Horne's reporting to the state and what Horne had actually paid on fraudulent applications.

60.    As discussed further below, the Relator assisted with SCO's review of sample applications in December 2021 and obtained additional first-hand knowledge of Defendants' disregard of the ERAP eligibility requirements.

**B.    Examples of Fraudulent Applications Paid by Horne**

61.    Relator frequently discussed fraudulent ERAP applications with her managers and co-workers in person and through using Microsoft Teams. Soon after she was hired and began work on ERAP, Relator and her co-workers discussed that it "felt like Horne was throwing money out of a plane and hoping that it landed on someone who needed it," or very similar words to that effect.

62.    On December 21, 2021, Lorrie Blevins (ERAP Section Chief of HCD's Division of Federal Financial Assistance) requested the Relator's assistance in reviewing cases that had been flagged by the SCO as potentially fraudulent. Notably, Horne disputed SCO's characterization of the listed cases, and instead asserted that those applicants were eligible landlords and households that had satisfied all application requirements. Thus, Horne refused to recapture the funds that had already been paid to those applicants.

63.    Laurissa Wells and Julian Garcia (each a Housing and Community Development

24

First Amended Complaint

Representative II on Relator's team under Ms. Gallagher) assisted the Relator with her review. As demonstrated in the redacted and excerpted Exhibit D, discussed in the "Findings" column, numerous cases flagged by SCO, *after ERAP payments had been made by Horne*, showed overt fraud or clearly insufficient documentation to establish the identities of both landlords and tenants, as well as the existence of any rental agreement. Three examples discussed below show the complete lack of required work performed by Horne.

64.    On November 10, 2021, Horne approved tenant case ID 682XXX and paid $50,500.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

- The landlord's Neighborly username did not match the landlord applicant's name.

- DataTree showed that the landlord applicant was not the owner of record for the requested three-month rental assistance period.

- DataTree and Zillow indicated that the property was constructed more than a year after the purported lease start date. In addition, a separate application was submitted for the same property that also included a lease starting prior to the property's construction.

- The supporting documentation (eviction notice, W-9, landlord application, lease, etc.) included numerous inconsistencies.

65.    On November 16, 2021, Horne approved tenant case ID 641XXX and paid $52,500.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Yet the Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

- The tenant's California-issued drivers' license ("CADL") was invalid, did not list the rental property's address although it was issued during tenancy period, and the signature did not match the lease.

- A landlord CADL was provided by tenant.

- The household size and members were inconsistently represented.

25

First Amended Complaint

- Both the tenant and landlord applications were submitted with the same e-mail address and within an hour of each other.

66.    On November 30, 2021, Horne approved tenant case ID 547XXX and paid $50,310.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

- DataTree showed that the owner of record did not match the owner names provided on the lease document.

- The address listed in the lease document was invalid.

- The property was sold during the lease and rental assistance period.

- There was no handwritten or validated electronic signature for the landlord on *any* of the documents submitted.

- The supporting documentation (lease, tax documents, etc.) included numerous inconsistencies.

67.    In each of the examples discussed above, and in many other instances, Relator summarized her findings regarding irregularities in the case, compiled supporting documents regarding the findings, and packaged the files for transfer to the HCD Legal Affairs Division where a finding of fraud could be made.

68.    On December 23, 2021, after a separate review by Relator, she sent an e-mail to her team to notify them of obvious and blatant fraud markers found in another application, including that the names of the tenant and landlord were mismatched throughout the documentation and all of the signatures were typed without any third-party verification (such as DocuSign). Even a cursory review of the lease documents should have immediately flagged this particular application as fraudulent, but Horne nevertheless paid out $54,500 to the purported landlord on September 23, 2021.

69.    On December 29, 2021, Laurissa Wells sent a message to the team that one of the cases she reviewed included a "'lease' that stated the 'tenant' was to pay the lessor $72,000 over a 3 year period, in monthly increments!" Relator and Julian Garcia (Housing and Community

26

First Amended Complaint

Development Representative II) understood that such a lease would be ridiculous: leases are typically set for year-long terms and specify monthly payments, not a total amount across multiple years.

70.    On January 13, 2022, Julian Garcia sent an e-mail to the team to inform them of fraudulent irregularities in an application that he was reviewing. The Rent Relief letter (notifying a tenant of the status of their application) was returned with a handwritten note that "This person does not own, rent or live at this property." Mr. Garcia reviewed the application and supporting documentation. He found that according to DataTree, the owners of the purportedly rented property and the landlord's reported residence did not match the names of either the tenant or the landlord listed on the ERAP application. The false tenant and landlord applications were also sent from the same IP address, indicating that both applications had been submitted from the same location. None of these issues had been flagged or reported by Horne during its supposed audit of ERAP applications.

71.    In early February 2022, Horne noted the following in its routine presentation: "Third-party validation tool update: Data Tree - Currently working on getting month-to-month subscriptions for fraud review team." Horne had obtained no Data Tree licenses before this time, and only obtained 50 licenses *by the end of February 2022*. As discussed above, the ERAP was scheduled to close all applications by the end of March 2022, less than two months after the date of this presentation. Of note, after Horne obtained the long overdue licenses, there was a dramatic increase in application denials in April 2022. SAN FRANCISCO CHRONICLE, Bob Egelko, *California can't deny pending applications for rent relief while its denials are under review, judge says* (July 12, 2022), available at https://www.sfchronicle.com/bayarea/article/California-must-grant-all-pending-applications-17301012.php. The Relator believes that the increase in denials resulted, at least in part, from Horne finally having access to DataTree to screen ERAP applications for fraud. Horne's refusal to obtain such a basic resource for its fraud review team until the very end of the program illustrates Horne's fraud in receiving significant Government payments while failing to perform the tasks Horne had agreed to undertake.

72.    The State of California relied heavily on Horne to detect and prevent ERAP fraud,

27

First Amended Complaint

as required by Horne's contract. Yet even limited review of applications by HCD, the California State Auditor, and SCO showed that Horne regularly failed to detect obviously fraudulent ERAP applications with numerous and overlapping markers of fraud, and to prevent payment on those applications.

### C.    Losses to the Government and Payments to Horne

73.    Horne's conduct caused significant financial losses to the Government and siphoned much-needed resources from California landlords and tenants relying on ERAP payments. A January 2022 agenda for an ERAP check-in meeting with Horne and HCD noted that ERAP had disbursed $1.78 billion by January 24, 2022. A month later, the agenda for the check-in meeting noted that ERAP had disbursed $2.2 billion by February 24, 2022. Horne's blatant disregard for its obligation to screen for fraud has likely caused hundreds of millions of dollars in damages to the Government. Per Horne's contract, such damages should have been repaid to the Government.

74.    Horne's contract to administer ERAP for $51.7 million was increased to at least $146.8 million after the State of California received Round 2 funding approval. The government would not have paid such fees to Horne if it had known that Horne would not comply with the ERAP legal and grant requirements.

75.    As discussed above, Horne's fraud caused the State of California and HCD to falsely certify to the Treasury that Round 1 funding had been obligated appropriately. As grantee, the State of California relied upon Horne's reports to HCD to determine whether Round 1 funding had been appropriately obligated by September 30, 2021. Had the State of California failed to meet that deadline, it would have been required to return any unobligated Round 1 funding to the Treasury so that it could be reallocated to other grantees. Horne's reports to HCD were made without any legitimate effort to ensure that ERAP funds were paid only to eligible landlords and households. If not for Horne's material omissions and misrepresentations in allowing fraudulent diversion of Government funds, the State of California would not have falsely certified to the Treasury that the Round 1 funding had been obligated in compliance with federal law.

76.    Horne's deceit in administering the ERAP grant program -- marked by its actual

28

First Amended Complaint

knowledge, deliberate ignorance, and/or reckless disregard as to its fraudulent misrepresentations, omissions, and failures -- lead to a significant loss of Government funds. Unfortunately, the context in which grant payments were disbursed by Horne may have allowed Horne's knowing failures to continue unabated. Horne and the states with whom Horne contracted, including California, were financially incentivized to ignore ERAP guidelines and permit distribution of federal funds to ineligible payees. As discussed above, due to the pandemic and ERAP funding measures, additional federal funds would be received by the states, and by Horne, if Horne was successful in depleting the first level of funding received from the Treasury. As such, there was little incentive to protect federal funds from fraudulent abuse, and possibly inadequate oversight or resistance to Horne's conduct.

77.    The Relator consistently complained to HCD management about Horne's performance and its lack of attention paid to fraudulent applications for ERAP funding. Her complaints went unheeded. Eventually the Relator filed a whistleblower complaint on February 25, 2022 with the California State Auditor in an attempt to prevent the on-going fraud. Shortly thereafter, the Relator was terminated. Geoffrey Ross, deputy director of HCD who managed ERAP, has defended the amount of money paid to Horne, stating that the increased funding in Round 2, "even though it's a sizeable amount of money," will be helpful "to actually now deploy additional resources." Mr. Ross has left HCD and now works for Horne as Director, Government Services.

**D.    ROALs' Participation in the Fraud**

78.    As discussed above, the ROALs were required by federal and state law to assist HCD and Horne in fraud prevention. *See, e.g.*, 15 U.S.C. § 9058a (Round 1 funding); 15 U.S.C. §§ 9058a(d)(1) & (f)(2) (Round 2 funding); Cal. Health & Safety Code 50897.4(a)–(c); *see also* U.S. DEPARTMENT OF THE TREASURY, *Emergency Rental Assistance, Frequently Asked Questions* (Rev. 8/25/21), Question 5 (guidance regarding applicant verification options). However, the ROALs failed to take any meaningful actions to prevent fraudulent disbursements of ERAP frauds within their jurisdictions. Instead, they accepted their portion of the federal funds, accepted the additional administrative fee, and knowingly disregarded their fraud prevention

29

First Amended Complaint

duties.

79.    HCD hosted regular Zoom meetings for representatives from Option A localities. Relator Widen and others were present in those meetings when questions about the ROALs' duties and possible activities were discussed. Despite the importance of fraud prevention, and the administrative fee paid to the ROALs to ensure that work, upon Relator's information and belief, fraud preventative steps were not taken by the ROALs.

80.    Most of the Option A localities already had the basic infrastructure in place to prevent many of the fraudulent schemes that caused the loss of federal ERAP funding, either directly or through partnership with municipal or quasi-municipal entities (local housing authorities, local community development departments, etc.).

81.    For example, by having "boots on the ground" access and knowledge of local neighborhoods, large apartment buildings, multi-family housing complexes, etc., the ROALs were in a position to verify that ERAP funding recipients were eligible residents within the community's rental housing units. The ROALs could and should have provided important fraud prevention assistance in ensuring that the information in ERAP applications actually matched local addresses and that rental housing units existed at those addresses. Indeed, the local community development departments or other local agencies of many ROALs own or have access to ARCView GIS systems that could easily have facilitated simple queries regarding property location and development characteristics.

82.    Moreover, many ROALs own or have access to a program called "Accela," a cloud-based software for government agencies that can also facilitate simple queries regarding property ownership. The ROARs and other Option A localities could easily have verified landlord ownership information when an ERAP applicant claimed to be a landlord owner.  In some cases, property managers acting as landlords could also have been easily verified through previous permit history in Accela available for parcels.

83.    If the ROALs had reviewed available local data, they could have flagged suspicious or outright fraudulent applications and provided that information to Horne and/or HCD. They could then have assisted with further investigation, as needed. Instead, Horne and the ROALs

30

First Amended Complaint

simply allowed payouts to countless fraudulent applicants.

84.    The ROALs' fraudulent conduct in failing to perform the duties they agreed to undertake in exchange for the ERAP funds and administrative fees, jointly and severally with Horne, caused substantial losses of ERAP funds and significant damages to the Government.

## VII. EMPLOYMENT ALLEGATIONS

85.    Widen consistently complained to HCD management about the fraud in the ERAP program and suggested things that could be done to catch and stop more of the fraud. She also complained to the State Auditor about the fraud on February 25, 2022. Her complaints and suggestions regarding the fraud included without limitation the following discussed below in paragraphs 86-94 and 97-98.

86.    Widen suggested methods that could be used to improve the verification of applicants' identities and the information applicants provided including without limitation through using an app that could detect whether a driver's license was valid by scanning the barcode on the back of the license, checking the authenticity of taxpayer ID numbers and 1099s provided by applicants with the IRS and/or appropriate State agency, and tracking data trends regarding identifications used for fraudulent applications. She complained about HCD's poorly designed "Housing is Key" Facebook website where applicants were confused as to what to do and were giving each other advice on what to do. This atmosphere was ripe for predators to ask applicants about their case information in order to provide "help," but they then could easily create duplicate applications to abscond rental fees for that address. Widen noticed inconsistencies in the verification process for ERAP applicants recommended by the federal treasury, the State's verification recommendations for Option B jurisdictions, the State's Administrative Plan verification process, and the verification process actually taking place on the State's "Housing is Key" website. When Widen brought the inconsistencies to HCD's attention, she was told that Horne determines what identity verifications are required and the inconsistency between the documents was not important.

87.    On February 3, 2022 Widen identified a purported California driver's license for "Jennifer Amy Lorie" as fake. The expiration date was not five years from date of issuance and

31

First Amended Complaint

part of the signature image below the photo was truncated. Widen had previously been told by Gallagher that an expiration date that was not five years from the date of issuance and a truncated signature on a driver's license both meant the license was fake.

88. Then, on February 24, 2022 in a Microsoft Teams training meeting, Widen was trained by Deborah Harper on how to respond to ERAP Inbox inquires with Gallagher and Blevins observing the training. As part of this training, Widen was chastised for having identified the license as fake on February 3, 2022. Widen was told "We are not case managers, we cannot do fraud review on cases we are looking at to respond to an ERAP Inbox inquiry. You shouldn't be looking at case documents for Inbox status inquiries."

89. Widen was represented by District Labor Council (DLC) 787 of Service Employees International Union (SEIU) Local 1000. Prior to February 25, 2022, Widen had communicated with Ruth Ibarra, the President of DLC 787 about the fraud. On February 25, 2022 at 10:46 am, Widen emailed Ibarra:

> The fake DL I was chastised for noticing is in the attached document. The project is still being processed with no flag to the case per attached audit log. You can see from the fraud tracking sheet a lot of the cases simply don't have the landlord mat[c]hing property owner name. Also, sometimes we pay out on non-existent or vacant properties. This program is a disaster.

Besides Ibarra, Widen also meant to send this email to Pedro Leon, an SEIU Local 1000 union representative. However, by mistake, she instead emailed it to Pedro Galvao, HCD's Deputy Director for Legislation. At 10:51 a.m. on February 25, 2022, Galvao forwarded Widen's email to Deborah Harper, who as mentioned above had conducted Widen's training on February 24, 2022, and to defendant Geoffrey Ross, who as mentioned above was then the Deputy Director of Federal Programs at HCD, and who is now the Director of State and Federal Programs at defendant Horne. At 10:59 a.m. on February 25, 2022, Harper forwarded Widen's email to defendants Blevins and Gallagher.

90. At 11:14 a.m. on February 25, 2022, Ibarra emailed Widen: "You sent to the wrong Pedro." Widen then let Galvao know that she had emailed him by mistake. Galvao replied that he would disregard the email. He did not tell Widen that he had already forwarded her email to Harper

32

First Amended Complaint

and Ross.

91.    On February 25, 2022 at 12:28 p.m., Gallagher emailed Widen venting her displeasure at Widen over her emailing Ibarra and Galvao about the fraud:

> This is not appropriate and will not be tolerated. When you have concerns about the programs policies and procedures, you need to discuss them with your management team and follow the proper chain of command to address your concerns. Directly emailing a Deputy Director is not appropriate.
>
> Additionally, the Department has mechanisms in place to address these types of concerns through the See Something Say Something policy, which was provided to you earlier today.

92.    Widen emailed Gallagher back at 12:34 p.m. on February 25, 2022:

> Every concern has been addressed to you and/or Lorrie and fraud concerns have not been addressed at every step. **I have filed a whistleblower complaint to Auditor's Office.** It's far overdue. The amount of fraud and waste in this program is obvious and unconscionable and it has caused me no end of stress to be a witness to this day in and day out. I will look at the see something say something policy you reference below as well and make my concerns known. I will also call Risk Management. I have tried to work within our team for the concerns and it has not been effective.
>
> I sent the email to Pedro by mistake, and he said he would disregard the email when I let him know that. Ruth had asked another union member named Pedro to help me look at options and I had meant to cc him.
>
> I'm done with silently standing by as thousands go homeless for no reason with misappropriated money from this program. I've never seen anything like it and it's time for it to stop.

93.    At 12:37 p.m. on February 25, 2022, Gallagher forwarded to Blevins and to Rebecca Herzog, then a Classification and Consultation Manager in HCD's Human Resources Department, the email thread containing her 12:28 p.m. email to Widen and Widen's 12:34 p.m. reply. At 12:41 p.m., Herzog emailed back to Gallagher and Blevins: "I would not engage any further. She has avenues and we have provided those to her. She can do what she feels she needs to – we will stay the course with managing her performance. The Audit team will address her complaint as they see necessary."

94.    At 12:50 p.m. on February 25, 2022, Blevins disregarded Human Resources Manager Herzog's advice to "not engage further" and to "stay the course with managing her

33

First Amended Complaint

performance," and emailed Ross: "I would like to immediately lock Heather out of our share point files and Neighborly. She has forwarded a spread sheet which contains private and personal information to individuals outside of this program." Blevins also forwarded to Ross the email thread containing Gallagher's 12:28 p.m. email to Widen, Widen's 12:34 p.m. reply, Gallagher's 12:37 p.m. forwarding email to Herzog and Blevins, and Herzog's 12:41 p.m. reply. The spreadsheet to which Blevins' email referred was a fraud tracking sheet attached to Widen's 10:46 a.m. email sent to two individuals-- Ibarra, her union president, and by mistake to Galvao, HCD's Deputy Director for Legislation. Widen had every right to report the fraud to the union. Galvao had said he would disregard the email.

95. At 1:08 p.m. on February 25, 2022, Ross replied to Gallagher and approved her request to lock Widen out, so Widen was locked out of her entire HCD online account which she needed to do her job.

96. At 2:02 p.m. on February 25, 2022, Leyla Najmi, then HCD's Human Resources Chief, emailed Widen that she was being put on paid Administrative Time Off.

97. Widen completed the See Something Say Something form to which Gallagher referred in her email sent at 12:28 p.m. on February 25, 2022, and submitted it to Najmi, then HCD's Human Resources Chief. Widen discussed the fraud in the ERAP program in the See Something Say Something form.

98. HCD had an investigator, Lisa Comer, investigate Widen's conduct. Comer's April 6, 2022 report on her investigation lists Blevins as the complainant against Widen. Comer interviewed, among others, Blevins and Gallagher who informed Comer that Widen's statements about fraud in the ERAP program were outside the scope of her job duties. In the report, Comer wrote that Blevins told her:

> Blevins received an email on February 25, 2022 from Harper, an HCD ERAP consultant, alerting Blevins to the email sent by Widen to Galvao and Ibarra. Blevins stated that Widen was sending this email because she was upset over a fraud reporting issue. Blevins recalled multiple conversations that she and Gallagher had with Widen about her role in fraud investigations, specifically that the HCD ERAP team was not responsible for fraud reviews, but that there were systems and processes in place to gather the information and report the fraud.

34

First Amended Complaint

Comer wrote that Gallagher told her:

> Widen advised Gallagher at an earlier date that the driver's license she eventually sent to Galvao, and Ibarra was fraudulent. When Widen brought the concerns forward, Gallagher reminded her that it was not part of their job duties to identify the fraud and that it would be reviewed by Horne who had specialized training in fraud prevention.

99.     On April 15, 2022, Leyla Najmi, then HCD's Human Resources Chief, issued a Notice of Rejection During Probation which went into effect on April 22, 2022 terminating Widen's employment.

## VIII. CAUSES OF ACTION

### Count I

### 31 U.S.C. § 3729(a)(1)(A)

### (Against Defendants Horne, ROALs and Does 1-20)

100.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

101.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

102.     Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

103.     The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

104.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

105.     Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $25,076), for each and every violation alleged herein.

First Amended Complaint

**Count II**

**31 U.S.C. § 3729(a)(1)(B)**

**(Against Defendants Horne, ROALs and Does 1-20)**

106.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

107.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

108.    Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

109.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

110.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

111.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $25,076), for each and every violation alleged herein.

**Count III**

**31 U.S.C. § 3729(a)(1)(C)**

**(Against Defendants Horne, ROALs and Does 1-20)**

112.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

113.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.,* as amended.

114.    By and through the acts described above, Defendants have knowingly conspired to commit violations of subparagraphs (A), (B), and (G).

115.    The Government, unaware of the conspiracy by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

36

First Amended Complaint

116. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

117. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $25,076) for each and every violation alleged herein.

**Count IV**

**31 U.S.C. § 3729(a)(1)(G)**

**(Against Defendants Horne, ROALs and Does 1-20)**

118. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

119. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.,* as amended.

120. By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government, and Defendants have concealed and improperly avoided an obligation to pay money to the Government.

121. The Government, unaware of the concealment by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

122. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $25,076), for each and every violation alleged herein.

**Count V**

**42 U.S.C. § 1983 for Damages**

**(Against Defendants Geoffrey Ross, Lorrie Blevins, Sandra Gallagher and Does 21-30)**

124. Plaintiff Widen realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

125. Defendants Geoffrey Ross, Lorrie Blevins and Sandra Gallagher are named in this count in their individual capacities.

37

First Amended Complaint

126.    The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of defendants sued herein as Does 21-30, inclusive, are unknown to Widen, who therefore sues said defendants by such fictitious names and will pray leave to amend this complaint together with appropriate charging allegations when the same have been ascertained. Widen is informed and believes and thereupon alleges that each of said fictitiously named defendants are responsible in some manner for the occurrences herein alleged, and that Widen's damages as herein alleged were proximately caused by their conduct.

127.    Widen's speech about fraud in the ERAP program including without limitation as discussed above in paragraphs 85-94 and 97-98 was on a matter of public concern and was uttered as a private citizen.

128.    Defendants caused Widen to be placed on administrative leave on February 25, 2022, and then rejected her during probation, thus effectively terminating her, in April 2022. In violation of the First Amendment of the United States Constitution and 42 U.S.C. § 1983, a substantial or motivating factor in causing them to do so was Widen's speech about fraud in the ERAP program including without limitation as discussed above in paragraph 85-94 and 97-98.

129.    As the proximate result of defendants' violation of 42 U.S.C. § 1983, Widen has suffered damages and is entitled an award therefor to be shown according to proof, including, without limitation, for past and future loss of income and benefits with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses.

130.    Defendants' violation of 42 U.S.C. § 1983 was malicious, oppressive, fraudulent, and done with reckless and conscious indifference to Widen's rights, and she is entitled to an award of punitive damages therefor to be shown according to proof.

131.    As the further proximate result of defendants' violation of 42 U.S.C. § 1983, Widen has had to hire attorneys and incur litigation expenses to prosecute this lawsuit and is entitled to an award of attorneys' fees and litigation expenses therefor to be shown according to proof.

38

First Amended Complaint

**Count VI**

**42 U.S.C. § 1983 for Injunctive Relief**

**(Against Defendants Geoffrey Ross, Lorrie Blevins, Sandra Gallagher and Does 21-30)**

132.    Plaintiff Widen realleges and incorporates by reference the allegations contained in paragraphs 1-123 and 126-128 as though fully set forth herein.

133.    Defendants Geoffrey Ross, Lorrie Blevins and Sandra Gallagher are named in this count in their official and individual capacities.

134.    Widen is entitled to injunctive relief including without limitation to require defendants to expunge her rejection during probation.

135.    As the further proximate result of defendants' violation of 42 U.S.C. § 1983, Widen has had to hire attorneys and incur litigation expenses to prosecute this lawsuit and is entitled to an award of attorneys' fees and litigation expenses therefor to be shown according to proof.

**Count VII**

**Negligence**

**(Against Defendants Horne and Does 1-20)**

136.    Plaintiff Widen realleges and incorporates by reference the allegations contained in paragraphs 1-123 as though fully set forth herein.

137.    Horne acted negligently in failing to find much of the massive fraud in the ERAP program, and in representing that it was acting with due care and finding the fraud. If Horne had not acted negligently, the massive fraud would not have occurred.

138.    It was reasonably foreseeable that as the proximate result of Horne's negligence, an employee of Horne's customer, the State of California, would blow the whistle on the massive fraud in the ERAP program and suffer retaliation. Whistleblowers commonly suffer retaliation.

139.    As the proximate result of Horne's negligence, Widen was put on administrative leave on February 25, 2022 and then rejected during probation, thus effectively terminating her, in April 2022. As the further proximate result of Horne's negligence, Widen has incurred attorneys' fees and litigation expenses to sue Ross, Blevins and Gallagher in Counts V and VI above.

140.    As the proximate result of Horne's negligence, Widen has suffered damages and is

39

First Amended Complaint

entitled an award therefor to be shown according to proof, including, without limitation, for past and future loss of income and benefits and reasonable attorneys' fees and litigation expenses incurred in suing Ross, Blevins and Gallagher with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses.

141.    Defendants' negligence was malicious, oppressive, fraudulent, and done with reckless and conscious indifference, and Widen is entitled to an award of punitive damages therefor to be shown according to proof.

### IX. PRAYER FOR RELIEF

WHEREFORE, Relator and Plaintiff Widen prays for judgment against Defendant as follows:

A.    That Defendants Horne and Does 1-20 cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

B.    That this Court enter judgment against Defendants Horne and Does 1-20 in an amount equal to three times the amount of damages sustained by the United States because of Defendants' actions, plus the maximum civil penalties available under the False Claims Act;

C.    That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

D.    That this Court order injunctive relief, including a permanent injunction enjoining Defendants Horne and Does 1-20, their agents, successors, and employees from engaging in each unlawful practice set forth above, and for such other injunctive relief as the Court may order;

E.    That Plaintiff be awarded damages to be shown according to proof against defendants Ross, Blevins and Gallagher in their individual capacities, and against Does 21-30, including, without limitation, for past and future loss of income and benefits with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses, and for punitive damages;

F.    That Plaintiff be awarded injunctive relief against defendants Ross, Blevins and Gallagher in their official and individual capacities, and against Does 21-30, including without

First Amended Complaint

limitation to require defendants to expunge her rejection during probation.

G.     That Plaintiff be awarded damages to be shown according to proof against defendants Horne and Does 1-20, including, without limitation, for past and future loss of income and benefits and reasonable attorneys' fees and litigation expenses incurred in suing Ross, Blevins and Gallagher, with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses, and for punitive damages;

H.     That Relator and Plaintiff be awarded all costs of this action, including attorneys' fees, costs and expenses; and

I.     That Relator and Plaintiff recovers such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator and Plaintiff hereby demands a trial by jury.

Dated: February 23, 2024

/s/ Michael A. Hirst
Michael A. Hirst, Esq.
Marisela Bernal, Esq.
Attorneys for Relator Heather Widen

/s/ Bruce Highman
Bruce Highman, Esq.
Attorney for Plaintiff Heather Widen

41

First Amended Complaint

Michael A. Hirst (CA Bar No. 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal (CA Bar No. 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, California 95616
P - (530) 756-7700
F - (530) 756-7707

Bruce Highman (CA Bar No. 101760)
bruce.highman@highmanlaw.com
THE HIGHMAN LAW FIRM
582 Market Street, Suite 1212
San Francisco, CA 94104
P - (415) 982-5564
F - (415) 982-5202

Counsel for Plaintiff-Relator Heather Widen

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> HEATHER WIDEN,<br><br>                 Plaintiffs,<br><br>        v.<br><br>HORNE INTERNATIONAL, INC., HORNE LLP, COUNTY OF BUTTE, COUNTY OF CONTRA COSTA, COUNTY OF EL DORADO, CITY OF FONTANA, COUNTY OF HUMBOLDT, COUNTY OF IMPERIAL, COUNTY OF KINGS, COUNTY OF LOS ANGELES, COUNTY OF MADERA, COUNTY OF MENDOCINO, COUNTY OF NAPA, COUNTY OF NEVADA, CITY OF OXNARD, COUNTY OF SAN LOUIS OBISPO, COUNTY OF SAN MATEO, COUNTY OF SANTA CRUZ, COUNTY OF SHASTA, COUNTY OF SUTTER, COUNTY OF TULARE, COUNTY OF VENTURA, COUNTY OF YOLO, COUNTY OF YUBA, GEOFFREY ROSS, LORRIE BLEVINS, SANDRA GALLAGHER, and DOES 1–30,<br><br>                 Defendants. | **Civil Action No. 2:22-cv-1893 AC**<br><br><br>**PROOF OF SERVICE**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Proof of Service

**PROOF OF SERVICE**

I live in the County of Yolo, State of California.  I am a citizen of the United States, over the age of eighteen (18) years, and not a party to the within action. My business address is Hirst Law Group, P.C., 200 B Street, Suite A, Davis, California, 95616.

On February 23, 2024, I served the following document(s), described as

**1.      First Amended Complaint and Jury Demand with Exhibits**

**2.      Statement of Material Evidence and Information with Exhibits**

**3.      First Supplemental Statement of Material Evidence and Information with Exhibits**

as follows:

Hon. Merrick B. Garland
United States Attorney General
U.S. Department of Justice
Attn: James Nealon, Esq.
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Hon. Phillip A. Talbert
United States Attorney
Eastern District of California
Attn: Steven S. Tennyson, Esq.
Robert T. Matsui United States Courthouse
501 I Street, Suite 10-100
Sacramento, CA 95814

I placed a true and correct copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above.  I placed each such envelope, with postage thereon fully prepaid, certified mail, and return receipt requested, for collection and mailing in one of the United States Post Offices located in Davis, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on this 23rd day of February, 2024, in Davis, California.

/s/ Marisela Bernal
Marisela Bernal

Proof of Service