James E. Miller (SBN 262553)
James C. Shah (SBN 260435)
**MILLER SHAH LLP**
8730 Wilshire Boulevard, Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jemiller@millershah.com
jcshah@millershah.com

Michael A. Hirst (SBN 131034)
Marisela Bernal (SBN 329589)
**HIRST LAW GROUP, P.C.**
200 B Street, Suite A
Davis, California 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707
michael.hirst@hirstlawgroup.com
marisela.bernal@hirstlawgroup.com

[Additional counsel listed on signature page]

*Counsel for Plaintiff-Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HEATHER WIDEN, | **Civil Action No. 2:22-cv-1893 AC** |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BDO GOVERNMENT SERVICES, LLC f/k/a HORNE LLP, GEOFFREY ROSS, LORRIE BLEVINS, SANDRA GALLAGHER, and DOES 1–20, | |
| Defendants. | |

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

Through her undersigned counsel, *qui tam* Plaintiff-Relator Heather Widen ("Relator"), on behalf of the United States of America (the "United States" or "Government") hereby respectfully submits this Second Amended Complaint against Defendants, BDO Government Services LLC, f/k/a Horne LLP ("Horne"), Geoffrey Ross, Lorrie Blevins, and Sandra Gallagher (the "Individuals"), and Does 1–20 (collectively, "Defendants") and alleges as follows:

## I. INTRODUCTION AND OVERVIEW OF THE FRAUD

1.     This is an action to recover damages and civil penalties for fraud perpetrated against the United States arising from false and/or fraudulent statements, records, and claims made and/or caused to be made by the Defendants, and funds knowingly received and retained by Defendants, all in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.     From at least March 2021 through the present, Horne has knowingly presented and caused to be presented false and fraudulent claims, has knowingly made or used false records and statements material to such claims, and has knowingly concealed and avoided repaying the Government for funds wrongfully received through its fraud.

3.     Specifically, Horne has knowingly failed to comply with even minimal, clearly understood grant requirements in administering the federal Emergency Rental Assistance Program and similar state-funded programs, enacted to provide economic relief from the effects of COVID-19 ("ERAP" or "ERA program").

4.     Several states—including Alabama, California, Colorado, Tennessee, and Texas— contracted with Horne to administer the ERA program, and Horne has received substantial grant funds to properly administer ERAP. Instead of doing so, Horne has knowingly failed to follow statutory and contractual program mandates, concealed its failures, and falsely certified that it complied with these material requirements.

5.     When enacting ERA programs, Congress and state legislatures included safeguards to ensure that program funds were not lost through waste, fraud, or abuse and were available to eligible recipients at risk of losing their housing. Despite these requirements, Horne knowingly failed to take even minimal and reasonable steps to prevent and detect fraud, such as verifying the identity of grant funding applicants, verifying the tenancy or landlord interest in the rental

1

SECOND AMENDED COMPLAINT                                              2:22-cv-1893-JAM-AC

properties for which funding was sought, and verifying the existence of the rental property. As explained further below, Horne knew that it needed to provide these safeguards, knew that it promised state grantees that it would do so, and also knew that it did not have, and for much of the relevant period did not obtain, the necessary resources to meet these requirements.

6. Without performing necessary verification services, Horne consistently paid grant funding to applicants who provided clearly fake identities and/or clearly fake addresses, allowing millions of dollars of grants to be obligated and then forwarded to applicants who were clearly not part of "eligible households" authorized to receive grant funding. Once Horne finally obtained the basic resources required to do the application verification work it promised to do, the level of funds it dispersed markedly declined, demonstrating that the previous outpouring of funds was likely tainted by substantial fraudulent payments to ineligible recipients. Faced with a deadline to obligate funds, Horne knowingly failed to meet its requirements under the ERA program and instead knowingly allowed ineligible recipients to receive the grants.

7. Horne falsely certified and caused others to falsely certify that ERAP in various states had been administered according to the federal and state requirements. The opposite is true. Through such knowingly false certifications, Horne has continued to wrongfully receive and retain millions of dollars from the Government to cover the administrative costs it incurred in administering ERAP. Horne knew it could not meet the federal deadline to commit and award rent relief to *eligible* households. Yet rather than risk losing its continued grant funding, Horne simply approved applications without taking basic, inexpensive, ERAP-required measures to ensure that only eligible recipients received the funds. Horne knowingly chose to allow government funds to be squandered and provided to entirely ineligible recipients so it could meet the deadline for obligating ERAP funds and continue to receive grant payments. By awarding grant funds to non-qualified recipients, Horne depleted funds available for those facing real and imminent risk of eviction and in need of urgent rental assistance, frustrating the Government's purpose in providing the grant funds.

8. Relator worked for the State of California, Housing and Community Development. She was hired to work specifically on the ERA program and did so as a Housing and Community

2

SECOND AMENDED COMPLAINT                                      2:22-cv-1893-JAM-AC

Development Representative II, Emergency Rental Assistance Program, Division of Federal Financial Assistance, Housing and Community Development Department.  Relator blew the whistle on Horne's knowing failure to comply with the ERAP requirements and brought credible and clear evidence of Horne's fraud in administering ERAP to her supervisors. Unfortunately, the State of California was also interested in the continued receipt of federal funding, and wanted to believe that Horne was fulfilling the grant and contractual requirements. Few if any steps were taken to stop the fraud. Instead, Relator was terminated.

## II.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

10.     Although the issue is no longer jurisdictional per the 2010 amendments to the FCA, to the best of Relator's knowledge and belief, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as that term is used in 31 U.S.C. § 3730(e).  Moreover, whether or not such a disclosure has occurred, Relator qualifies under the FCA as an "original source" of the allegations in this Complaint.  Before filing this action, and before any disclosure, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without Relator's knowledge.

11.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Horne and the Individuals can be found, reside, and have transacted business in this District.

## III.  PARTIES

12.     Plaintiff-Relator, Heather Widen, worked on ERAP grant funding in the California Department of Housing and Community Development ("HCD"), Division of Federal Financial

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

Assistance. Before being hired by HCD for the ERAP position, Relator had fourteen years of experience in county and city planning projects for community development. During her work on ERAP, Relator gained substantial knowledge and expertise on ERAP requirements and grant funding administration. On February 25, 2022, Relator submitted a whistleblower complaint to the California State Auditor to report the high prevalence of fraudulent applications approved by Horne and to report that HCD had not taken adequate steps to prevent fraud, waste, and abuse by Horne. Relator was placed on administrative leave later that day and was thereafter terminated.

13.    Horne LLP was headquartered in Ridgeland, Missouri and had an office in Sacramento, California, among numerous other cities. Horne was one of the largest accounting and management firms in the United States. According to its former website, Horne was ranked number twenty-nine in the "top 100 accounting firms in the U.S." and number thirteen in the "top 50 program management firms in the U.S."[1]  Horne boasted that it "maximizes reimbursements, expedites recovery, preserves trust and prevents fraud and deobligation on federally funded programs" and that its "proven methods are helping local governments, state agencies and healthcare systems deliver aid quickly while maintaining compliance."[2]

14.    Notably, Horne has previously come under scrutiny for its flawed management of federal relief programs.  In April 2025, Horne agreed to pay $1,207,600 to resolve allegations that it received improper payments from federal disaster recovery grant funds in connection with disaster recovery services it provided in West Virginia in 2017 and 2018.  Investigators working on this matter discovered that Horne billed the government for "personal consultations," invoiced at $950 each, which were merely brief cold calls resulting in a finding of "no unmet need." Yet "[d]espite a quick call confirming the homeowner had no need of Horne's services, Horne created an applicant file for each person, complete with fictitious birthdates, social security numbers, and

---

[1] Recognition & Achievements, Horne (June 18, 2025), https://web.archive.org/web/20250618024533/https://horne.com/recognition/ (Wayback Machine capture).

[2] Federal, State and Local Government, Horne (Apr. 16, 2022), https://web.archive.org/web/20220416162137/https://horne.com/federal-state-local-government/ (Wayback Machine capture).

SECOND AMENDED COMPLAINT                                     2:22-cv-1893-JAM-AC

fake signatures on legal documents." Moreover, investigators discovered that also some of these personal consultations "were actually performed by staff for Voluntary Organizations Active in Disaster (VOAD), not Horne." Investigators also found that "approximately 48 of the physical property inspections, costing the government $1,850 each, were for vacant lots where an inspection was not required." Similarly, Horne billed $1,650 each for 72 repair estimates "where there was nothing to repair."[3]

15.    On November 1, 2025, Horne was officially acquired by BDO USA, one of the nation's leading accounting and advisory firms.[4] Following the acquisition, BDO USA created BDO Government Services, LLC, a Delaware limited liability company and wholly-owned subsidiary of BDO USA.[5] BDO Government Services, LLC incorporates Horne's "extensive experience in disaster recovery and federal program compliance, as well as the management of more than $126 billion in state and federal funding over the past 15 years."[6] BDO Government Services, LLC is the successor in interest to and legally responsible for the acts of Horne.

16.    Sandra Gallagher is a Staff Services Manager at HCD. Relator reported to Gallagher. Gallagher participated in the decisions to place Relator on administrative leave on February 25, 2022 and to reject her during probation, which effectively terminated her employment on April 22, 2022.

17.    Lorrie Blevins is the Section Chief of HCD. Relator reported to Gallagher who

[3] Press Release, U.S. Attorney's Office, Southern District of West Virginia, Mississippi Firm to Pay $1,207,600 to Resolve Disaster Recovery Claims (Apr. 16, 2025), https://www.justice.gov/usao-sdwv/pr/mississippi-firm-pay-1207600-resolve-disaster-recovery-claims.

[4] Press Release, BDO, BDO USA Expands Professional Services Capabilities – With a Focus on Disaster Recovery – through HORNE (Nov. 3, 2025), https://www.bdo.com/insights/press-releases/bdo-usa-expands-professional-services-capabilities-through-horne.

[5] See Government Services Consulting, BDO, https://www.bdo.com/services/industry-specialty-consulting/government-services-consulting (last visited Dec. 10, 2025).

[6] Press Release, BDO, BDO USA Launches BDO Government Services, LLC Following Completion of HORNE Expansion (Dec. 9, 2025), https://www.bdo.com/insights/press-releases/bdo-usa-launches-bdo-government-services-llc-following-completion-of-horne-expansion.

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

reported to Blevins. Blevins participated in the decisions to place Relator on administrative leave on February 25, 2022 and to reject her during probation, which effectively terminated her employment on April 22, 2022.

18.     Geoffrey Ross is currently the Managing Director for BDO Government Services, LLC. Before the BDO acquisition, Ross was Director of Government Services at Horne. At the time of the fraud alleged herein, Ross was the Deputy Director of Federal Programs at HCD. Relator reported to Sandra Gallagher who reported to Lorrie Blevins who reported to Ross. Relator is informed and believes that Ross participated in the decisions to place her on administrative leave on February 25, 2022 and to reject her during probation, which effectively terminated her employment on April 22, 2022.

19.     The identities of the Doe Defendants are presently unknown to Relator.  To Relator's knowledge and belief, the Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in the fraud, concealment, and submission of false and fraudulent claims, as well as the wrongful retention of overpayments, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein.  Defendants, including the Doe Defendants, participated in and are jointly and severally liable for the scheme to defraud the Government.  Relator intends to amend her complaint to name such Doe Defendants when additional information is learned.

### IV.  APPLICABLE FEDERAL AND STATE LAW

**A.     Emergency Rental Assistance Program**

20.     To support those faced with possible evictions from their homes due to the economic emergency caused by the COVID-19 pandemic, Congress established a nationwide Emergency Rental Assistance program through the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, in December 2020. *See* 15 U.S.C. § 9058a. This federal law required the United States Department of the Treasury ("Treasury") to provide federal grantee states and cities and counties with populations greater than 200,000 with funding to provide rental assistance to residents ("Round 1 funding"). *Id.* § 9058a(b).  In March 2021, Congress passed the American Rescue Plan Act of 2021, Pub. L. No. 117-2, which established a second round ("Round 2

6

funding") of ERAP funds for federal grantees. *See* 15 U.S.C. § 9058c.

21.     While the eligibility requirements for both rounds of funding were substantially the same, *id.* § 9058c(d), federal law established different timelines and requirements for Round 1 and Round 2 funding grantees. To mitigate the impact of potential widespread evictions during the pandemic, Round 1 federal grantees were to provide specific assistance to eligible households for existing debt and future rent or utilities payments. To ensure that the funds quickly got to those who needed them, the Round 1 federal program requirements specify that the Treasury must recapture all funds that federal grantees had not obligated by September 30, 2021. 15 U.S.C. § 9058a(d). "Treasury defined obligated funds as the total amount of funds a federal grantee has approved for payment to or for participating households and for a federal grantee's approved administrative expenses."[7] Treasury would then recapture and reallocate non-obligated funds to other eligible federal grantees that had obligated at least 65 percent of their original allocations and had thus demonstrated a need for the additional funds.[8] Grantees had until September 30, 2022, to then spend all of their obligated Round 1 funds and until September 30, 2025, to spend all of their Round 2 funds. 15 U.S.C. §§ 9058a(e), 9058c(g). Of course, the states and Horne were aware of this requirement.

22.     In California, local jurisdictions that received block grants under ERAP had to obligate at least 65 percent of their Round 1 block grant funds by August 1, 2021 before HCD could begin to reallocate unused funds in advance of the federal September 30, 2021 deadline. State grantees that failed to meet this requirement were required to repay any unused block grant funds not obligated or spent at that time. HCD could then reallocate those funds to other eligible local jurisdictions based on certain factors, such as unmet need. This reallocation process allowed California to obligate as much rental assistance funding as possible to eligible households before

---

[7] Letter from Elaine M. Howle, CPA, California State Auditor, to Governor and Legislative Leaders (Sept. 16, 2021), available at https://www.auditor.ca.gov/pdfs/reports/2021-615.1.pdf.

[8] *See* U.S. DEPT. OF THE TREASURY, *Emergency Rental Assistance Under the Consolidated Appropriations Act, 2021 Reallocation Guidance* (Mar. 30, 2022), https://home.treasury.gov/system/files/136/Updated-ERA1-Reallocation-Guidance%203-30-%202022.pdf.

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

the federal deadline of September 30, 2021.

23. On October 25, 2021, the Deputy Secretary for Treasury stated: "As I wrote last month, this statutory reallocation process is a critical step towards ensuring additional funds are made available to grantees with a proven capacity to deliver ERA in jurisdictions where families remain at serious risk of eviction or housing instability. Treasury will begin identifying excess funds for potential reallocation in mid-November. As funds become available for reallocation, they will be distributed in tranches…."[9]

24. This deadline created a sense of urgency among state grantees to obligate ERAP funds. For example, the California State Auditor concluded that "the likelihood of mismanagement of [ERAP] funds is great enough to create substantial risk of serious detriment to the State and its residents. . . . Because of the looming deadline and effect it may have on the State if critical requirements are not met, it is important to issue this first report of our audit to notify you of the urgent risk of losing federal funds that the State faces. Given the narrow time frame set by the federal government, we wanted to impress upon you the need for continued attention in order to minimize the risk and the amount of funds the State could lose beginning September 30, 2021."

25. California received a total of $2.6 billion in Round 1 ERAP funding: $1.5 billion to the State and $1.1 billion directly to 49 cities and counties with a population of 200,000 or more. Using the federal allocation to the State, the California Legislature created a rental relief program, SB 91, signed into law on January 29, 2021, which directed the California Department of Housing and Community Development to administer the program and allocate the $1.5 billion throughout the State based on population. Cal. Health & Safety Code §§ 50897, *et seq.* SB 91 specifically noted "the intent of the [California] Legislature that the state closely monitor the usage of funding." *Id.* § 50897.6. SB 91 also granted authority to HCD to hire a vendor to implement the program and distribute funds. *Id.* § 50897.3(a)(1). Up to 10% of the funds could be used for the administrative

---

[9] Letter from Adewale O. Adeyemo, Deputy Secretary of the Treasury, Dept. of the Treasury, to Emergency Rental Assistance (ERA) Grantee (Oct. 25, 2021), available at https://home.treasury.gov/system/files/136/Deputy-Secretary-Adeyemo-ERA-Program-Grantee-Letter-20211025.pdf.

SECOND AMENDED COMPLAINT                                          2:22-cv-1893-JAM-AC

costs of the program. *Id.* § 50897.5(b).

26.    The federal statutory requirements for ERAP eligibility make clear that program funds are to be paid only to eligible landlords and tenants who need the funds for housing-related costs. 15 U.S.C. § 9058a(c)(1).  Permissible uses of ERAP funds included "rent; rental arrears; utilities and home energy costs; utilities and home energy costs arrears; and other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, as defined by the Secretary."  *Id.* § 9058a(c)(2)(A). To be eligible, one or more individuals in the household with rental obligations must meet the following conditions:

> (A) IN GENERAL.—The term ''eligible household'' means a household of 1 or more individuals who are obligated to pay rent on a residential dwelling and with respect to which the eligible grantee involved determines—
>
>> (i)  that 1 or more individuals within the household has
>>
>>> (I)  qualified for unemployment benefits or
>>>
>>> (II) experienced a reduction in household income, incurred significant costs, or experienced other financial hardship due, directly or indirectly, to the novel coronavirus disease (COVID–19) outbreak, which the applicant shall attest in writing;
>>
>> (ii)  that 1 or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability, which may include—
>>
>>> (I)   a past due utility or rent notice or eviction notice;
>>>
>>> (II)  unsafe or unhealthy living conditions; or
>>>
>>> (III) any other evidence of such risk, as determined by the eligible grantee involved; and
>>
>> (iii) the household has a household income that is not more than 80 percent of the area median income for the household.
>
> (B) EXCEPTION.—To the extent feasible, an eligible grantee shall ensure that any rental assistance provided to an eligible household pursuant to funds made available under this section is not duplicative of any other Federally funded rental assistance provided to such household.
>
> (C) INCOME DETERMINATION.—
>
>> (i)  In determining the income of a household for purposes of determining such household's eligibility for assistance from a payment made under this section (including for purposes of subsection (c)(4)), the eligible grantee involved shall consider either
>>
>>> (I)   the household's total income for calendar year 2020, or
>>>
>>> (II)  subject to clause (ii), sufficient confirmation, as determined by the Secretary, of the household's monthly income at the time of application for such assistance.
>>
>> (ii)  In the case of income determined under subclause (II), the eligible grantee shall be required to re-determine the eligibility of a household's income after

9

SECOND AMENDED COMPLAINT                                                    2:22-cv-1893-JAM-AC

each such period of 3 months for which the household receives assistance from a payment made under this section.

15 U.S.C. § 9058a(k)(3).

27.     Landlords or property owners were permitted to submit applications on behalf of their tenants, so long as they obtained the tenant's signature on the application, provided the tenant with a copy of the application, and used any payments received to satisfy the tenant's rental obligations. *Id.* § 9058a(f).

28.     The enabling statute for Round 2 funding made clear that the purpose of the funds was to provide financial assistance to meet the same housing-related costs as Round 1 funding. 15 U.S.C. §§ 9058a(d)(1). The definition of "eligible household" for Round 2 funding also remained largely unchanged from Round 1 funding. *Id.* § 9058(f)(2).

29.     Treasury's final grant terms for Round 1 funding provide, among other requirements, that the recipient agrees to comply with the funding uses set forth in Section 501 of Division N of the Consolidated Appropriations Act, 2021 Pub. L. No. 116-260 (Dec. 27, 2020), and in Treasury interpretive guidance, as well as with all other applicable federal statutes, regulations and executive orders. U.S. DEPARTMENT OF THE TREASURY, Emergency Rental Assistance (ERA1), *Award Terms and Conditions*, ¶¶ 1, 2, 8 (March 26, 2021). The final grant terms further provide that "Recipient understands that false statements or claims made in connection with this award may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law." *Id.* ¶ 9.

30.     The final grant terms also include a whistleblower protection provision, instructing that "Recipient may not discharge, demote, or otherwise discriminate against an employee as a reprisal for disclosing information to any of the list of persons or entities provided below that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract (including the competition for or negotiation of a contract) or grant." *Id.* ¶ 13(a). The enumerated persons or entities for protected disclosure purposes include a

10

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

"management official or other employee of Recipient, contractor, or subcontractor who has the responsibility to investigate, discover, or address misconduct." *Id.* ¶ 13(b)(vii).

31.    The ERA Round 2 funding grant terms provide essentially similar requirements. U.S. DEPARTMENT OF THE TREASURY, Emergency Rental Assistance (ERA2), *Award Terms and Conditions*, ¶¶ 1, 10, 15 (May 7, 2021).

32.    The Government provided substantial guidance to grantees on how to prevent fraud in the ERAP and how to ensure grant funds were provided only to eligible recipients. For instance, the ERA Frequently Asked Questions (FAQs) provide:

> ERA funds may be used for rent and rental arrears. How should a grantee document where an applicant resides and the amount of rent or rental arrears owed?
>
> Grantees must obtain, if available, a current lease, signed by the applicant and the landlord or sublessor, that identifies the unit where the applicant resides and establishes the rental payment amount. If a household does not have a signed lease, documentation of residence may include evidence of paying utilities for the residential unit, an attestation by a landlord who can be identified as the verified owner or management agent of the unit, or other reasonable documentation as determined by the grantee. In the absence of a signed lease, evidence of the amount of a rental payment may include bank statements, check stubs, or other documentation that reasonably establishes a pattern of paying rent, a written attestation by a landlord who can be verified as the legitimate owner or management agent of the unit, or other reasonable documentation as defined by the grantee in its policies and procedures. …

U.S. DEPARTMENT OF THE TREASURY, *Emergency Rental Assistance, Frequently Asked Questions* (Rev. 8/25/21), Question 5.

**B.    False Claims Act**

33.    The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(l), provides for the imposition of treble damages and civil penalties against a defendant for, *inter alia*, knowingly submitting or causing the submission of false or fraudulent claims for payment to the Government. When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law. Government programs require compliance with these certifications as a material condition of both participation in the programs and receipt of payment, and claims that violate these requirements are false or fraudulent claims under the FCA.

11

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

34.     The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 ("FERA"), specifically provides, in relevant part:

> Liability for Certain Acts. (1) In General—Subject to paragraph (2), any person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), … or (G);
>
> … or
>
> (G) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States for a civil penalty of not less than [currently $12,537] and not more than [currently $25,076] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).  The FCA further provides:

> Actions by Private Persons. (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.

31 U.S.C. § 3730(b)(1).

## V.  HORNE'S REPRESENTATIONS AND CONTRACTUAL REQUIREMENTS

35.     As authorized by the federal grant provisions and California law, HCD contracted with Horne to implement and administer California's rental assistance program. State law required that Horne have sufficient capacity and experience to manage California's rental assistance program and distribute funding to eligible applicants. *See* Cal. Health & Safety Code §§ 50897.3(a)(1), 50897.3.1(a)(1), 50897.2(f), 50897.21(f). Horne made significant representations about its resources and planned work to obtain the ERAP contract in California and elsewhere.

36.     HCD entered into a contract with Horne for ERAP services on March 4, 2021, and Horne started accepting applications in California on March 15, 2021, as the law required. From the outset, Horne knowingly failed to comply with ERAP requirements and its own representations.

12

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

**A.** **Horne's Response to California's Request for Proposal and Bid**

37. In its Response to California's Request for Proposal ("Bid"), Horne made several representations regarding its ability to administer ERAP and the specific measures that Horne would implement:

- "QA/QC Team Reviews Applications/Eligibility Determinations" would be ready to handle ERAP applications within two weeks of the bid acceptance in March 2021. Bid at 8.

- "100% of all applications are audited by internal quality assurance teams for compliance to validate the submission." *Id.* at 231.

- "Our system provides quality assurance dashboards and audit management tools to ensure disbursements are made to qualified recipients. The system is built with compliance at every step to avoid fraud, waste, and abuse." *Id.* at 243.

- "Our system contains checks and balances to prevent duplication of address. Each application is tied to an address and duplicate addresses cannot be added within the system." *Id.* at 244.

- "As reviews are completed, all notes, conclusions, and details will be saved in the audit log." *Id.* at 244.

- "In the event of identified fraud, waste and abuse, our program director will notify HCD for next steps." *Id.* at 245.

- "Our approach will be tailored to ensure HCD's vision for prioritization is executed in accordance with SB 91 and the federal Consolidated Appropriations Act, 2021." *Id.* at 245.

- "HORNE's automated calculations are tailored to Treasury guidance and SB 91. Our Fund Disbursement portal incorporates automated calculation based on information submitted by the landlord or tenant to arrive at the eligible payment award." *Id.* at 248.

- "In addition to payment controls, HORNE's eligibility tool automatically assigns unique identifiers for landlords and tenants that dramatically reduce the potential for fraud. For example our application portal/tool requires that each landlord and/or tenant provides a unique: email address, tax ID number, and property address. Property addresses are validated with USPS integration in the portal to confirm property location and veracity. Our automated controls are supplemented by the QC team, which leverages data analytics to identify repetitive data trends that may indicate attempted fraud such as sequential tax ID numbers, duplicative or sequential phone numbers, or duplicative tenant and/or landlord names. Our manual processes enhance payment quality and protect tax payer funds in accordance with Treasury's expectations." *Id.* at 250.

38. The State of California relied upon these representations when it accepted Horne's Bid in March 2021.

**B.** **Horne's Contract and Amendments**

13

SECOND AMENDED COMPLAINT                                         2:22-cv-1893-JAM-AC

39.     Under its contract and amended contract with HCD, Horne was responsible for accepting and reviewing all rental assistance applications, including determining eligibility, and disbursing benefit funds to approved applicants in the 57 jurisdictions participating in HCD's state rental assistance program. Horne also contracted directly with other local jurisdictions within California, and with state and local jurisdictions in other states.

40.     In its amended contract with HCD,[10] among other specific agreements to accept and review all rental assistance applications, Horne agreed to the following:

A.  The Contractor will provide and oversee the staffing, technology, banking and overall Program delivery required to properly disburse federally-funded HAP (housing assistance payments) on behalf of low income renters across the State, pursuant to the U.S. Emergency Rental Assistance Program outlined in the Act and Chapter 17 of SB 91.

Based on current projections, it is possible that the Department may receive ~~between 750,000 and 1 million~~ at a minimum of 1,700,000 applications. …

The Contractor will respond to inquiries, accept, and review applications, and determine eligibility based on the requirements of the Act and SB 91, any rules or guidance promulgated by the U.S. Department of the Treasury, and all other applicable federal or state laws. It is the Contractor's responsibility to remain current on all such requirements. The number of applications, level of funding, and households served are subject to change and could vary significantly based on a wide variety of factors. *However, the Contractor will be responsible for delivering all necessary services to properly disburse the funding available in compliance with the applicable rules and laws.*     ...
…

B.     Case Management

The Contractor shall develop Application Review Procedures that will include the process for case management staff and supervisors to review applications and documentation, *verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments* under the oversight of HCD. This will include developing process flow diagrams, policies and procedures, and other documents as necessary. …

1) Case managers will perform a Primary Review to determine applicant eligibility as determined by the Act, SB 91, and based on the eligibility criteria agreed upon with HCD. …
….

3)  *The Contractor is responsible for ensuring that no duplicate payments are*

---

[10] Contract, State of California - Department of General Services, Standard Agreement, Agreement No. 19-CDBGDR17-001-A (Rev. 4/27/21), at Exhibit A (Scope of Work), §§ 5(A) & 6(B), available at: https://www.documentcloud.org/documents/21067609-20-20-015_a2_std213_executed_combined (strikeout in original and emphasis added) (the "Contract").

SECOND AMENDED COMPLAINT                                   2:22-cv-1893-JAM-AC

*issued and may be held financially responsible for duplicate payments or overpayments that must be recaptured by the Contractor.* The Contractor will, at a minimum, ensure that:

a)  No individual is able to submit and have approved more than one application to the Program on behalf of the same eligible household over the same time period;

b)  No individual who submits an application is also listed as a household member on another application;

c)  No individual is counted as a household member on more than one application;

The landlord and the tenant are not the same person. The Contractor will, at a minimum, be expected to cross-reference names, addresses and social security numbers (if available) of applicants and household members. It is anticipated that the Contractor's technology solution (see requirements below) will automate this function and flag duplicate applications to the greatest extent possible. …

5) *The Contractor will be responsible to ensure that its services rendered include responsibility for implementing measures and systems to prevent the illegal and improper payment of funds (hereafter Wrongful Payments) to putative tenants or landlords (hereafter Wrongful Recipients).* This must include measures, that among other matters, prevent fraud resulting from: tenant applicants; landlord applicants; collusion or cooperation among tenants, landlords and third parties; intrusion into the Contractor's technological and evaluation system and process; and intrusion into the payment system or methodology. The Contractor will be required to indemnify, defend and save harmless the State, HCD, their officers, agents and employees from any and all claims and losses accruing or resulting from Wrongful Payments, whether resulting from the intentional misrepresentation, negligent misrepresentation, or deceit of the Wrongful Recipients, Contractor or its agents, or any other third party.

41.  Thus, Horne was required to build a management operation capable of achieving each of Horne's legal and contractual requirements. The Contract explicitly assigns responsibility to Horne for ensuring that ERAP is deployed in compliance with federal law, including the statutory requirements regarding eligible households and landlords.

42.  Horne received significant federal funding to carry out the Contract.

## VI.  HORNE'S FRAUDULENT PRACTICES

43.  Horne engaged in a pattern and practice of failing to comply with ERAP requirements set forth in grant provisions, contracts, and related statutes, and then concealing its noncompliance. Despite its inability to satisfy program requirements, Horne continued to participate in ERAP and receive substantial Government funds.

44.  As the Government expected, numerous fraudsters sought to divert ERAP funding, including by submitting false ERAP applications; posing as eligible owners/landlords, tenants, or both; and using fake identities, addresses, and/or supporting documentation. While some highly-

15

sophisticated fraudsters may have been capable of creating realistic falsified ERAP applications, the majority of fraudulent applicants relied instead on submitting low-quality falsifications, using completely fabricated identities and addresses that would not match any real people or places, and by submitting poorly falsified supporting documentation, including fake leases, fake identifications, and the like. Had Horne provided the resources and ability to administer the ERAP as it represented and promised in the Contract, substantial diversion of funds through fraudulent applications would have been prevented.

45. Upon amending its original contract with Horne, the State of California paid Horne an additional $1,546,566,405.00, which included both the compensation for Horne's ERAP operations and the funds to be paid to eligible landlords and tenants. Contract, at 1. However, seeking to maximize its own profits, Horne cut corners and failed to satisfy its obligations, including by creating a supposed "fraud detection team" that was ineffective and lacked necessary resources. Horne's failure to maintain an adequate fraud detection program allowed innumerable fraudsters to divert Government funds. As a result of Horne's conduct, California's ERA program paid out millions of federal funding dollars on ERAP applications that Horne inappropriately approved, causing the Government to sustain losses and potentially depriving legitimate ERAP applicants of funding necessary to secure housing throughout the pandemic.

46. Under the Contract, upon failing to ensure that only eligible recipients receive ERAP grant funds, Horne can be held financially responsible to recapture the wrongfully paid funds and to indemnify the state for such wrongful payments. Contract, Exhibit A, Section B(3), (5). By allowing payments to ineligible recipients, and then knowingly concealing the extent of such payments and disputing the ineligibility of recipients, Horne further violated the FCA by concealing and improperly avoiding an obligation to pay money to the Government.

47. In addition to its inadequate and non-compliant application review and fund disbursement process, Horne also knowingly failed to comply with the ERAP and Contract requirements to provide complete and accurate reports. *See, e.g.*, Contract at Exhibit A, Part D(1)(e) ("The Contractor must track payment distributions and report to HCD in writing per the Program requirements."). Instead, Horne hid its conduct in its various reports so that federal and

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

state auditors would remain unaware of the number of clearly fraudulent ERAP applications Horne approved and paid. In doing so, Horne caused the states to submit false certifications to the Government that the funds were obligated to eligible households in compliance with ERAP requirements. *See* Exhibit B (template Obligated Funds Certification).

48.     As part of its Bid, Horne's proposal summary claimed that "QA/QC Team Reviews Applications/Eligibility Determinations" would be ready to handle ERAP applications within two weeks of the bid acceptance in March 2021. Bid at 8. Horne's Bid also stated that "100% of all applications are audited by internal quality assurance teams for compliance to validate the submission." *Id.* at 231. However, as discussed herein, Horne failed to create an adequate fraud review team until February 2022, let alone a team that could audit "100% of all applications." Had the Government been aware of Horne's decision not to create and maintain an adequate fraud detection program, the Government would not have allowed payments to Horne and would have demanded repayment of federal funds.

## A.     Horne's Fraudulent Non-Compliance

49.      Rather than apply an appropriate fraud screening *before* it approved or paid ERAP applications, Horne relied on post-hoc, third-party audits of applications it had already approved for payment or actually paid out. In fact, Horne only provided cursory reviews of ERAP applications, often relying on requests for information to HCD. During Relator's time at HCD, she found an alarming, consistent problem: Horne failed to secure and use widely available resources to conduct third-party verification of eligible tenants and landlords. Furthermore, Horne failed to consistently flag applications as potentially fraudulent, either because Horne staff ignored numerous signs of fraud or because Horne lacked the staff to conduct such reviews and instead neglected or skimmed over the review process.

### i.     Horne failed to acquire necessary fraud prevention resources

50.     In December 2021, during a routine presentation by Horne Senior Manager Holly Smith to the HCD team, Horne's slideshow indicated it had "PeopleMap training scheduled today with 25 staff identified for licensing." WestLaw's PeopleMap subscription service provides verification of landlords and tenants. However, although Horne purportedly had "staff identified

SECOND AMENDED COMPLAINT                                             2:22-cv-1893-JAM-AC

for licensing," it never obtained any PeopleMap licenses for its team. Horne later reported to HCD that it was not feasible to purchase PeopleMap. Horne instead chose to consider DataTree licenses, which provided much more cursory data than PeopleMap. And Horne did not even obtain the lesser DataTree licenses until February 2022, a month before ERAP was scheduled to close applications.

51. Horne management was well aware that Horne had failed to employ adequate resources to confirm whether applicants were eligible tenants or landlords. For example, on December 20, 2021, Horne Manager Christine Waldron sent an e-mail (attached as Exhibit C) to HCD's ERAP Staff Services Manager I Sandra Gallagher, asking Gallagher if she could " review your magical resources to determine if this LL [landlord] is living at the home? Something 'off' about this file that I want to verify through your resources." Exhibit C. The fact that a Horne management employee lacked the resources to check the residence of a landlord applicant demonstrates Horne's knowing failure to protect Government funds by filtering and excluding fraudulent ERAP applications.

52. In early February 2022, Horne finally noted that it was "Currently working on getting month-to-month subscriptions [of DataTree] for fraud review team." Horne had obtained no DataTree licenses before this time and only obtained 50 licenses by the end of February 2022, a mere month before ERAP was scheduled to close all applications by the end of March 2022. Notably, after Horne obtained the long overdue licenses, there was a dramatic increase in application denials in April 2022.[11] Relator believes that the increase in denials resulted, at least in part, from Horne finally having access to DataTree to screen ERAP applications for fraud. Horne's refusal to obtain such a basic resource for its fraud review team until the very end of the program illustrates Horne's failure to perform the tasks it agreed to undertake in administering ERAP, all the while receiving significant Government payments for doing so.

> ii. *Horne's inadequate process resulted in fraudulent ERAP application approvals and pay outs*

---

[11] Bob Egelko, *California can't deny pending applications for rent relief while its denials are under review, judge says*, SAN FRANCISCO CHRONICLE (July 12, 2022), https://www.sfchronicle.com/bayarea/article/California-must-grant-all-pending-applications-17301012.php.

SECOND AMENDED COMPLAINT                                   2:22-cv-1893-JAM-AC

53.    The California State Controller's Office ("SCO") regularly reviewed Horne's administration of the ERA program and regularly identified problems with the lack of documentation Horne required from ERAP applicants. On November 10, 2021, Amy Liu, an SCO auditor, sent an e-mail to HCD staff identifying problems with applications, including fake IDs, altered utility bills, out of state IDs, landlord signatures not matching up with names, and landlord case IDs all associated with a single landlord . Similarly, various applications all provided the same documentation, certain tenants provided identifying information in a PDF format that can be edited, and many applications lacked third-party documentation substantiating a claim that the individual actually lived at the address. Ms. Liu concluded that "the lack of documentation requirements" for both landlords and tenants "is allowing fraud to occur and go undetected." She also noted that the audit files she reviewed had cases marked with "Approved: Pending Payment" status, but actually "these applications have been PAID," demonstrating a severe discrepancy between Horne's reporting to the state and what Horne had actually paid on fraudulent applications.

54.    In August 2022, SCO published a report (the "SCO Review Report") regarding HCD's oversight of Horne's administration of ERAP, finding multiple instances of non-compliance.[12] As part of its review, which may have been initiated as a result of Relator's whistleblower complaint to the California State Auditor in February 2022, SCO audited a random sample of approved ERAP applications submitted between April 14, 2021 and December 31, 2021. SCO Review Report at 8. SCO reviewed whether those applications complied with all statutory requirements and determined whether payments had been proper. *Id.* at 7. Of the sample reviewed (the size was not disclosed), SCO determined that Horne had approved at least 488 potentially fraudulent ERAP applications during that time period, totaling $18.1 million. *Id.* at 8. At the time of the SCO Review Report, Horne had already paid out $7 million of that total (and likely would

---

[12] *See* CALIFORNIA STATE CONTROLLER, *California Department of Housing and Community Development - Review Report - State Rental Assistance Program* (August 2022), https://www.sco.ca.gov/Files-AUD/08_2022CADeptofHousingAndCommunityDevelopment_SRAP.pdf

19

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

have paid out the remaining $11.1 million had SCO not prevented further disbursement). *Id.*

55. In addition to the application audit, SCO also reviewed 1,007 of the 9,911 payments from Horne to applicants between April 26, 2021 and June 28, 2021. *Id.* at 14. Of those 1,007 transactions, SCO found that: (a) 992 (98.5%) of Horne's quality assurance/quality control checklists were incomplete; (b) 967 (96%) of Horne's case management checklists were incomplete; (c) 309 (30.6%) transaction amounts had been incorrectly calculated by Horne staff and subsequently approved by a separate Horne team; (d) 199 (19.8%) failures by Horne to "[v]erify that lease and rent amounts are eligible and accurate" that resulted in erroneous payments; and (e) at least 165 (16.4%) transactions were overpayments. *Id.* at 14–15. In other words, Defendants' consistent failure to follow their *own* policies and procedures resulted in substantial overpayments to non-eligible applicants. SCO also noted that the State of California may be unable to recover the disbursed funds because numerous recipients had used false identities. *Id.* at 15.

56. The SCO Review Report included several additional findings:

- Horne "did not consistently perform the internal control procedure of requesting a death match verification for each application before approving the application for payment." *Id*. at 17.

- Horne "lacked adequate internal controls over the application review process" to "prevent duplicate applications from being processed, to prevent duplication of benefits, or to prevent other errors resulting in improper payments" based on applications also submitted to cities or counties that elected to self-administer ERAP funds. *Id*. at 19.

- Horne continuously added or subtracted to the weekly pay file submitted to HCD and failed to reconcile the pay files to the amounts it actually disbursed to each applicant or the number of applicants paid. *Id.* at 22.

- Horne failed to respond to or document its corrections to the errors and issues identified by SCO and HCD. *Id.* at 29.

- Landlord and tenant documentation requirements were insufficient "to mitigate the risk of fraud and misuse of funds." *Id.* at 31.

20

SECOND AMENDED COMPLAINT                                                    2:22-cv-1893-JAM-AC

57.    Horne disputed SCO's characterization of the listed cases, and instead asserted that those applicants were eligible landlords and households that had satisfied all application requirements. Thus, Horne refused to recapture the funds that had already been paid to those applicants.

58.    As discussed further below, Relator assisted with SCO's review of sample applications in December 2021 and obtained additional first-hand knowledge of Defendants' disregard of the ERAP eligibility requirements.

### iii.    Examples of Fraudulent Applications Paid by Horne

59.    Relator frequently discussed fraudulent ERAP applications with her managers and co-workers in person and over Microsoft Teams. Soon after she was hired and began work on ERAP, Relator and her co-workers discussed their impression that the program management "felt like Horne was throwing money out of a plane and hoping that it landed on someone who needed it," or very similar words to that effect.

60.    On December 21, 2021, Lorrie Blevins (ERAP Section Chief of HCD's Division of Federal Financial Assistance) requested Relator's assistance in reviewing cases that had been flagged by SCO as potentially fraudulent.

61.    Laurissa Wells and Julian Garcia (each a HCD Representative II on Relator's team under Gallagher) conducted the same kind of review as Relator with. As demonstrated in the redacted and excerpted "Findings" column in Exhibit D, numerous cases flagged by SCO, *after ERAP payments had been made by Horne*, showed overt fraud or clearly insufficient documentation to establish the identities of both landlords and tenants, as well as the existence of any rental agreement. The examples discussed below show Horne completely failed to perform the required verification work.

62.    On November 10, 2021, Horne approved tenant case ID 682XXX and paid $50,500.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

SECOND AMENDED COMPLAINT                                        2:22-cv-1893-JAM-AC

- The landlord's Neighborly username did not match the landlord applicant's name.[13]

- DataTree showed that the landlord applicant was not the owner of record for the requested three-month rental assistance period.

- DataTree and Zillow indicated that the property was constructed more than a year after the purported lease start date. In addition, a separate application was submitted for the same property that also included a lease starting prior to the property's construction.

- The supporting documentation (eviction notice, W-9, landlord application, lease, etc.) included numerous inconsistencies.

63.     On November 16, 2021, Horne approved tenant case ID 641XXX and paid $52,500.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

- The tenant's California-issued drivers' license ("CADL") was invalid, did not list the rental property's address although it was issued during tenancy period, and the signature on the CADL did not match the one on the lease.

- A landlord CADL was provided by tenant.

- The household size and members were inconsistently represented.

- Both the tenant and landlord applications were submitted with the same e-mail address and within an hour of each other.

64.     On November 30, 2021, Horne approved tenant case ID 547XXX and paid $50,310.00. Horne disputed SCO's assertion that the application was potentially fraudulent. Relator found numerous irregularities in the applicants' supporting documentation, including but not limited to:

- DataTree showed that the owner of record did not match the owner names provided on the lease document.

- The address listed in the lease document was invalid.

---

[13] Horne tracked the status of ERAP applications through a system called Neighborly.

Second Amended Complaint                                     2:22-cv-1893-JAM-AC

- The property was sold during the lease and rental assistance period.
- There was no handwritten or validated electronic signature for the landlord on *any* of the documents submitted.
- The supporting documentation (lease, tax documents, etc.) included numerous inconsistencies.

65.     In each of the examples discussed above, and in many other instances, Relator summarized her findings regarding irregularities in the case, compiled supporting documents, and packaged the files for transfer to the HCD Legal Affairs Division, which could make a finding of fraud.

66.     On December 23, 2021, after conducting a separate review, Relator sent an e-mail to her team to notify them of obvious and blatant fraud markers found in another application, including that the names of the tenant and landlord were mismatched throughout the documentation and all of the signatures were typed without any third-party verification (such as DocuSign). Even a cursory review of the lease documents should have immediately flagged this particular application as fraudulent, but Horne nevertheless paid out $54,500 to the purported landlord on September 23, 2021.

67.     On December 29, 2021, Laurissa Wells sent a message to the team that one of the cases she reviewed included a "'lease' that stated the 'tenant' was to pay the lessor $72,000 over a 3 year period, in monthly increments!" Relator and Julian Garcia (Housing and Community Development Representative II) understood that such a lease would be ridiculous: leases are typically set for year-long terms and specify monthly payments, not a total amount across multiple years.

68.     On January 13, 2022, Julian Garcia sent an e-mail to the team to inform them of fraudulent irregularities in an application that he was reviewing. The Rent Relief letter (notifying a tenant of the status of their application) was returned with a handwritten note that "This person does not own, rent or live at this property." Mr. Garcia reviewed the application and supporting documentation. He found that according to DataTree, the owners of the purportedly rented property and the landlord's reported residence did not match the names of either the tenant or the

23

SECOND AMENDED COMPLAINT                                          2:22-cv-1893-JAM-AC

landlord listed on the ERAP application. The false tenant and landlord applications were also sent from the same IP address, indicating that both applications had been submitted from the same location. None of these issues had been flagged or reported by Horne during its supposed audit of ERAP applications.

69.     The State of California relied heavily on Horne to detect and prevent ERAP fraud, as required by Horne's Contract. Yet even limited review of applications by HCD, the California State Auditor, and SCO showed that Horne regularly failed to detect obviously fraudulent ERAP applications with numerous and overlapping markers of fraud, and to prevent payment on those applications.

### C.     Confidential Witnesses Confirm Relator's Allegations

70.     Multiple Confidential Witnesses ("CWs") working for Horne on ERAP administration projects across the country confirm Relator's allegations. Indeed, these CWs reported that Horne was underprepared and understaffed for its ERAP administration projects, that Horne staff lacked the knowledge, training, and skills to identify suspicious features on applications, that Horne did not provide the resources necessary to verify applications, and that they were under significant pressure to meet productivity goals. Multiple CWs also recalled that Horne instructed them not to use the word "fraud," and instead refer to potentially wrongful applications as containing "irregularities" or "inconsistencies."

71.     CW1 was a Reconciliation Specialist who worked on Horne's ERAP contract with Alabama. CW 1 felt that he/she and his/her colleagues were not adequately trained and that Horne did not have enough employees to review the number of applications being submitted. CW1 also recalled that as applications started to slow, Horne loosened the income requirements for applicants and became more liberal with releasing payments. According to CW1, employees could flag applications for "irregularities," but were not supposed to use the word "fraud."

72.     CW2 was a Case Manager on Horne's California ERAP Contract. Although CW2 would message his/her supervisor over zoom about suspicious documents, his/her supervisor would frequently disagree with CW2's assessment and instruct him/her to move the application along for approval. CW2 felt there was a dismissive attitude toward potential fraud and recalled

24

feeling "productivity pressure" to meet dollar-amount key performance indicators that Horne reported back to California. CW2 also recalled that Horne employees were not supposed to use the word "fraud."

73. CW3 worked for Horne as an Eligibility Specialist and then an Appeals Coordinator on the Texas ERAP contract, and also as a Senior Associate, Irregularities Lead on the Colorado ERAP contract. CW3 felt there were leadership problems within Horne and recalled that although there was a large backlog of applications in Colorado, many of which appeared fraudulent, Horne only had one Certified Fraud Examiner to review "irregular" applications. CW3's fellow employees did not know how to use public records to verify information or spot suspicious features. In CW3's opinion, Horne distributed funds to applicants in Colorado whose applications seemed clearly falsified. Furthermore, Horne asked CW3 and another employee to review both eligibility and appeals, sometimes of the same application, which CW3 believed to be a conflict of interest. According to CW3, there was so much pressure from Horne to get payments out, that employees felt they could not take sick leave.

74. CW4 was an Eligibility Specialist and an Irregularities Team Reviewer for Horne's Texas ERAP contract. CW4 recalled receiving some training upon started work for Horne, but it was not sufficient or helpful. CW4 never received fraud training or training on how to spot inauthentic documents. Moreover, none of the Eligibility Specialists had access to commercial public records databases. When CW4 joined the Irregularities Team, which reviewed applications which had already been approved and paid out, he/she did not receive any additional training or resources. Upon joining the Irregularities Team, CW4 realized that many applications should not have been approved, and thousands appeared to have been automatically approved or not reviewed at all. CW4 explained that Horne employees were under pressure to meet productivity goals, but believed the root cause behind approved fraudulent applications was the lack of training.

75. CW5 was a QA/QC Analyst for the Horne contracts in Tennessee and California. CW5 recalled that he/she and most of his/her colleagues did not have prior experience reviewing applications for government grants or conducting due diligence. CW5 also felt Horne did not provide adequate training or resources to detect fraud, and recalled numerous fraudulent

25

SECOND AMENDED COMPLAINT                                                2:22-cv-1893-JAM-AC

applications.  Besides using their own common sense, Horne employees did not regularly take steps to verify documents and information. CW5 explained that Horne established a quota for the number of applications he/she was supposed to review every day, and that these productivity metrics caused employees to rush and could have led employees to approve fraudulent applications.

76.    CW6 was a Director for Horne's ERAP contract in Alabama. CW6 felt that fraud was condoned at Horne, that his/her attempts to bring this to the attention of leaders at Horne went unheeded,  and that the lack of controls in the ERAP program resulted in pervasive fraud. CW6 found it impossible to meet Horne's productivity standards while complying with Treasury guidelines.  Like other CWs, CW6 felt Horne did not have enough employees to review the tens of thousands of ERAP applications it received.

77.    CW7 worked for the Alabama Housing Finance Authority as a Research Specialist for Alabama's ERAP program and served as a liaison to Horne. According to CW7, Horne was not the "right fit" for the ERAP program, as Horne had no prior experience vetting applicants for financial assistance.  CW7 felt Horne was more concerned with getting payments out as quickly as possible rather than getting funds to the right people.  CW7 felt that Horne worked fast at the expense of fraud prevention.  Based on CW7's review of applications Horne approved in the first five or six months of the program, CW7 estimated that 25% of applications should not have been approved. CW7 felt Horne employees took no proactive steps to detect or prevent fraud, and he/she and other Housing Finance Authority employees told Horne that it needed to run more robust property searches and do more to vet applications.

78.    CW8 was a QA/QC Reviewer on Horne's ERAP Contract in California.  CW8 explained that if allowed more time under Horne's strict productivity standards, he/she would have requested more information from many applicants. CW8 recalled being told in Horne trainings that anything with a name and address was a valid ID document, which he/she thought was too lax. CW8 was sure that many people received funds through fraudulent applications.

79.    CW9 was an Eligibility Specialist and then a QA/QC Reviewer for Horne's ERAP contract in Alabama.  CW9 explained that while he/she had previous experience doing anti-fraud

26

SECOND AMENDED COMPLAINT                                                      2:22-cv-1893-JAM-AC

due diligence, most of his/her colleagues did not and had no training on how to take basic research steps to prevent fraud.  According to CW9, employees simply accepted documents at face value. When CW9 complained about this to his/her supervisor and other senior managers at Horne, he/she was shut down and told not to worry about it because that was not Horne's job. CW9 suggested that Horne provide access to public records databases, but Horne said that was too costly. Although Horne eventually started to take fraud prevention more seriously, CW9 never felt he/she had adequate resources to detect fraud.

80.     CW10 was a QA/QC Analyst, an Analyst Trainer, an Administrative Supervisor of QA/QC Reviewers, and a Recapture Team Member on Horne's ERAP contract with Texas. CW10 did not recall receiving any training upon starting work for Horne.  CW10 did not have access to any commercial databases, and did not believe the fraud group had access to these resources, either. When CW10 became a trainer to other analysts, Horne did not provide any curriculum or materials. The training CW10 provided was basic, but Horne still chastised  him/her for paying too much attention to detail and told him/her to just get the money out. CW10 said the high review targets led analysts to both unnecessarily approve and deny applications.  According to CW10, Horne discouraged employees from reviewing for fraud and told them their job was just to get the money out. CW10 believed at least 30 percent of fraudulent applications were approved.

**D.     Losses to the Government and Payments to Horne**

81.     Horne's conduct caused significant financial losses to the Government and siphoned much-needed resources from California landlords and tenants relying on ERAP payments. A January 2022 agenda for an ERAP check-in meeting with Horne and HCD noted that ERAP had disbursed $1.78 billion by January 24, 2022. A month later, the agenda for the check-in meeting noted that ERAP had disbursed $2.2 billion by February 24, 2022. Horne's blatant disregard for its obligation to screen for fraud has likely caused hundreds of millions of dollars in damages to the Government. Per Horne's Contract, such damages should have been repaid to the Government.

82.     Horne's contract to administer ERAP for $51.7 million was increased to at least $146.8 million after the State of California received Round 2 funding approval. The government

27

SECOND AMENDED COMPLAINT                                          2:22-cv-1893-JAM-AC

would not have paid such fees to Horne if it had known that Horne would not comply with the ERAP statutory and grant requirements.

83. As discussed above, Horne's fraud caused the State of California and HCD to falsely certify to the Treasury that Round 1 funding had been obligated appropriately. As a grantee, the State of California relied upon Horne's reports to HCD to determine whether Round 1 funding had been appropriately obligated by September 30, 2021. Horne's reports to HCD were made without any legitimate effort to ensure that ERAP funds were paid only to eligible landlords and households. If not for Horne's material omissions and misrepresentations in allowing fraudulent diversion of Government funds, the State of California would not have falsely certified to the Treasury that the Round 1 funding had been obligated in compliance with federal law.

84. Horne's deceit in administering the ERAP grant program—marked by its actual knowledge, deliberate ignorance, and/or reckless disregard as to its fraudulent misrepresentations, omissions, and failures—led to a significant loss of Government funds. As discussed above, under ERAP funding measures, Horne's successful depletion of Round 1 funding for the states with which it contracted would result in additional federal funds allocated to the states, and to Horne. As such, although legally obligated to do so, Horne had little incentive to protect federal funds from fraudulent abuse.

## VII. EMPLOYMENT ALLEGATIONS

85. Relator consistently complained to HCD management about the fraud in the ERAP program and suggested things that could be done to catch and stop more of the fraud. She also complained to the State Auditor about the fraud on February 25, 2022. Her complaints and suggestions regarding the fraud alleged herein are discussed below.

86. Relator suggested methods that could be used to improve the verification of applicants' identities and the information applicants provided, including without limitation through using an app that could detect whether a driver's license was valid by scanning the barcode on the back of the license, checking the authenticity of taxpayer ID numbers and 1099s provided by applicants with the IRS and/or appropriate State agency, and tracking data trends regarding identifications used for fraudulent applications. She complained about HCD's poorly designed

SECOND AMENDED COMPLAINT                                2:22-cv-1893-JAM-AC

"Housing is Key" Facebook website where applicants were confused as to what to do and were giving each other advice on what to do. This atmosphere was ripe for predators to ask applicants about their case information in order to provide "help," but they then could easily create duplicate applications to abscond rental fees for that address. Relator noticed inconsistencies in the verification process for ERAP applicants recommended by the federal treasury, the State's verification recommendations for Option B jurisdictions, the State's Administrative Plan verification process, and the verification process actually taking place on the State's "Housing is Key" website. When Relator brought the inconsistencies to HCD's attention, she was told that Horne determines what identity verifications are required and the inconsistency between the documents was not important.

87.    On February 3, 2022 Relator identified a purported California driver's license for "Jennifer Amy Lorie" as fake. The expiration date was not five years from date of issuance and part of the signature image below the photo was truncated. Widen had previously been told by Gallagher that an expiration date that was not five years from the date of issuance and a truncated signature on a driver's license both meant the license was fake.

88.    Then, on February 24, 2022 in a Microsoft Teams training meeting, Relator was trained by Deborah Harper on how to respond to ERAP Inbox inquires with Gallagher and Blevins observing the training. As part of this training, Relator was chastised for having identified the license as fake on February 3, 2022.  Relator was told "We are not case managers, we cannot do fraud review on cases we are looking at to respond to an ERAP Inbox inquiry. You shouldn't be looking at case documents for Inbox status inquiries."

89.    Relator was represented by District Labor Council ("DLC") 787 of Service Employees International Union ("SEIU") Local 1000. Prior to February 25, 2022, Relator had communicated with Ruth Ibarra, the President of DLC 787 about the fraud. On February 25, 2022 at 10:46 am, Relator emailed Ibarra:

> The fake DL I was chastised for noticing is in the attached document. The project is still being processed with no flag to the case per attached audit log. You can see from the fraud tracking sheet a lot of the cases simply don't have the landlord mat[c]hing property owner name. Also, sometimes we pay out on non-existent or

29

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

vacant properties. This program is a disaster.

Besides Ibarra, Relator also meant to send this email to Pedro Leon, an SEIU Local 1000 union representative. However, by mistake, she instead emailed it to Pedro Galvao, HCD's Deputy Director for Legislation. At 10:51 a.m. on February 25, 2022, Galvao forwarded Relator's email to Deborah Harper, who had conducted Widen's training on February 24, 2022, and to defendant Geoffrey Ross, who was then the Deputy Director of Federal Programs at HCD, and who became the Director of State and Federal Programs at defendant Horne. At 10:59 a.m. on February 25, 2022, Harper forwarded Relator's email to defendants Blevins and Gallagher.

90.    At 11:14 a.m. on February 25, 2022, Ibarra emailed Relator: "You sent to the wrong Pedro." Relator then let Galvao know that she had emailed him by mistake. Galvao replied that he would disregard the email. He did not tell Relator that he had already forwarded her email to Harper and Ross.

91.    On February 25, 2022 at 12:28 p.m., Gallagher emailed Relator venting her displeasure at Relator over her emailing Ibarra and Galvao about the fraud:

> This is not appropriate and will not be tolerated. When you have concerns about the programs policies and procedures, you need to discuss them with your management team and follow the proper chain of command to address your concerns. Directly emailing a Deputy Director is not appropriate.
>
> Additionally, the Department has mechanisms in place to address these types of concerns through the See Something Say Something policy, which was provided to you earlier today.

92.    Relator emailed Gallagher back at 12:34 p.m. on February 25, 2022:

> Every concern has been addressed to you and/or Lorrie and fraud concerns have not been addressed at every step. **I have filed a whistleblower complaint to Auditor's Office.** It's far overdue. The amount of fraud and waste in this program is obvious and unconscionable and it has caused me no end of stress to be a witness to this day in and day out. I will look at the see something say something policy you reference below as well and make my concerns known. I will also call Risk Management. I have tried to work within our team for the concerns and it has not been effective.
>
> I sent the email to Pedro by mistake, and he said he would disregard the email when I let him know that. Ruth had asked another union member named Pedro to help me look at options and I had meant to cc him.

30

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

I'm done with silently standing by as thousands go homeless for no reason with misappropriated money from this program. I've never seen anything like it and it's time for it to stop.

93.     At 12:37 p.m. on February 25, 2022, Gallagher forwarded to Blevins and to Rebecca Herzog, then a Classification and Consultation Manager in HCD's Human Resources Department, the email thread containing her 12:28 p.m. email to Widen and Widen's 12:34 p.m. reply. At 12:41 p.m., Herzog emailed back to Gallagher and Blevins: "I would not engage any further. She has avenues and we have provided those to her. She can do what she feels she needs to – we will stay the course with managing her performance. The Audit team will address her complaint as they see necessary."

94.     At 12:50 p.m. on February 25, 2022, Blevins disregarded Human Resources Manager Herzog's advice to "not engage further" and to "stay the course with managing her performance," and emailed Ross: "I would like to immediately lock [Relator] out of our share point files and Neighborly. She has forwarded a spread sheet which contains private and personal information to individuals outside of this program." Blevins also forwarded to Ross the email thread containing Gallagher's 12:28 p.m. email to Widen, Widen's 12:34 p.m. reply, Gallagher's 12:37 p.m. forwarding email to Herzog and Blevins, and Herzog's 12:41 p.m. reply. The spreadsheet to which Blevins' email referred was a fraud tracking sheet attached to Relator's 10:46 a.m. email sent to two individuals-- Ibarra, her union president, and by mistake to Galvao, HCD's Deputy Director for Legislation. Widen had every right to report the fraud to the union. Galvao had said he would disregard the email.

95.     At 1:08 p.m. on February 25, 2022, Ross replied to Gallagher and approved her request to lock Relator out, so she was locked out of her entire HCD online account, which she needed to do her job.

96.     At 2:02 p.m. on February 25, 2022, Leyla Najmi, then HCD's Human Resources Chief, emailed Relator that she was being put on paid Administrative Time Off.

97.     Relator completed the See Something Say Something form to which Gallagher referred in her email sent at 12:28 p.m. on February 25, 2022, and submitted it to Najmi, then

31

HCD's Human Resources Chief. Relator discussed the fraud in the ERAP program in the See Something Say Something form.

98.    HCD had an investigator, Lisa Comer, investigate Relator's conduct. Comer's April 6, 2022 report on her investigation lists Blevins as the complainant against Relator. Comer interviewed, among others, Blevins and Gallagher, who informed Comer that Relator's statements about fraud in the ERAP program were outside the scope of her job duties. In the report, Comer wrote that Blevins told her:

> Blevins received an email on February 25, 2022 from Harper, an HCD ERAP consultant, alerting Blevins to the email sent by [Relator] to Galvao and Ibarra. Blevins stated that [Relator] was sending this email because she was upset over a fraud reporting issue. Blevins recalled multiple conversations that she and Gallagher had with [Relator] about her role in fraud investigations, specifically that the HCD ERAP team was not responsible for fraud reviews, but that there were systems and processes in place to gather the information and report the fraud.

Comer wrote that Gallagher told her:

> [Relator] advised Gallagher at an earlier date that the driver's license she eventually sent to Galvao, and Ibarra was fraudulent. When [Relator] brought the concerns forward, Gallagher reminded her that it was not part of their job duties to identify the fraud and that it would be reviewed by Horne who had specialized training in fraud prevention.

99.    On April 15, 2022, Leyla Najmi, then HCD's Human Resources Chief, issued a Notice of Rejection During Probation which went into effect on April 22, 2022, terminating Widen's employment.

### VIII. CAUSES OF ACTION

#### Count I

#### 31 U.S.C. § 3729(a)(1)(A)

#### (Against Defendants Horne and Does 1–20)

100.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

101.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

32

SECOND AMENDED COMPLAINT                                                2:22-cv-1893-JAM-AC

102.    Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

103.    The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, paid these false or fraudulent claims, and would not have done so but for Defendants' illegal conduct.

104.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

105.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $28,619), for each and every violation alleged herein.

## Count II

## 31 U.S.C. § 3729(a)(1)(B)

## (Against Defendants Horne and Does 1–20)

106.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

107.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

108.    Defendants have violated the FCA, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

109.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid claims that would not have been paid but for Defendants' illegal conduct.

110.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

111.    Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $28,619), for each and every violation alleged herein.

SECOND AMENDED COMPLAINT                                                2:22-cv-1893-JAM-AC

**Count III**

**31 U.S.C. § 3729(a)(1)(C)**

**(Against Defendants Horne and Does 1–20)**

112. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

113. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.,* as amended.

114. By and through the acts described above, Defendants have knowingly conspired to commit violations of subparagraphs (A), (B), and (G).

115. The Government, unaware of the conspiracy by Defendants, paid claims that would not have been paid but for Defendants' illegal conduct.

116. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

117. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $28,619) for each and every violation alleged herein.

**Count IV**

**31 U.S.C. § 3729(a)(1)(G)**

**(Against Defendants Horne and Does 1–20)**

118. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

119. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729, *et seq.,* as amended.

120. By and through the acts described above, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government, and Defendants have concealed and improperly avoided an obligation to pay money to the Government.

121. The Government, unaware of the concealment by Defendants, paid claims that would not have been paid but for Defendants' illegal conduct.

34

SECOND AMENDED COMPLAINT                                     2:22-cv-1893-JAM-AC

122. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123. Additionally, the United States is entitled to the maximum penalty, as adjusted by applicable law (currently $28,619), for each and every violation alleged herein.

### Count V

### 42 U.S.C. § 1983 for Damages

**(Against Defendants Geoffrey Ross, Lorrie Blevins, Sandra Gallagher, and Does 1–20)**

124. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

125. Defendants Geoffrey Ross, Lorrie Blevins and Sandra Gallagher are named in this count in their individual capacities.

126. The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of the Doe Defendants are unknown to Relator, who therefore sues said defendants by such fictitious names and will pray leave to amend this complaint together with appropriate charging allegations when the same have been ascertained. Relator is informed and believes and thereupon alleges that each of said fictitiously named defendants are responsible in some manner for the occurrences herein alleged, and that Relator's damages as herein alleged were proximately caused by their conduct.

127. Relator's speech about fraud in the ERAP program was on a matter of public concern and was uttered as a private citizen.

128. Defendants caused Relator to be placed on administrative leave on February 25, 2022, and then rejected her during probation, thus effectively terminating her, in April 2022. A substantial or motivating factor causing Defendants to terminate Relator was her speech about fraud in the ERAP program, in violation of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

129. As the proximate result of Defendants' violation of 42 U.S.C. § 1983, Relator has suffered damages and is entitled an award therefor to be shown according to proof, including, without limitation, for past and future loss of income and benefits with prejudgment interest

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses.

130. Defendants' violation of 42 U.S.C. § 1983 was malicious, oppressive, fraudulent, and done with reckless and conscious indifference to Relator's rights, and she is entitled to an award of punitive damages therefor to be shown according to proof.

131. As the further proximate result of Defendants' violation of 42 U.S.C. § 1983, Relator has had to hire attorneys and incur litigation expenses to prosecute this lawsuit and is entitled to an award of attorneys' fees and litigation expenses to be shown according to proof.

### Count VI

### 42 U.S.C. § 1983 for Injunctive Relief

**(Against Defendants Geoffrey Ross, Lorrie Blevins, Sandra Gallagher and Does 1–20)**

132. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

133. Defendants Geoffrey Ross, Lorrie Blevins and Sandra Gallagher are named in this count in their official and individual capacities.

134. Relator is entitled to injunctive relief including, without limitation, to require Defendants to expunge her rejection during probation.

135. As the further proximate result of Defendants' violation of 42 U.S.C. § 1983, Relator has had to hire attorneys and incur litigation expenses to prosecute this lawsuit and is entitled to an award of attorneys' fees and litigation expenses therefor to be shown according to proof.

### Count VII

### Negligence

**(Against Defendants Horne and Does 1–20)**

136. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

137. Horne acted negligently in failing to find much of the massive fraud in the ERAP program and in representing that it was acting with due care and finding the fraud. If Horne had

SECOND AMENDED COMPLAINT                                      2:22-cv-1893-JAM-AC

not acted negligently, the massive fraud described herein would not have occurred.

138.   It was reasonably foreseeable that as the proximate result of Horne's negligence, an employee of Horne's customer, the State of California, would blow the whistle on the massive fraud in the ERAP program and suffer retaliation. Whistleblowers commonly suffer retaliation.

139.   As the proximate result of Horne's negligence, Relator was put on administrative leave on February 25, 2022 and then rejected during probation, thus effectively terminating her, in April 2022. As the further proximate result of Horne's negligence, Relator has incurred attorneys' fees and litigation expenses to sue Ross, Blevins and Gallagher in Counts V and VI above.

140.   As the proximate result of Horne's negligence, Relator has suffered damages and is entitled an award therefor to be shown according to proof, including, without limitation, for past and future loss of income and benefits and reasonable attorneys' fees and litigation expenses incurred in suing Ross, Blevins and Gallagher with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses.

141.   Defendants' negligence was malicious, oppressive, fraudulent, and done with reckless and conscious indifference, and Relator is entitled to an award of punitive damages therefor to be shown according to proof.

## IX. PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant as follows:

A.   That Defendants Horne and Does 1–20 cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

B.   That this Court enter judgment against Defendants Horne and Does 1–20 in an amount equal to three times the amount of damages sustained by the United States because of Defendants' actions, plus the maximum civil penalties available under the False Claims Act;

C.   That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

D.   That this Court order injunctive relief, including a permanent injunction enjoining Defendants Horne and Does 1–20, their agents, successors, and employees from engaging in each

37

SECOND AMENDED COMPLAINT                                       2:22-cv-1893-JAM-AC

unlawful practice set forth above, and for such other injunctive relief as the Court may order;

E.    That Relator be awarded damages to be shown according to proof against Defendants Ross, Blevins and Gallagher in their individual capacities, and against Does 1–20, including, without limitation, for past and future loss of income and benefits with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses, and for punitive damages;

F.    That Relator be awarded injunctive relief against Defendants Ross, Blevins and Gallagher in their official and individual capacities, and against Does 1–20, including, without limitation, to require Defendants to expunge her rejection during probation.

G.    That Relator be awarded damages to be shown according to proof against Defendants Horne and Does 1–20, including, without limitation, for past and future loss of income and benefits and reasonable attorneys' fees and litigation expenses incurred in suing Ross, Blevins and Gallagher, with prejudgment interest thereon, emotional and physical distress, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other nonpecuniary losses, and for punitive damages;

H.    That Relator be awarded all costs of this action, including attorneys' fees, costs and expenses; and

I.    That Relator recover such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

SECOND AMENDED COMPLAINT                                    2:22-cv-1893-JAM-AC

Dated: December 11, 2025

/s/ *James C. Shah*
**MILLER SHAH LLP**
James E. Miller (SBN 262553)
James C. Shah (SBN 260435)
8730 Wilshire Boulevard, Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jemiller@millershah.com
jcshah@millershah.com

**HIRST LAW GROUP, P.C.**
Michael A. Hirst (SBN 131034)
Marisela Bernal (SBN 329589)
200 B Street, Suite A
Davis, CA 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707
michael.hirst@hirstlawgroup.com
marisela.bernal@hirstlawgroup.com

**THE HIGHMAN LAW FIRM**
Bruce Highman (SBN 101760)
582 Market Street, Suite 1212
San Francisco, CA 94104
Telephone: (415) 982-5563
Facsimile: (415) 712-0018
bruce.highman@highmanlaw.com

*Attorneys for Plaintiff-Relator*

39

SECOND AMENDED COMPLAINT                                      2:22-cv-1893-JAM-AC