James E. Miller (SBN 262553)
James C. Shah (SBN 260435)
**MILLER SHAH LLP**
8730 Wilshire Boulevard, Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
        jcshah@millershah.com

Michael A. Hirst (SBN 131034)
Marisela Bernal (SBN 329589)
**HIRST LAW GROUP, P.C.**
200 B Street, Suite A
Davis, CA 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707
Email: michael.hirst@hirstlawgroup.com
        marisela.bernal@hirstlawgroup.com

[Additional counsel listed on signature page]

*Attorneys for Plaintiff-Relator*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES of AMERICA, *ex rel.* HEATHER WIDEN, <br><br> Plaintiff, <br><br> v. <br><br> BDO GOVERNMENT SERVICES, LLC f/k/a HORNE LLP, *et al.*, <br><br> Defendants. | Civil Action No. 2:22-cv-1893-JAM-AC <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT HORNE LLP'S MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Second Amended Complaint filed Dec. 11, 2025 <br><br> Date: April 21, 2026 <br> Time: 1:00 P.M. <br> Judge: Hon. John A. Mendez <br> Courtroom 6, 14th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

    I.      Horne Contracted to Administer ERAP Subject to Applicable Laws and Regulations ................................................................................................................2

    II.     Horne Failed to Establish Adequate Anti-Fraud Policies and Paid Fraudulent Applications ...............................................................................................................3

    III.    Horne's Failures to Prevent Fraud Harmed the Government ...................................4

ARGUMENT...................................................................................................................................4

    I.      The SAC States a Claim Under the FCA...............................................................4

         A.     The SAC states an FCA claim against Horne................................................4

         B.     Horne caused California to make false certifications ...................................8

         C.     The SAC states a reverse false claim.........................................................10

         D.     The SAC states a claim for FCA conspiracy .............................................10

         E.     The SAC states a false records claim.........................................................11

         F.     The SAC adequately pleads materiality......................................................11

         G.     The SAC adequately pleads scienter..........................................................13

    II.     The SAC States Claims for FCA Violations Outside California.............................13

    III.    The SAC States Negligence Claims Against Horne for Relator's Termination......14

CONCLUSION...............................................................................................................................15

MPA IN OPP. TO MOTION TO DISMISS SAC                2:22-cv-1893-JAM-AC

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andresen v. Int'l Paper Co.*,
2014 WL 2511283 (C.D. Cal. June 3, 2014) ........................................................................ 6

*Bastian v. Cnty. of San Luis Obispo*,
199 Cal. App. 3d 520 (Ct. App. 1988) ........................................................................... 14, 15

*Brown v. USA Taekwondo*,
11 Cal.5th 204 (2011) .................................................................................................... 15

*Davis v. Nadrich*,
174 Cal. App. 4th 1 (2009) ............................................................................................ 14

*Ebeid ex rel. United States v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ...................................................................................... Passim

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ........................................................................................... 6

*Ileto v. Glock, Inc.*,
349 F.3d 1191 (9th Cir. 2003) ......................................................................................... 15

*Kenley Emergency Med. v. Schumacher Grp. of Louisiana Inc.*,
2025 WL 1359065 (N.D. Cal. May 9, 2025) ..................................................................... 14

*Landeros v. Flood*,
17 Cal.3d 399 (1976) ..................................................................................................... 15

*Malhotra v. Steinberg*,
2013 WL 441740 (W.D. Wash. Feb. 5, 2013), *aff'd*, 770 F.3d 853 (9th Cir. 2014) ............. 9

*Nance v. United States*,
2023 WL 5211606 (N.D. Ill. Aug. 14, 2023), *aff'd*, 2024 WL 4502107 (7th Cir. Oct. 16, 2024) ........ 15

*Steinle v. United States*,
17 F.4th 819 (9th Cir. 2021) ............................................................................................ 15

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
314 F.3d 995 (9th Cir. 2002) ............................................................................................ 5

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ........................................................................................... 11

*United States ex rel. Brown v. Celgene Corp.*,
2014 WL 3605896 (C.D. Cal. July 10, 2014) ............................................................... 5, 8, 9

ii

*United States ex rel. Campie v. Gilead Scis.*,
  862 F.3d 890 (9th Cir. 2017) ................................................................................................ 4, 12

*United States ex rel. Chin v. CVS Pharm., Inc.*,
  2017 WL 4174416 (C.D. Cal. Aug. 15, 2017) ..................................................................... 5, 14

*United States ex rel. Hendow v. Univ. of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) .............................................................................................. 6, 11

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
  874 F.3d 905 (6th Cir. 2017) .................................................................................................... 10

*United States ex rel. Khaira v. Blue Cross of California, Inc.*,
  2024 WL 1020481 (E.D. Cal. Mar. 7, 2024) .............................................................................. 8

*United States ex rel. Osinek v. Kaiser Permanente*,
  2023 WL 4054279 (N.D. Cal. June 15, 2023) .......................................................................... 10

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*,
  640 F.Supp.3d 885 (N.D. Cal. 2022) ......................................................................................... 4

*United States ex rel. Puhl v. Terumo BCT*,
  2019 WL 6954317 (C.D. Cal. Sept. 12, 2019) ........................................................................... 9

*United States ex rel. Quesenberry v. JMG Invs., Inc.*,
  2026 WL 453469 (C.D. Cal. Jan. 14, 2026) ............................................................................. 12

*United States ex rel. Thomas v. Touchstone Behav. Health*,
  774 F.Supp.3d 1179 (D. Ariz. 2025) ........................................................................................ 10

*United States ex rel. Turner v. Dynamic Medical Systems, LLC*,
  2022 WL 20804350 (E.D. Cal. Jan. 24, 2022) ......................................................................... 13

*United States ex rel. Tutanes-Luster v. Broker Sols., Inc.*,
  2019 WL 6972689 (C.D. Cal. Jul. 8, 2019) .............................................................................. 13

*United States v. Eghbal*,
  548 F.3d 1281 (9th Cir. 2008) .................................................................................................... 9

*United States v. N. Am. Health Care, Inc.*,
  2015 WL 6871781 (N.D. Cal. Nov. 9, 2015) .............................................................................. 8

*United States v. Neifert-White Co.*,
  390 U.S. 228 (1968) .................................................................................................................... 5

*United States v. Otero*,
  2017 WL 11673897 (S.D. Cal. Aug. 8, 2017) ............................................................................ 8

*United States v. Quicken Loans Inc.*,
  239 F.Supp.3d 1014 (E.D. Mich. 2017) ..................................................................................... 9

iii

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ............................................................................................... 7

*Valenzuela v. California*,
  194 Cal. App. 3d 916 (1987) ............................................................................................... 14

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
  953 F.3d 1108 (9th Cir. 2020) ......................................................................................... 5, 13

**Statutes**

15 U.S.C. § 9058a(c)(1) ...................................................................................................... 8, 12

31 U.S.C. § 3729(b)(1) ........................................................................................................... 13

MPA IN OPP. TO MOTION TO DISMISS SAC                          2:22-cv-1893-JAM-AC

Plaintiff-Relator, Heather Widen ("Relator") respectfully submits this Memorandum of Points and Authorities in Opposition to the Motion to Dismiss ("Motion," ECF No. 59) and Memorandum of Points and Authorities ("MPA," ECF No. 57-1) filed by Defendant, BDO Government Services, LLC f/k/a Horne LLP ("Horne").

## **INTRODUCTION**

This case arises out of Horne's fraudulent profiteering under government contracts to administer the federal Emergency Rental Assistance Program ("ERAP" or "ERA Program"). Horne failed to take even the minimal steps it promised to prevent this taxpayer-funded program from being marred by persistent and pervasive fraud. Horne knew it was receiving, approving, and paying fraudulent claims, yet did nothing to address the misconduct for fear of losing its own ability to profit from the COVID-19 pandemic. As a result, Horne submitted or caused to be submitted false statements, records, and claims and knowingly received and retained millions of Government dollars in violation of the False Claims Act ("FCA").

Rather than disavow its serious misconduct, Horne protests that the Second Amended Complaint (ECF No. 42, "SAC") should be dismissed because it does not identify specific false claims. Yet this argument ignores Ninth Circuit law and the multiple indicia of a fraudulent scheme from which the Court may infer false claims were submitted. Horne further attempts to use the involvement of other actors as a shield, incredibly suggesting that California knew and tacitly approved of Horne's unlawful practices despite Horne's express certifications that it was obligating ERAP funds according to applicable laws and regulations, including those pertaining to fraud, waste, and abuse. Horne concedes the SAC alleges it acted knowingly in administering ERAP (and failing to implement proper compliance policies), which is all that is required to plead scienter under the FCA.

Horne also attempts to avoid liability by arguing that certifications about claims are not claims themselves, that the SAC includes derivative claims, and that Horne owed no duty to employees engaging in protected conduct by blowing the whistle on fraud that pervaded ERAP. None of these arguments have merit. The SAC explains how Horne placed its own self-interest above the law, failing to comply with ERAP requirements, paying out fraudulent ERAP claims, and submitting or causing false claims to be submitted to the Government. The Court should deny Horne's Motion in its entirety.

1

## BACKGROUND

**I.      Horne Contracted to Administer ERAP Subject to Applicable Laws and Regulations**

Congress established the ERAP in December 2020 to provide financial support to people facing eviction because of the COVID-19 pandemic.  SAC ¶ 20.  Only landlords and tenants with enumerated housing-related costs who met certain statutory criteria were eligible to receive ERAP funds.  *Id.* ¶¶ 26, 28.  To ensure funds went to people who truly needed rental assistance, the Department of the Treasury ("Treasury") established a recapture provision for ERAP funds that had not been obligated by a certain date, thereby allowing those funds to be reallocated to grantees with demonstrated need.  *Id.* ¶¶ 21, 23. Recognizing the program's potential for misuse, Treasury also issued substantial guidance on how to prevent fraud and ensure grant funds went only to eligible recipients.  For instance, the ERA FAQs required grantees to prove their residence and rent payments. *Id.* ¶ 32.  Under Treasury's final grant terms, "false claims or statements made in connection with [an ERAP] award may result in fines, imprisonment, debarment from participating in federal awards or contracts, and/or any other remedy available by law." *Id.* ¶¶ 29, 31.

California directed its Department of Housing and Community Development ("HCD") to administer the federal ERAP funds it received and permitted HCD to contract with a vendor to undertake this task.  *Id.* ¶ 25.  When bidding on the lucrative California ERAP contract (the "Contract"), Horne represented that it would audit 100% of all applications for compliance; use a system "built with compliance at every step to avoid fraud, waste, and abuse;" and supplement automated controls with manual QC review to "identify repetitive data trends that may indicate attempted fraud" to "protect tax payer funds in accordance with Treasury's expectations."  *Id.* ¶ 37.

After making these material representations about its resources and ability to properly administer California's ERAP funds, Horne was awarded the Contract and paid $1,546,566,405, which included both the ERAP funds to be distributed and Horne's compensation.  *Id.* ¶¶ 35–38, 45.  The Contract required Horne to "properly disburse funding available in compliance with the applicable rules and laws," and Horne specifically agreed to "develop Application Review Procedures" to "verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments."  *Id.* ¶ 40. The Contract also made Horne "responsible for ensuring that no duplicate payments are issued" and noted

2

MPA IN OPP. TO MOTION TO DISMISS SAC                                    2:22-cv-1893-JAM-AC

Horne "may be held financially responsible for duplicate payments or overpayments." *Id.* Horne was also specifically responsible for "implementing measures and systems to prevent the illegal and improper payments of funds [] to putative tenants or landlords" and was required to "indemnify, defend and save harmless the State, HCD, their officers, agents and employees from any and all claims and losses accruing or resulting from Wrongful Payments." *Id.* ¶ 40, 46.  In addition to California, Horne administered ERAP funds for the states of Alabama, Colorado, Tennessee, and Texas.  *Id.* ¶ 4.

**II.      Horne Failed to Establish Adequate Anti-Fraud Policies and Paid Fraudulent Applications**

Despite the legal and contractual requirements to prevent fraud in its administration of ERAP funds, Horne entirely failed to establish an adequate monitoring program and then concealed its noncompliance from the Government.  *Id.* ¶ 43.  To maximize its own profits, Horne cut corners and failed to secure the necessary staff and resources for fraud detection, resulting in an insufficient (or nonexistent) review process that consistently failed to flag potentially fraudulent applications.  *Id.* ¶¶ 45, 49, 53.  This led to Horne's approval of applications presenting fake IDs, doctored utility bills, out of state IDs, and duplicative landlord case IDs.  *Id.* ¶ 53.  In the words of an auditor from the California State Controller's Office ("SCO"), Horne was "allowing fraud to occur and go undetected."  *Id.*

A sample of 1,007 payments Horne made between April 26 and June 28, 2021, revealed that 98.5% of Horne's quality assurance checklists were incomplete, 96% of Horne's case management checklists were incomplete, 30.6% of transaction amounts were incorrect, 19.8% featured ineligible or inaccurate lease or rent amounts that resulted in erroneous payments, and 16.4% were overpayments.  *Id.* ¶ 55. Relator and her colleagues at HCD personally reviewed numerous applications Horne approved that had obvious markers of fraud.  *See id.* ¶¶ 59–68.  Incredibly, Horne never attempted to address the myriad failings in its review program identified by SCO and HCD.  *Id.* ¶¶ 56–57.

Confidential witnesses from across the country confirmed that Horne was underprepared and understaffed for its ERAP administration projects, that Horne staff lacked the knowledge, training, and skills to identify suspicious features on applications, and that Horne did not provide the resources necessary to verify applications.  *Id.* ¶¶ 70–80.  Rather than take its fraud prevention obligations seriously, Horne dismissed blatant fraud indicators and rushed approval of applications for the sake of maintaining its contracts to administer ERAP.  *Id.* ¶¶ 72, 74, 77, 80, 84.

MPA IN OPP. TO MOTION TO DISMISS SAC                    2:22-cv-1893-JAM-AC

**III.    Horne's Failures to Prevent Fraud Harmed the Government**

Unfortunately, the Government's concerns about fraud in ERAP were well-founded. *Id.* ¶ 44. Horne's failure to adequately identify and redress fraudulent applications resulted in California wrongfully paying millions of federal funding dollars and submitting certifications to the Government that the funds were obligated in compliance with ERAP requirements. *Id.* ¶¶ 45, 47, 54, 61, 83. Per the Contract, Horne should have repaid any wrongful ERAP payments to the Government. *Id.* ¶ 81.

**ARGUMENT**

**I.    The SAC States a Claim Under the FCA**

"[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government either to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 902 (9th Cir. 2017). Without engaging in good faith with the SAC's allegations, Horne asserts Relator has failed to plead "several elements of a viable FCA claim." Mot. at 5. But as Horne fatally fails to acknowledge, it is more than sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010). This is precisely what Relator has done in the SAC.

**A.    The SAC states an FCA claim against Horne**

***Horne submitted or caused false claims to be submitted to the Government.*** Horne's first argument is premised on the incorrect assertion that Relator has not established that false claims were submitted to the Government. *See* MPA at 5–6. Specifically, Horne challenges the presence of "a misrepresentation" and "a claim," *id.* at 5, or elements (1) and (4) of the Ninth's Circuit's formulation of an FCA claim in *Campie*. However, Horne entirely fails to explain how promising to administer ERAP "in compliance with the applicable rules and laws," and to "verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments," SAC ¶ 40, and proceeding to wholly flaunt that contractual obligation, was not a "fraudulent course of conduct." *Campie*, 862 F.3d at 902. Indeed, Horne's misrepresentation about how it would administer ERAP funds is the definition of a legally false claim. *See United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F.Supp.3d 885, 904 (N.D. Cal. 2022) ("A legally false claim for payment involves an assertion (either express or

4

implied) that there is compliance with a statute, regulation, or contract."). Rather than the "garden-variety" breaches Horne invokes, MPA at 5, this is precisely the type of conduct the FCA is designed to address. *See Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020) ("We interpret the FCA broadly, in keeping with the Congress's intention 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.' For that reason, the Supreme Court 'has consistently refused to accept a rigid, restrictive reading' of the FCA, and has cautioned courts against 'adopting a circumscribed view of what it means for a claim to be false or fraudulent.'") (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).[1]

As to the "claim" element, Horne also fails to acknowledge that, when alleging a nationwide scheme, Relator is not required "to plead each and every instance of fraudulent conduct." *United States ex rel. Chin v. CVS Pharm., Inc.*, 2017 WL 4174416, at *7 (C.D. Cal. Aug. 15, 2017). The Ninth Circuit has expressly held that a plaintiff "need not[] provide representative examples to establish the payment element of the prima facie case." *Ebeid*, 616 F.3d at 998–99. Instead, a relator may present "sufficiently detailed circumstantial evidence to establish that the defendant actually submitted a false claim." MPA at 7 (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)). Furthermore, courts are more lenient at the pleading stage when defendants are alleged to have induced third parties to submit false claims, as a relator "cannot reasonably be expected to allege details about the individual claims that were submitted." *United States ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *9 (C.D. Cal. July 10, 2014).

Contrary to Horne's claim that Relator pleads "only that HCD transferred funds to Horne to administer ERAP," MPA at 7, the SAC is replete with circumstantial evidence establishing the submission of false claims. Relator provides numerous detailed accounts of applications Horne paid despite obvious indicators of fraud, including the date and amount of payment. When Horne paid these applications, it caused California to falsely certify that federal funds had been allocated in accordance with all applicable

---

[1] Horne misleadingly suggests its fraudulent misrepresentations were limited to the bid it made in response to California's request for proposal. MPA at 6. In truth, Horne lied about its processes and abilities in the actual Contract it executed with HCD, by which it received federal funds. SAC ¶¶ 40–42.

MPA IN OPP. TO MOTION TO DISMISS SAC                    2:22-cv-1893-JAM-AC

laws and regulations, including the FCA.  SAC ¶¶ 61–64, 66.  Moreover, these payments constituted "claims" for purposes of the FCA, which arise "whenever the government is asked to 'pay out money or to forfeit moneys due.'" *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) (citation omitted).  While Horne did not necessarily cause people to submit fraudulent applications for ERAP funding, *see* MPA at 6, its review failures encouraged continued false applications and was the but for cause of those applications actually being paid.

***Horne made false certifications to the Government.***  Horne's next attempt to avoid the consequences of its actions is belied by the plain language of the SAC.  Following Horne's own recitation, MPA at 6–7, Relator more than adequately pled false certification: (1) Horne previously undertook to expressly comply with a law when it contracted with HCD and agreed to administer ERAP according to "the requirements of the Act and SB 91, any rules or guidance promulgated by the U.S. Department of the Treasury, and all other applicable federal or state laws," SAC ¶ 40; (2) Horne failed to comply with that express promise in refusing to employ the requisite staff and resources to review ERAP applications and by approving and paying fraudulent applications, *id.* ¶¶ 50–80; (3) submitting claims for payment implicated Horne's obligation because Horne certified to HCD that it was approving applications in accordance with the FCA and, in paying fraudulent applications, Horne caused California to falsely certify to Treasury that its ERAP funds were allocated appropriately, *id.* ¶¶ 7, 83–84; (4) Horne specifically represented that it reviewed and approved ERAP applications in accordance with applicable state and federal guidance and laws, *id.* ¶ 40; and (5) Horne's failure to disclose its noncompliance with the Contract terms rendered its representations to HCD, and California's misrepresentations to the Government, "misleading half-truths." *Id.* ¶¶ 7, 83–84. *See Hendow*, 461 F.3d at 1172 ("False Claims liability attaches '*because of the fraud* surrounding the efforts to obtain the contract or benefit status, or the payments thereunder.'") (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)).

***The SAC pleads the "how," "who," and "when" of the false claims alleged.***  Horne also ignores Relator's well pled allegations and asserts the SAC "provides no specifics" regarding the how, who, and when false claims were submitted.  MPA at 7–8.  Of course, the "time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *Andresen v. Int'l Paper Co.*, 2014 WL 2511283, at *5 (C.D. Cal. June 3, 2014) (citation omitted).  "Rather, the rule is context specific and flexible." *Id.*  Regardless,

6

no fair reading of the SAC could conclude that Relator's detailed allegations do not amount to a fraudulent scheme. As to the "how" allegations, there is no "gap" between Horne's misconduct and the false claims at issue. *See* MPA at 7. Despite promising to do so, Horne failed to allocate the necessary personnel, resources, and training to ERAP application review. *See* SAC ¶¶ 50–80. This directly resulted in thousands of fraudulent applications worth millions of dollars being approved and paid with government funds. *Id.* ¶¶ 6–7, 45, 53–54, 81. Indeed, SCO's audit of a random sample of ERAP applications submitted between April 14, 2021 and December 31, 2021, revealed that within the sample alone, Horne approved at least 488 potentially fraudulent applications worth $18.1 million and had, as of the time of the audit, already paid $7 million of those claims. *Id.* ¶ 54.

As to the "who" allegations, Horne's inappropriately lax review policies permeated the entire company and were directed from management.[2] Multiple former Horne employees confirmed the failings of the ERAP administration and specifically reported that their superiors at Horne ignored, dismissed, and discouraged their concerns about fraud. *Id.* ¶¶ 70–80. Horne itself was the entity that contracted with HCD, promised to administer ERAP in accordance with federal and state laws and guidelines, received significant federal funding to do so, and agreed to be financially responsible for wrongfully paid funds. SAC ¶¶ 35–36, 40–42, 45–46. These are the "underlying misrepresentations giving rise to the fraud claims" in this action. MPA at 8. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.")

Lastly, regarding the "when" allegations, the relevant time period is adequately defined. Horne contracted with HCD on March 4, 2021, and began accepting applications on March 15, 2021. SAC ¶ 36. Relator alleges Horne approved and paid fraudulent applications from the outset of its participation until the program's end. *Id.* ¶ 2. Relator specifically notes that Horne did not secure DataTree subscriptions until February 2022, approved at least 488 potentially fraudulent applications between April 12, 2021 and December 31, 2021, and presents specific examples of fraudulent applications Horne approved on

---

[2] Relator has also named Doe Defendants, who are contractors, agents, partners, and/or representatives of Horne and whom Relator will name once she has confirmed their identities. SAC ¶ 19.

7

September 23 and November 10, 16, and 30, 2021.  *Id.* ¶¶ 52, 54, 62–66.  *See United States v. N. Am. Health Care, Inc.*, 2015 WL 6871781, at *6 (N.D. Cal. Nov. 9, 2015) (finding relator's description of scheme through "first-hand information" sufficient).  Such allegations are more than sufficient to put Horne on notice of the time period at issue in this action.  *See Ebeid*, 616 F.3d at 999.

### B.   Horne caused California to make false certifications

Horne argues it cannot be liable for causing California to falsely certify that ERAP funding had been remitted appropriately.  MPA at 8–10.  Neither of Horne's two points—that California's certification was not a claim for reimbursement and that there was no proximate causation—have merit.

*First*, whether California's Obligated Funds Certification ("OFC") was itself a claim for payment is irrelevant.  The OFC was material to California's retention of Round 1 funding and Treasury's award of Round 2 funding.  "The federal statutory requirements for ERAP eligibility make clear that program funds are to be paid only to eligible landlords and tenants who need the funds for housing-related costs." SAC ¶¶ 26 (citing 15 U.S.C. § 9058a(c)(1)), 29.  Indeed, the Government informed the states that non-obligated funds were to be reallocated on a needs-basis to other grantee states and cities.  *Id.* ¶¶ 22–23.  If California could not certify that Round 1 funding had been obligated appropriately or the Government knew that certification was false, the Government would have reallocated outstanding Round 1 funds, ordered repayment of improperly allocated Round 1 funds, and/or heavily reduced, if not eliminated, California's Round 2 funding.  *See United States v. Otero*, 2017 WL 11673897, at *5 (S.D. Cal. Aug. 8, 2017) (rejecting argument that the forms plaintiff relied upon were not submitted "in conjunction with payments" because defendants' allegedly false statements "were relied upon by the United States when it awarded contracts . . . and resulted in payments of invoices submitted by Defendants").  This critical difference renders *United States ex rel. Khaira v. Blue Cross of California, Inc.*, which Horne cites and where the certifications had no connection to the "disbursement of funds," inapposite.  2024 WL 1020481, at *4 (E.D. Cal. Mar. 7, 2024).

*Second*, Horne urges the Court to adopt an incorrect theory of causation.  Relator need only show that Horne's false certifications and reports to California were "a substantial factor in bringing about the false claims and such claims were a foreseeable and natural consequence of its conduct."  *Brown*, 2014 WL 3605896, at *8.  For example, in *Brown*, the court found the following causal chain "straightforward":

8

"(1) Celgene allegedly fraudulently promoted [] non-reimbursable, off-label uses to physicians, (2) this [] caused physicians to write off-label prescriptions, and (3) many of these non-reimbursable prescriptions were submitted to government payors for reimbursement." *Id.*[3] Here, the causal chain is even simpler: (1) Horne falsely certified and reported that it was filtering fraudulent ERAP applications; (2) the states relied upon and incorporated Horne's certifications and reports in their own certifications to the Government; and (3) based on those certifications and reports, the Government provided and did not reallocate or order repayment of ERAP funds. SAC ¶ 47; *see United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008) (even though defendants "were not parties to the actual claims presented to HUD," "liability under the FCA nevertheless attaches, because the false statements were 'relevant to the government's decision to confer a benefit.'") (citation omitted).

Horne suggests that HCD either ignored or knowingly incorporated Horne's false certifications and reports, and that California did the same in its certifications to the Government. MPA at 10. Even if this were true, it would not insulate Horne from liability. As discussed throughout the SAC, Horne's fraud caused the Government to pay and not reallocate funds. Whether California's work on ERAP was negligent or even knowingly inappropriate, Horne remains liable for its own conduct. Moreover, SCO did not take a formal position until it audited Horne's ERAP claims process and published its audit report in August 2022, about a year after Round 1 funding had been obligated. SAC ¶¶ 22, 54. Horne can hardly claim that California had definitive knowledge of fraudulent activity it was in the process of investigating, particularly when the fraudulent actor was repeatedly certifying as to its compliance. *See, e.g.*, *Malhotra v. Steinberg*, 2013 WL 441740, at *3 (W.D. Wash. Feb. 5, 2013), *aff'd*, 770 F.3d 853 (9th Cir. 2014) (finding that an initial investigation did not impart "true knowledge" of defendant's fraudulent activities). In any event, "proximate cause, foreseeability, and intervening causes are questions for the jury." *United States v. Quicken Loans Inc.*, 239 F.Supp.3d 1014, 1043 (E.D. Mich. 2017). In sum, this is, at most, a factual defense that cannot be resolved on a motion to dismiss.

---

[3] In contrast, in *United States ex rel. Puhl v. Terumo BCT*, which Horne cites, the relator did not allege any promotional activities to influence the physicians or the likelihood of government reimbursement, thus creating a causal gap. 2019 WL 6954317, at *4 (C.D. Cal. Sept. 12, 2019).

9

**C.      The SAC states a reverse false claim**

Horne asserts the SAC does not state a reverse false claim because the Contract states that Horne "*may* be held financially responsible for duplicate payments or overpayments."  MPA at 10 (emphasis added).  Focusing myopically on the permissive "may," Horne neglects to inform the Court that the Contract goes on to require that "duplicate payments or over payments . . . *must* be recaptured" by Horne.  SAC ¶ 40.  The Contract further states that Horne ""will be *required* to indemnify, defend and save harmless the State . . . from any and all claims and losses accruing or resulting from Wrongful Payments."  *Id.* ¶¶ 40, 46.  In short, the Contract holds Horne financially responsible for duplicate payments or overpayments to the extent it cannot recover them.  By failing to return wrongfully paid funds or indemnify California and knowingly concealing that overpayment, Horne has violated the FCA.  *See United States ex rel. Thomas v. Touchstone Behav. Health*, 774 F.Supp.3d 1179, 1194 (D. Ariz. 2025) ("the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment").

Horne's citation to *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.* cannot save its argument.  There, the alleged "obligation to pay" was penalties in connection with violations of the defendants' corporate integrity agreements, which "were subject to discretionary enforcement by the Office of the Inspector General."  874 F.3d 905, 922 (6th Cir. 2017).  Here, the wrongful payments are not penalties subject to any discretionary enforcement by the Government; under the terms of the Contract, Horne was obligated to either recover the overpayments or reimburse the Government.

**D.      The SAC states a claim for FCA conspiracy**

Horne's defense to Relator's FCA conspiracy claim is merely an extension of its prior insufficient arguments that there is no underlying FCA violation.  MPA at 11.  As Relator's allegations of Horne's FCA violations are sufficiently pled, *supra* Arg. § I(A), this argument also fails.  Horne further insists that the SAC does not identify the persons or their agreement in the conspiracy.  To the contrary, the SAC details efforts by certain HCD personnel and Defendants Ross, Blevins, and Gallagher to conceal Horne's fraud.  SAC ¶¶ 88–99.  Such allegations indicate a tacit agreement between Horne and certain HCD personnel and are sufficient to state a conspiracy claim.  *See United States ex rel. Osinek v. Kaiser Permanente*, 2023 WL 4054279, at *9 (N.D. Cal. June 15, 2023) (finding it "plausible that the [defendants]

10

implicitly agreed to submit factually false claims for payment to the United States" where allegations demonstrated defendants knew there was a problem with their policies and did nothing to fix them).

### E.     The SAC states a false records claim

Horne argues Relator does not state a false records claim because she fails to plead the submission of a fraudulent claim and has not identified a specific false record.  But the SAC is not required to "identify representative examples of actual false claims." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 678 (9th Cir. 2018)).  Instead, it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99).  As discussed above, the SAC adequately pleads submission of false or fraudulent claims and details Horne's scheme, supplying the requisite "strong inference that [false records] were actually submitted." *Id.*  Moreover, Horne's argument that Relator does not identify a false record or statement is irreconcilable with her well-pled allegations regarding the false representations Horne made in its bid to secure the Contract and the false statements it caused California to make that ERAP funds were obligated appropriately, both of which were material to the Government's payment of ERAP funds.  *See* SAC ¶¶ 37–38, 47, 83; *Hendow*, 461 F.3d at 1174–75 (finding allegations that the defendant violated a statutory requirement, by which it had agreed to abide in contract, presented a false statement).

### F.     The SAC adequately pleads materiality

Horne presents multiple flawed rationales to support its position that the SAC does not establish materiality.  MPA at 10–13.  First, Horne's dogged repetition that Relator does not identify misrepresentations does not erase the SAC's clear allegations that Horne made false certifications to the Government and caused California to make false certifications, without which the Government would not have granted ERAP funds.  *See supra*, Argument §§ II(A), (B); SAC ¶¶ 20-25, 47-48.

Second, Horne incredibly suggests that the Government would have allocated and continued allocating ERAP funding to California and the other contracted states even had it known that Horne was systematically facilitating payment of fraudulent applications. Specifically, Horne claims that "the ability to distribute relief funds quickly was the true material issue" of the ERAP program.  MPA at 12.  Of course, it is possible for a statute to have multiple material concerns, and it is facially absurd to claim that the Government is indifferent to the fraudulent use of the public fisc.  Horne cannot "use the . . .

11

fraudulently-obtained [Government] approval as a shield against liability." *Campie*, 862 F.3d at 906. Moreover, the Government emphasized that ERAP relief funds were to be distributed to **eligible** households, which Horne acknowledges. 15 U.S.C. § 9058a(c)(1); SAC ¶¶ 26-28. In other words, the grantee states' abilities to ensure distribution to **eligible** households was material to the Government, and Horne's false claims and reports misrepresented this fact. While Congress delegated certain "flexibility" for eligibility determinations, nothing in ERAP sanctions Horne's systematic approval of fraudulent applications, which is the issue here. To the contrary, the Government indicated at the outset that it would reallocate funds if grantees could not certify distribution to eligible households and required grantee certifications before obligating and distributing funds. SAC ¶¶ 22–23, 83.

Horne is also incorrect that Congress did not create a mechanism to recoup fraudulently allocated funds. MPA at 12. ERAP grant terms warned against false statements or claims in connection with the applications and provided whistleblower protections for disclosing any such fraudulent activity. SAC ¶¶ 29–31. And, directly contradicting Horne's point, the Government provided guidance on detecting and reporting fraudulent activity. *Id.* ¶ 32. Had the Government been apathetic about approval of fraudulent applications, as Horne suggests, none of these provisions or conditions would be in place. There can be no serious dispute that Horne's systemic inability to vet applications (and misrepresentation of that fact) was material to the Government's decision to provide and not redirect ERAP funding. *See United States ex rel. Quesenberry v. JMG Invs., Inc.*, 2026 WL 453469, at *7 (C.D. Cal. Jan. 14, 2026) (finding materiality because there was "no serious dispute" that the defendants would not have received PPP loan had they answered the certification truthfully).

Horne's argument that California somehow opted to overlook its fraud, MPA at 12-13, misses the point. Materiality focuses on what the *federal* Government knew, not what California saw or overlooked. Without the misrepresentations to Treasury that the ERAP was being administered in compliance with federal law, the Government would have sought recoupment of those improperly dispersed funds.[4]

---

[4] *See* Emergency Rental Assistance Program,  (last accessed on March 12, 2026) (Treasury has recouped over $900 million from unobligated and improper ERA1 payments, over $60 million in ERA2 payments, and issued close to $1 million in monetary findings for improper payments.)

MPA IN OPP. TO MOTION TO DISMISS SAC                    2:22-cv-1893-JAM-AC

**G.        The SAC adequately pleads scienter**

Horne suggests any false claims or certifications were merely the result of mistake, MPA at 13–14, an assertion incompatible with the SAC's detailed allegations of knowing misconduct.  Horne's approval process was grossly inadequate, resulting in millions of dollars in fraudulent payments, and HCD, SCO and multiple Horne employees raised this issue with Horne.  *See* SAC ¶¶ 49–80.  This ineffective approval system was created, facilitated, and directed from the top of Horne, with directives coming from senior officers including Senior Manager Holly Smith and Manager Christine Waldron.  *See id.* ¶¶ 50–51.  It is entirely irreconcilable for Horne to claim it was unaware of the material deficiencies in its process while its officers were directly involved in those operations and while it received detailed reports of those failings from SCO—which Horne disputed and refused to correct.  *Id.* ¶ 57; *see, e.g.*, *United States ex rel. Tutanes-Luster v. Broker Sols., Inc.*, 2019 WL 6972689, at *12 (C.D. Cal. Jul. 8, 2019) (finding scienter allegations sufficient where the defendant "certified that each loan was eligible for government insurance . . . even when management-level employees knew [otherwise]").

In short, Horne unquestionably knew it was approving and paying fraudulent applications, all the while certifying that it would take steps to verify eligibility, correctly calculate payment amounts, prevent duplicate payments, and implement measures and systems to prevent improper and illegal payment of funds.  SAC ¶¶ 40, 53–56, 61–68, 72–80.  Such allegations are more than sufficient to establish scienter at this stage.[5]  *See Gardens*, 953 F.3d at 1122 (quoting 31 U.S.C. § 3729(b)(1)).

**II.        The SAC States Claims for FCA Violations Outside California**

Horne argues the allegations regarding the other contracted states should be dismissed because the SAC focuses on California.  MPA at 14.  However, an FCA complaint need not "identify representative examples of false claims to support every allegation."  *Ebeid*, 616 F.3d at 998.  Relator has "plausibly alleged that the fraudulent scheme at issue here extends beyond [Relator's] experience . . . in California

---

[5] Relator can also establish scienter through Horne's recklessness in not taking reasonable steps to ensure the appropriate dispensing of ERAP funds, which in turn lead to the submission of false claims.  *See United States ex rel. Turner v. Dynamic Medical Systems, LLC,* 2022 WL 20804350, at *26-27 (E.D. Cal. Jan. 24, 2022) (scienter can be established through reckless disregard by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness).

MPA IN OPP. TO MOTION TO DISMISS SAC                    2:22-cv-1893-JAM-AC

due to [Horne's] nationwide practices." *Kenley Emergency Med. v. Schumacher Grp. of Louisiana Inc.*, 2025 WL 1359065, at *9 (N.D. Cal. May 9, 2025). Indeed, Horne operates nationally, and despite Horne's unsupported claim that other ERA Programs "necessarily worked differently from California's because of the diffuse manner in which Congress structured ERAP," MPA at 14, Horne fails to identify how these purported variations affected the structure or effectiveness of its application approval system. To the contrary, witnesses from other contracted states corroborate Relator's experience in California. SAC ¶¶ 71, 76–77, 79 (Alabama); 73 (Colorado) 74, 80 (Texas); 75 (Tennessee). *See CVS Pharm.*, 2017 WL 4174416, at *7 (sustaining nationwide scheme allegations where relator provided examples from four distinct locations in three states).

## III.    The SAC States Negligence Claims Against Horne for Relator's Termination

Horne asserts it cannot be liable for Relator's termination because the chain of events is, in its own self-serving estimation, "speculative and attenuated." MPA at 14. Relator complained to HCD about Horne's fraud in administering ERAP on multiple occasions, culminating in her complaint to the State Auditor on February 25, 2022 and eventual termination on April 22, 2022. SAC ¶¶ 8, 12, 85-99. As it was reasonably foreseeable that Horne's fraudulent conduct would cause an employee such as Relator to blow the whistle and suffer retaliation, the SAC adequately states a claim for negligence. *Id.* ¶ 138.

First, Horne attempts to evade responsibility by recasting Relator's claim as one for negligent interference with contractual relations. MPA at 14–15. However, Relator's employment relationship with California is governed by statute and is not a contractual relationship. *Valenzuela v. California,* 194 Cal. App. 3d 916, 919–20 (1987). Thus, Horne's first point is inapposite. Even the court in *Davis v. Nadrich*, which Horne cites, held there is a cause of action for negligent interference with prospective economic advantage, which is the harm here. 174 Cal. App. 4th 1, 9 (2009).

Next, Horne argues there was no "special relationship" between it and Relator that would give rise to lability. MPA at 15. But California allows individuals to sue non-employers for negligence when the non-employer's acts "would injure [] reputation and employment status and would subject him to possible civil liability." *Bastian v. Cnty. of San Luis Obispo*, 199 Cal. App. 3d 520, 529–30 (Ct. App. 1988). As in *Bastian*, Horne had a duty because it "created a peril" to HCD employees auditing its decisions by fraudulently administering ERAP. *See id.* at 529–31 ("no special relationship need exist where the

14

defendant created the peril which caused the plaintiff's injury."). In fact, the California Supreme Court recently echoed the *Bastian* decision in *Brown v. USA Taekwondo*,[6] where it held that "the law imposes a general duty of care on a defendant . . . who has created a risk of harm to the plaintiff, including when the defendant is responsible for making the plaintiff's position worse." 11 Cal.5th 204, 214 (2021) (cleaned up). The "special relationship" requirement arises only when one seeks to impose liability on a defendant that did not cause the harm. *Id.* at 220. In the present case, because Horne's misconduct created a risk of harm to those impacted by its fraud, Horne owed a general duty of care to Relator. *Accord Nance v. United States,* 2023 WL 5211606, at *5–6 (N.D. Ill. Aug. 14, 2023), *aff'd*, 2024 WL 4502107 (7th Cir. Oct. 16, 2024) (rejecting negligence claim where the plaintiff alleged the U.S. government's failure to investigate his whistleblower complaint against his employer caused his discharge because the government did not have a duty to investigate the complaint).

Lastly, Horne claims there are breaks in the causal chain which defeat its liability for Relator's termination. MPA at 15. However, "an intervening act does not amount to a 'superseding cause' relieving the negligent defendant of liability [] if it was reasonably foreseeable." *Landeros v. Flood*, 17 Cal.3d 399, 411 (1976); *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1209 (9th Cir. 2003). By contrast, in *Steinle v. United States*, defendant's alleged negligence was not the proximate cause of the harm because there were numerous unusual intervening acts. 17 F.4th 819, 822 (9th Cir. 2021). Whether it was reasonably foreseeable that Horne's conduct would result in an employee such as Relator blowing the whistle and subsequently suffering retaliation is a question for the jury. *See Bastian*, 199 Cal. App. 3d at 531 ("Facts relating to the issue of causation is a job properly left to the trier of fact.").

## CONCLUSION

For all the foregoing reasons, Relator respectfully submits the Court should deny Horne's Motion in its entirety. Should the Court find any portion of the SAC insufficient, Relator respectfully requests leave to amend to cure any deficiencies.

---

[6] Horne's quote from *Brown* was not the Supreme Court's holding but rather the Supreme Court's discussion of the appellate decision it was reviewing. MPA at 15 (quoting *Brown*, 11 Cal.5th at 211).

15

Dated: March 13, 2026

**MILLER SHAH LLP**

*/s/ James C. Shah*

James E. Miller (SBN 262553)
James C. Shah (SBN 260435)
8730 Wilshire Boulevard, Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jemiller@millershah.com
jcshah@millershah.com

**HIRST LAW GROUP, P.C.**
Michael A. Hirst (SBN 131034)
Marisela Bernal (SBN 329589)
200 B Street, Suite A
Davis, CA 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707
michael.hirst@hirstlawgroup.com
marisela.bernal@hirstlawgroup.com

**THE HIGHMAN LAW FIRM**
Bruce Highman (SBN 101760)
582 Market Street, Suite 1212
San Francisco, CA 94104
Telephone: (415) 982-5563
Facsimile: (415) 712-0018
bruce.highman@highmanlaw.com

*Attorneys for Plaintiff-Relator*

16

MPA IN OPP. TO MOTION TO DISMISS SAC                    2:22-cv-1893-JAM-AC

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 13, 2026, the foregoing document was filed via the Court's CM/ECF system, thereby causing a true and correct copy to be sent to all ECF registered counsel of record.

/s/James C. Shah
James C. Shah

17