UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HEATHER WIDEN,<br><br>                Plaintiff,<br><br>        v.<br><br>BDO GOVERNMENT SERVICES, LLC f/k/a HORNE LLP; GEOFFREY ROSS; LORRIE BLEVINS; SANDRA GALLAGHER; and DOES 1-20,<br><br>                Defendants. | No. 2:22-cv-01893-JAM-AC<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING IN PART** |

This is a whistleblower case brought by *qui tam* Plaintiff-Relator Heather Widen ("Plaintiff") on behalf of the United States of America ("Government") to recover damages and civil penalties for fraud allegedly perpetrated against the Government by Defendant BDO Government Services LLC, f/k/a Horne LLP ("Horne"). Horne was hired by the State of California to disburse rental assistance funds appropriated by the Government during the novel coronavirus disease ("COVID-19") pandemic to landlords and tenants who needed the funds for housing-related costs. Plaintiff alleges that, when bidding for that role, Horne made representations to California that it would implement robust

1

review procedures to ensure disbursements would be made only to eligible recipients and to weed out fraud, representations which were reflected in Horne's contract with the state.  Despite these representations and contractual obligations, Plaintiff alleges Horne utterly failed to implement adequate review procedures, resulting in rampant fraud and substantial monetary losses to the Government.  Plaintiff, who worked for the state at the time and reviewed applications approved by Horne for fraud, blew the whistle on Horne's practices, and was fired.  This lawsuit followed soon after.

Horne now seeks to dismiss the False Claims Act ("FCA") and negligence claims alleged in Plaintiff's Second Amended Complaint, arguing the claims are insufficiently pled.  As discussed further below, the Court agrees in part, and dismisses Plaintiff's FCA conspiracy, reverse FCA, and negligence claims, as well as Plaintiff's FCA claims to the extent they are premised on FCA violations outside of California.  However, the Court declines to dismiss Plaintiff's direct FCA claims premised on FCA violations in California.  The Court also grants Plaintiff leave to amend.

## I.    FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

In December 2020, in the throes of the COVID-19 pandemic, Congress established a nationwide Emergency Rental Assistance Program ("ERAP") through the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260.  Second Amended Complaint ("SAC") ¶ 20, ECF No. 42.  This law required the United States Department of the Treasury ("Treasury") to provide federal grantee states, cities, and counties with funding to provide rental assistance to

2

their residents ("Round 1").  Id.  In March 2021, Congress passed the American Rescue Plan Act of 2021, Pub. L. No. 117-2, which established a second round ("Round 2") of ERAP funds for federal grantees.  Id.  The funds were to be paid only to eligible landlords and tenants, as defined in 15 U.S.C. § 9058a, who needed the funds for housing-related costs including "rent; rental arrears; utilities and home energy costs; utilities and home energy costs arrears; and other expenses related to housing incurred due, directly or indirectly, to the novel coronavirus disease (COVID-19) outbreak, as defined by the Secretary."  Id. ¶ 26.

To ensure that the funds quickly got to those in need, the Round 1 federal program requirements specified that Treasury must recapture all funds federal grantees had not obligated by September 30, 2021.  Id. ¶ 21.  Treasury would recapture and then reallocate non-obligated funds to other eligible federal grantees that had obligated at least 65 percent of their original allocations.  Id.  Grantees had until September 30, 2022, to spend all of their obligated Round 1 funds and until September 30, 2025, to spend all of their Round 2 funds.  Id.

These deadlines created a sense of urgency among state grantees to obligate ERAP funds.  Id. ¶ 24.  California received a total of $2.6 billion in Round 1 ERAP funding: $1.5 billion to the state and $1.1 billion directly to 49 cities and counties. Id. ¶ 25.  Using the federal allocation to the state, the California Legislature created a rental relief program, SB 91, signed into law on January 29, 2021, which directed the California Department of Housing and Community Development

3

("HCD") to administer the program and allocate the $1.5 billion throughout the state based on population.  Id.  SB 91 also granted HCD authority to hire a vendor to implement the program and distribute funds.  Id.

As authorized by the federal grant provisions and California law, HCD contracted with Horne in March 2021 to implement and administer California's rental assistance program.  Id. ¶ 35.  As part of the bidding process for the contract, Horne made "several representations regarding its ability to administer ERAP and the specific measures that Horne would implement," including that it would begin processing ERAP applications within two weeks of California's bid acceptance; 100% of ERAP applications would be audited by a quality assurance team; that their systems made use of "quality assurance dashboards and audit management tools" to ensure disbursements would be made to qualified recipients; that their system contained checks and balances to prevent address duplications; that they would maintain an audit log; that Horne's program director would notify HCD in the event of "identified fraud, waste[,] and abuse"; that their approach would be tailored to ensure HCD's vision for prioritization was executed in accordance with SB 91 and the federal Consolidated Appropriations Act, 2021; that their automated calculations would be "tailored to Treasury guidance and SB 91"; and that their "eligibility tool would automatically assign unique identifiers for landlords and tenants that would dramatically reduce the potential for fraud." Id. ¶ 37.

California relied on these representations when accepting Horne's bid.  Id. ¶ 38.  HCD entered into a contract with Horne

for ERAP services on March 4, 2021, and Horne started accepting applications on March 15, 2021.  Id. ¶ 36.  Under its contract with HCD, Horne was responsible for accepting and reviewing all rental assistance applications, including determining eligibility, and disbursing benefit funds to approved applicants in the 57 jurisdictions participating in HCD's state rental assistance program.  Id. ¶ 39.  Horne also contracted directly with other local jurisdictions within California, and with state and local jurisdictions in other states.  Id.

As part of its contracts, Horne agreed in pertinent part to "deliver[] all necessary services to properly disburse the funding available in compliance with the applicable rules and laws," "verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments under the oversight of HCD," "ensur[e] that no duplicate payments are issued," and assume "responsibility for implementing measures and systems to prevent the illegal and improper payment of funds (hereafter Wrongful Payments) to putative tenants or landlords (hereafter Wrongful Recipients)."  Id. ¶ 40.  Thus, Horne's contract with California "explicitly assign[ed] responsibility to Horne for ensuring that ERAP [was] deployed in compliance with federal law, including the statutory requirements regarding eligible households and landlords."  Id. ¶ 41.

As soon as ERAP funding began to be disbursed, numerous fraudsters sought to divert ERAP funding, "including by submitting false ERAP applications; posing as eligible owners/landlords, tenants, or both; and using fake identities, addresses, and/or supporting documentation."  Id. ¶ 44.  Instead

5

of protecting against this fraud, Horne failed to maintain an adequate fraud detection program and "engaged in a pattern and practice of failing to comply with ERAP requirements set forth in grant provisions, contracts, and related statutes, and then concealing its noncompliance." Id. ¶¶ 43, 45. In particular, "[r]ather than apply an appropriate fraud screening before it approved or paid ERAP applications, Horne relied on post-hoc, third-party audits of applications it had already approved for payment or actually paid out" and "failed to secure and use widely available resources to conduct third-party verification of eligible tenants and landlords." Id. ¶ 49. "Furthermore, Horne failed to consistently flag applications as potentially fraudulent, either because Horne staff ignored numerous signs of fraud or because Horne lacked the staff to conduct such reviews and instead neglected or skimmed over the review process." Id.

"In addition to its inadequate and non-compliant application review and fund disbursement process, Horne also knowingly failed to comply with the ERAP and Contract requirements to provide complete and accurate reports." Id. ¶ 47. "Instead, Horne hid its conduct in its various reports so that federal and state auditors would remain unaware of the number of clearly fraudulent ERAP applications Horne approved and paid." Id. "In doing so, Horne caused the states to submit false certifications to the Government that the funds were obligated to eligible households in compliance with ERAP requirements." Id. As a result of Horne's conduct, California "paid out millions of federal funding dollars on ERAP applications that Horne inappropriately approved, causing the Government to sustain losses and potentially

6

depriving legitimate ERAP applicants of funding necessary to secure housing throughout the pandemic." Id. ¶ 45.

The California State Controller's Office ("SCO") regularly reviewed Horne's administration of ERAP and regularly identified problems with the lack of documentation Horne required from ERAP applicants. Id. ¶ 53. In August 2022, SCO published a report regarding HCD's oversight of Horne's administration of ERAP, finding "multiple instances of non-compliance." Id. ¶ 54. As part of that report, SCO audited a random sample of approved ERAP applications submitted between April 14, 2021, and December 31, 2021, and found that "Horne had approved at least 488 potentially fraudulent ERAP applications during that time period, totaling $18.1 million," and had already paid out $7 million of that total. Id. SCO also reviewed 1,007 of the 9,911 payments from Horne to applicants between April 26, 2021, and June 28, 2021, and found numerous quality assurance/control checklists that were incomplete, numerous transaction amounts that had been incorrectly calculated by Horne staff and subsequently approved, and numerous failures to verify that lease and rent amounts were eligible and accurate, among other failings. Id. ¶¶ 55-56.

In December 2021, Plaintiff, who worked on ERAP grant funding as a Representative II in HCD's Division of Federal Financial Assistance, was asked to assist in reviewing cases that had been flagged by SCO for potential fraud. Id. ¶¶ 8, 60. Plaintiff, as well as other HCD employees reviewing the cases, found numerous potential instances of fraud in applications reviewed and approved by Horne. Id. ¶¶ 62-68. Plaintiff alleges that "even limited review of applications by HCD, the California

7

State Auditor, and SCO showed that Horne regularly failed to detect obviously fraudulent ERAP applications with numerous and overlapping markers of fraud, and to prevent payment on those applications." Id. ¶ 69. Statements by multiple confidential witnesses working for Horne on ERAP administration projects confirmed these allegations. Id. ¶¶ 70-80.

"Horne's conduct caused significant financial losses to the Government and siphoned much-needed resources from California landlords and tenants relying on ERAP payments." Id. ¶ 81. A January 2022 agenda for an ERAP check-in meeting with Horne and HCD noted that ERAP had disbursed $1.78 billion by January 24, 2022. Id. A month later, the agenda for the check-in meeting noted that ERAP had disbursed $2.2 billion by February 24, 2022. Id. "Horne's blatant disregard for its obligation to screen for fraud [] likely caused hundreds of millions of dollars in damages to the Government." Id.

In addition, Horne's contract to administer ERAP for $51.7 million was increased to at least $146.8 million after California received Round 2 funding approval. Id. ¶ 82. "The government would not have paid such fees to Horne if it had known that Horne would not comply with the ERAP statutory and grant requirements." Id. "Horne's fraud caused the State of California and HCD to falsely certify to the Treasury that Round 1 funding had been obligated appropriately . . . by September 30, 2021." Id. ¶ 83. "If not for Horne's material omissions and misrepresentations in allowing fraudulent diversion of Government funds, the State of California would not have falsely certified to the Treasury that the Round 1 funding had been obligated in compliance with federal

law."  Id.

Plaintiff alleges that she "consistently" complained to HCD management about fraud in the administration of ERAP, and suggested what could be done to catch and stop more of the fraud. Id. ¶¶ 85-86.  She also complained to the State Auditor about the fraud on February 25, 2022.  Id. ¶ 85.  Following a series of disagreements with HCD management, Plaintiff's employment with HCD was terminated on April 22, 2022.  Id. ¶¶ 85-99.

Plaintiff filed this lawsuit on October 24, 2022, alleging five causes of action in her operative Second Amended Complaint against Horne for (1) violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) (Count I); (2) violation of the FCA, 31 U.S.C. § 3729(a)(1)(B) (Count II); (3) violation of the FCA, 31 U.S.C. § 3729(a)(1)(C) (Count III); (4) violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) (Count IV); and (5) negligence (Count VII).  Id. ¶¶ 100-23, 136-41.  Horne moved to dismiss all of Plaintiff's claims against it on February 13, 2026.  Mot. Dismiss ("Mot."), ECF No. 57.  This matter is fully briefed and was submitted without oral argument under Local Rule 230(g).  See Pl.'s Opp'n ("Opp'n"), ECF No. 60; Horne's Reply ("Reply"), ECF No. 62; ECF No. 65.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable.  Id.  A plaintiff need not provide detailed factual allegations, but must provide more than mere legal conclusions.  Twombly, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.

When ruling on a Rule 12(b)(6) motion, the Court must accept well-pled factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  See Autotel v. Nev. Bell. Tel. Co., 697 F.3d 846, 850 (9th Cir. 2012).  Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

Because they involve allegations of fraud, *qui tam* actions under the FCA must also meet the particularity requirements of Rule 9(b).  United States v. Corinthian Colleges, 655 F.3d 984, 992 (9th Cir. 2011) (citing Bly—Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001)).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Ninth Circuit interprets Rule 9(b) to require that allegations of fraud be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."

Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993).  The complaint "must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity."  Id. at 672.  However, the complaint "need not identify representative examples of false claims to support every allegation.  It is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016) (internal quotes and citations omitted.)  Allegations of "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

**III. OPINION**

   A.   California FCA Claims

Plaintiff brings four causes of action under the FCA based on Horne's administration of ERAP in California.  First, Plaintiff claims that Horne, in violation of 31 U.S.C. § 3729(a)(1)(A), "knowingly present[ed], or caus[ed] to be presented, a false or fraudulent claim for payment or approval."  SAC ¶¶ 100-05.  Second, Plaintiff claims that Horne, in violation of 31 U.S.C. § 3729(a)(1)(B), "knowingly ma[de], used[d], or cause[d] to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government."  Id. ¶¶ 106-11.  Third, Plaintiff claims that Horne, in violation of 31 U.S.C. § 3729(a)(1)(C), "knowingly conspired to commit violations of subparagraphs (A), (B), and (G) [of the False Claims Act]."  Id. ¶¶ 112-17.  Finally, Plaintiff claims that

11

Horne, in violation of 31 U.S.C. § 3729(a)(1)(G), "knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government," and "concealed and improperly avoided an obligation to pay money to the Government." Id. ¶¶ 118-23.  The Court will address each cause of action in turn.

### 1.    Plaintiff States Direct FCA Claims under 31 U.S.C. §§ 3729(a)(1)(A)-(B)

The direct FCA provision makes liable anyone who "[(1)] knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or (2)] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]"  31 U.S.C. §§ 3729(a)(1)(A)-(B).  The direct FCA provision "requires a showing of: '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, (4) causing the government to pay out money or forfeit moneys due.'"  Godecke ex rel. United States v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 899 (9th Cir. 2017)).

Here, Horne argues Plaintiff's direct FCA claims fail to satisfy each of the falsity, scienter, and materiality elements discussed above.  Mot. at 5-14.  For the reasons discussed below, the Court disagrees and finds that the elements of Plaintiff's direct FCA claims are met.  Thus, the Court declines to dismiss Plaintiff's first and second causes of action under 31 U.S.C. §§ 3729(a)(1)(A), (B).

a.    False Claim or Statement

To establish falsity under the FCA, a relator must allege that a defendant submitted claims that were factually or legally false.  See United States ex rel. Silingo v. WellPoint, Inc., 904 F.3d 667, 675-76 (9th Cir. 2018).  "A factually false claim is one in which the claim for payment is itself literally false or fraudulent, such as when the claim involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  Id. at 675 (cleaned up).

As for legal falsity, there are two recognized theories: express false certification and implied false certification.  See Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010).  Express false certification "means that the entity seeking payment [falsely] certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted."  Id.  To plead implied false certification, on the other hand, a plaintiff must allege (1) the defendant had "*previously* undertaken to expressly comply with a law, rule, or regulation," (2) the defendant did not comply with that express promise, (3) the act of "submitting a claim for payment" "implicate[d]" that obligation, (4) the claim "does not merely request payment, but also makes *specific representations* about the goods or services provided," and (5) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1017-18 (9th Cir. 2018)

(emphasis in original) (quoting Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 190 (2016)).

*First*, Horne argues Plaintiff fails to plead that Horne submitted or caused false claims to be submitted to the Government under any of the theories above because, even if Horne "engaged in a pattern and practice of failing to comply with [supposed] ERAP requirements set forth in grant provisions, contracts, and related statutes, and then conceal[ed] its noncompliance," SAC ¶ 43, Horne's breach of its contractual terms alone was not a misrepresentation.  Mot at 6.  Horne argues that Plaintiff fails to plead that Horne "ever expressly promised to comply with a particular law or regulation, how Horne's supposed claims contained 'specific representations about the goods or services provided,' or how those claims constituted 'misleading half-truths[.]'"  Id. at 7.  Horne also argues that "there is no allegation *Horne* presented the claims Plaintiff focuses on as being fraudulent (i.e., ERAP applications by ineligible landlords or tenants)"; rather, these claims were presented *to Horne*.  Id. at 6.

The Court disagrees and finds that Plaintiff has adequately pled a theory of implied false certification.  The crux of Plaintiff's theory is that Horne engaged in a "fraudulent course of conduct" that caused the Government to pay out funds by promising to administer ERAP "in compliance with the applicable rules and laws," and to "verify eligibility, validate income and rent calculations, collect landlord payment data, and approve subsidy payments," and then wholly flaunting that contractual obligation.  See Opp'n at 4.  In support of this theory,

Plaintiff alleges that (1) Horne contracted with HCD and agreed to administer ERAP according to "the requirements of the Act and SB 91, any rules or guidance promulgated by the U.S. Department of the Treasury, and all other applicable federal or state laws," SAC ¶ 40; (2) Horne failed to comply with that express promise in refusing to employ the requisite staff and resources to review ERAP applications and by approving and paying fraudulent applications, id. ¶¶ 49-80; (3) submitting claims for payment implicated Horne's obligation because Horne reported to HCD that it was approving applications in accordance with federal and state requirements and, in paying fraudulent applications, Horne caused California to falsely certify to Treasury that its ERAP funds were allocated appropriately, id. ¶¶ 7, 43-48, 61-69, 83-84; (4) Horne represented that it reviewed and approved ERAP applications in accordance with applicable state and federal guidance and laws, id. ¶¶ 40, 43-48; and (5) Horne's failure to disclose its noncompliance with the contract terms rendered its representations to HCD, and California's misrepresentations to the Government, misleading half-truths. Id. ¶¶ 7, 83-84. While Horne did not directly induce fraudsters to submit applications for ERAP funding, Plaintiff alleges numerous applications Horne paid despite obvious indicators of fraud, id. ¶¶ 54-69, and plausibly alleges Horne's poor review measures encouraged continued false applications and caused those applications to actually be paid. Id. ¶¶ 49-53, 81-84. Thus, the Court finds that Plaintiff has adequately pled that Horne submitted or caused false claims to be submitted to the Government.

*Second*, Horne argues that Plaintiff inadequately "plead[s]

15

particularized facts about any scheme together with the 'reliable indicia' that would be required to establish a 'strong inference' 'that false claims were actually submitted.'" Mot. at 7.  In particular, Horne argues that Plaintiff provides no specific facts about how Horne submitted allegedly false claims, who at Horne made the misrepresentations giving rise to fraud claims, or when Horne made the misrepresentations at issue. Id. at 7-8.

     Again, the Court disagrees.  "To state an FCA claim, a relator is not required to identify actual examples of submitted false claims; instead, 'it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  Godecke, 937 F.3d at 1209 (some internal quotation marks omitted) (quoting Ebeid, 616 F.3d at 998-99).  "A relator is not required to identify representative examples of false claims to support every allegation, although the use of representative examples is one means of meeting the pleading obligation."  Id.

     Here, as to "how" Horne submitted false claims, Plaintiff alleges that Horne utterly failed to allocate the necessary personnel, resources, and training to ERAP application review, despite promises to do so.  See SAC ¶¶ 49-80.  Plaintiff alleges this resulted in thousands of fraudulent applications worth millions of dollars being approved and paid with government funds.  Id. ¶¶ 6-7, 45, 53-58, 81-84.  For example, Plaintiff alleges that SCO reviewed 1,007 of the 9,911 payments from Horne to applicants between April 26, 2021, and June 28, 2021, and found numerous quality assurance/control checklists that were

16

incomplete, numerous transaction amounts that had been incorrectly calculated by Horne staff and subsequently approved, and numerous failures to verify that lease and rent amounts were eligible and accurate, among other failings.  Id. ¶¶ 55-56. These allegations sufficiently identify how Horne caused fraudulent claims to be paid.

As to who at Horne made misrepresentations giving rise to fraudulent claims, Plaintiff alleges Horne itself was the entity that contracted with HCD, promised to administer ERAP in accordance with federal and state laws and guidelines, and received significant federal funding to do so.  Id. ¶¶ 35-42, 45-46.  Plaintiff further alleges that Horne's lax review policies permeated the entire company and were directed from management, citing multiple former Horne employees who confirmed the failings of the ERAP administration and reported that their superiors at Horne ignored, dismissed, and discouraged their concerns about fraud.  Id. ¶¶ 70-80.  These allegations are sufficient to put Horne on notice of who at the company was responsible for the underlying misrepresentations giving rise to the fraud claims.

Finally, as to "when" this activity occurred, Plaintiff alleges Horne contracted with HCD on March 4, 2021, and began accepting applications on March 15, 2021.  Id. ¶ 36.  Horne approved and paid fraudulent applications from the outset of its participation until the program's end.  Id. ¶ 2.  Plaintiff specifically notes that Horne approved at least 488 potentially fraudulent applications between April 12, 2021, and December 31, 2021, and presents specific examples of fraudulent applications Horne approved between November and December 2021.  Id. ¶¶ 54,

17

61-67.  These allegations sufficiently put Horne on notice of the time period at issue.

*Third*, Horne argues it cannot be liable for "caus[ing] the State of California and HCD to certify falsely to the Treasury that Round 1 funding had been obligated appropriately" through California's Obligated Funds Certification ("OFC"), see SAC ¶ 83, because the OFC was not a "request or demand . . . for money or property" (and thus not a claim under 31 U.S.C. § 3729(b)(2)), and because Horne did not cause its submission.  Mot. at 8-10.

These arguments lack merit.  First, Plaintiff has plausibly pled that the OFC was material to California's retention of Round 1 funding and Treasury's award of Round 2 funding.  "The federal statutory requirements for ERAP eligibility make clear that program funds are to be paid only to eligible landlords and tenants who need the funds for housing-related costs."  SAC ¶¶ 26, 29.  When disbursing funds, the Government informed the states that nonobligated funds were to be reallocated on a needs-basis to other grantee states and cities.  Id. ¶¶ 22-23.  Thus, as Plaintiff argues, whether the OFC was itself a claim for payment is irrelevant because "[i]f California could not certify that Round 1 funding had been obligated appropriately or the Government knew that certification was false, the Government would have reallocated outstanding Round 1 funds, ordered repayment of improperly allocated Round 1 funds, and/or heavily reduced, if not eliminated, California's Round 2 funding."  Opp'n at 8; see United States v. Otero, No. 15cv441 JAH (RBB), 2017 WL 11673897, at *5 (S.D. Cal. Aug. 8, 2017) (rejecting argument that the forms plaintiff relied upon were not submitted "in

conjunction with payments" because defendants' allegedly false statements "were relied upon by the United States when it awarded contracts . . . and resulted in payments of invoices submitted by Defendants").

Second, Plaintiff need only show that Horne's false certifications and reports to California were "a substantial factor in bringing about the false claims and such claims were a foreseeable and natural consequence of its conduct." United States ex rel. Brown v. Celgene Corp., No. CV 10-3165-GHK (SSx), 2014 WL 3605896, at *8 (C.D. Cal. July 10, 204).  Here, Plaintiff alleges that Horne falsely certified and reported that it was filtering fraudulent ERAP applications; California relied upon and incorporated Horne's certifications and reports in their own certifications to the Government; and based on those certifications and reports, the Government provided and did not reallocate or order repayment of ERAP funds.  SAC ¶ 37-84.  This is sufficient.  See United States v. Eghbal, 548 F.3d 1281, 1283 (9th Cir. 2008) (even though defendants "were not parties to the actual claims presented to HUD," "liability under the FCA nevertheless attaches, because the false statements were 'relevant to the government's decision to confer a benefit'") (citation omitted).

Thus, the Court declines to dismiss Plaintiff's direct FCA claims on any of the bases discussed above.

b.    Scienter

Regarding the scienter element, "[l]iability under the FCA is established only when the defendant 'knowingly' presents a false or fraudulent claim for payment."  Godecke, 937 F.3d at

19

1211 (citing 31 U.S.C. § 3729(a)(1)(A)).  "'Knowingly' is defined as having: (1) actual knowledge of the information; (2) deliberate ignorance of the truth or falsity of the information; or (3) reckless disregard of the truth or falsity of the information."  Id. (citing 31 U.S.C. § 3729(b)(1)(A)).  "The FCA's 'knowingly' requirement 'requires no proof of specific intent to defraud.'"  Id. (internal brackets omitted) (quoting 31 U.S.C. § 3729(b)(1)(B)).  "Instead of pleading specific intent to defraud, it is sufficient to plead that the defendant knowingly filed false claims, or that the defendant submitted false claims with reckless disregard or deliberate ignorance as to the truth or falsity of its representations."  Id.  "The deliberate ignorance standard can cover 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted."  Id. (quoting United Healthcare Ins. Co., 848 F.3d at 1174).

    Here, Horne argues that Plaintiff neither pleads it "submitted claims it knew were false or knowingly made false statements," nor that "Horne was reckless or indifferent to the truth of any promise, statement, or certification."  Mot. at 13. At most, Horne argues that it "was underprepared or could have done a better job of detecting fraud in connection with ERAP." Id.  That said, the "FCA does not penalize 'negligence,' 'innocent mistakes,' or 'faulty' or 'low quality' work."  Id. at 13-14.

    However, Plaintiff alleges far more than mere negligence here.  Rather, Plaintiff alleges that Horne's approval process

was grossly inadequate throughout the time period in question despite Horne's management being put on notice by HCD, SCO, and multiple Horne employees that its process was deficient.  SAC ¶¶ 49-80.  As Plaintiff argues, "Horne unquestionably knew it was approving and paying fraudulent applications, all the while certifying that it would take steps to verify eligibility, correctly calculate payment amounts, prevent duplicate payments, and implement measures and systems to prevent improper and illegal payment of funds."  Opp'n at 13 (citing SAC ¶¶ 40, 53-56, 61-68, 72-80).  Such allegations are sufficient to establish scienter at this stage.  See, e.g., United States ex rel. Tutanes-Luster v. Broker Sols., Inc., No. CV 19-1630 PSG (JPRx), 2019 WL 6972689, at *12 (C.D. Cal. Jul. 8, 2019) (finding scienter allegations sufficient where the defendant "certified that each loan was eligible for government insurance . . . even when management-level employees knew [otherwise]").

Thus, the Court finds that Plaintiff has sufficiently pled scienter for her direct FCA claims.

c.   Materiality

Regarding the materiality element, the FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  Godecke, 937 F.3d at 1213 (quoting 31 U.S.C. § 3729(b)(4)).  "Although the requirement is 'demanding,' the Supreme Court has held that there is not a bright-line test for determining whether the FCA's materiality requirement has been met."  Id. (citing Escobar, 579 U.S. at 194).  "Instead, the Supreme Court has given a list of relevant, but not necessarily

21

dispositive, factors in determining whether the false claims were material, such as whether the government decided 'to expressly identify a provision as a condition of payment.'" Id. (quoting Escobar, 579 U.S. at 194).  "Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Id. (quoting Escobar, 579 U.S. at 194–95).  "Conversely, if the government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  Id. (quoting Escobar, 579 U.S. at 195).  "Or, if the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  Id. (quoting Escobar, 579 U.S. at 195).  "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial."  Id. (quoting Escobar, 579 U.S. at 194).

Here, Horne argues that Plaintiff has failed to plead how "Horne's *false statements* were material to the Government's decision to pay."  Mot. at 12.  Instead, Horne argues that the "ERAP statutory framework set out in the SAC itself *indicates that the ability to distribute relief funds quickly was the true material issue under ERAP, not the ability to police against fraud or rigidly assess eligibility*."  Id.  At the California level, Horne argues that "HCD closely directed, monitored, and

oversaw Horne's administration of the ERAP funds" and was undisputedly aware of the alleged challenges with getting relief funds to the right households, yet Plaintiff "does not contend HCD ever asked or directed Horne to modify its practices or otherwise took issue with Horne's performance." Id. at 13. Thus, Horne argues the materiality element is not met.

Horne's argument, that the Government was wholly indifferent to the fraudulent use of ERAP funds, is unsupported by Plaintiff's allegations here.  While the rapid distribution of funds was certainly a priority, the Government clearly emphasized that ERAP relief funds were to be distributed to *eligible* households.  15 U.S.C. § 9058a(c)(1); SAC ¶ 26.  ERAP grant terms warned against false statements or claims in connection with the applications and provided whistleblower protections for disclosing any such fraudulent activity.  SAC ¶¶ 29-31.  The Government also provided guidance on detecting and reporting fraudulent activity.  Id. ¶ 32.  Despite the Government's clear concern with preventing fraud, Plaintiff alleges that "Horne [] knowingly failed to comply with the ERAP and Contract requirements to provide complete and accurate reports" and "hid its conduct in its various reports so that federal and state auditors would remain unaware of the number of clearly fraudulent ERAP applications Horne approved and paid," which "caused the states to submit false certifications to the Government that the funds were obligated to eligible households in compliance with ERAP requirements."  Id. ¶ 47.  Given these provisions, Plaintiff plausibly alleges that Horne's systemic inability to vet applications, and misrepresentation of that fact, was material to

the Government's decision to provide and not redirect ERAP funding.  See id. ¶¶ 20-25, 43-48; see also United States ex rel. Quesenberry v. JMG Invs., Inc., No. CV 20-8497-MWF (ASx), 2026 WL 453469, at *7 (C.D. Cal. Jan. 14, 2026) (finding materiality because there was "no serious dispute" that the defendants would not have received PPP loan had they answered the certification truthfully).

Thus, the Court finds that Plaintiff has adequately pled materiality for her direct FCA claims.

B.    Plaintiff Fails to State an FCA Conspiracy Claim Under 31 U.S.C. § 3729(a)(1)(C)

"To state a claim under the FCA for conspiracy, a plaintiff must show that (1) the defendant agreed with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) one or more conspirators performed any act to effect the object of the conspiracy; and (3) the United States suffered damages as a result."  United States v. B & H Educ. Inc., No. 13-CV-05256-RGK (AJWx), 2015 WL 13919323, at *4 (C.D. Cal. Aug. 24, 2015).

Here, Horne argues that Plaintiff's FCA conspiracy claim fails for multiple reasons.  First, Horne argues that in order to state an FCA conspiracy claim, Plaintiff must plead an underlying FCA violation under another subparagraph of 31 U.S.C. § 3729(a)(1), which Plaintiff has failed to do.  Mot. at 11. Horne further argues that Plaintiff fails to allege an "agree[ment] with one or more persons to get a false or fraudulent claim," or an overt act by anyone "to effect the object of the conspiracy."  Id. (quoting United States v.

Vandewater Int'l Inc., No. 2:17-cv-04393-RGK-KS, 2019 WL 6917927, at *5 (C.D. Cal. Sept. 3, 2019)). The Court agrees.

Plaintiff argues that she has pled "efforts by certain HCD personnel and Defendants Ross, Blevins, and Gallagher to conceal Horne's fraud," citing SAC ¶¶ 88-99, which "indicate[s] a tacit agreement between Horne and certain HCD personnel and [is] sufficient to state a conspiracy claim." Opp'n at 10. However, the Second Amended Complaint does not specifically allege Defendants Ross, Blevins, or Gallagher were Horne's co-conspirators. See SAC ¶¶ 112-17. Further, the portions of the Second Amended Complaint cited by Plaintiff merely detail a series of disagreements between Plaintiff and Defendants Ross, Blevins, and Gallagher leading up to Plaintiff's termination from HCD for blowing the whistle on Horne. See id. ¶¶ 88-99. Plaintiff's disagreements with HCD leadership over her whistleblowing do not plausibly indicate a tacit conspiracy between Horne and those Defendants to conceal Horne's fraudulent conduct.

Thus, the Court dismisses Plaintiff's third cause of action under 31 U.S.C. § 3729(a)(1)(C) against Horne.

C.   Plaintiff Fails to State a "Reverse" FCA Claim Under 31 U.S.C. § 3729(a)(1)(G)

The reverse-FCA provision makes liable anyone who "[(1)] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [(2)] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the

25

Government."   31 U.S.C. § 3729(a)(1)(G).

Here, Horne argues that Plaintiff's reverse FCA theory improperly rests on Plaintiff's allegation that HCD's contract with Horne provides that Horne "may be held financially responsible for duplicate payments or overpayments that must be recaptured by the Contractor" if it fails to ensure that only eligible recipients receive ERAP grant funds.  Mot. at 10 (citing SAC ¶¶ 40, 46).  Horne argues this theory is flawed because a "reverse FCA claim requires a plausible, particularized allegation that the defendant had 'a present duty to pay' the Government 'at the time that the alleged false record or statement was made.'"  Id. (quoting United States ex rel. Lesnik v. ISM Vuzem d.o.o., 112 F.4th 816, 819 (9th Cir. 2024)).  Horne argues that a contract provision stating an amount "may" need to be paid is not an obligation recognized under 31 U.S.C. § 3729(a)(1)(G).

Horne is correct.  An "obligation to pay" is an essential element of a reverse FCA claim, and means "an established duty [to pay], whether or not fixed," arising from a statute or regulation (among other sources).  See 31 U.S.C. §§ 3729(a)(1)(G), (b)(3).  A plaintiff bringing such a claim must show that the Government "was owed a specific, legal obligation at the time that the alleged false record or statement was made." United States v. Bourseau, 531 F.3d 1159, 1169 (9th Cir. 2008). "The obligation cannot be merely a potential liability," but rather a "a present duty to pay."  Id.

Plaintiff argues that the contract contains language creating such a present obligation by requiring that "duplicate

payments or over payments . . . must be recaptured" by Horne and stating that Horne "will be required to indemnify, defend and save harmless the State . . . from any and all claims and losses accruing or resulting from Wrongful Payments."  Opp'n at 10 (citing SAC ¶¶ 40, 46).  This language does not save Plaintiff's claim.  Read in full, the first contract provision cited by Plaintiff states: "The Contractor is responsible for ensuring that no duplicate payments are issued and may be held financially responsible for duplicate payments or overpayments that must be recaptured by the Contractor."  SAC ¶ 40.  Thus, the language is clear that Horne may, but will not necessarily be, held liable for duplicate payments and overpayments.  Plaintiff's "indemnification" theory fails as well because it is contingent on claims that might be brought in the future.

The Court finds that Plaintiff has failed to plausibly plead any present duty to pay the Government and dismisses Plaintiff's fourth cause of action under 31 U.S.C. § 3729(a)(1)(G) against Horne.

### D.    FCA Claims Outside of California

Horne argues that Plaintiff's allegations, which focus almost exclusively on Horne's administration of California's ERAP for HCD, come nowhere close to showing that Horne submitted or caused false claims in connection with other state programs that necessarily worked differently from California's because of the diffuse manner in which Congress structured ERAP.  Mot. at 14.  Thus, Horne argues Plaintiff's "FCA claims based on conduct outside of California should be dismissed for failure to plead any required FCA elements in connection with any of those

programs." Id.

The Court agrees.  Plaintiff alleges generally that "[s]everal states—including Alabama, California, Colorado, Tennessee, and Texas—contracted with Horne to administer the ERA program," and that "Horne has knowingly failed to follow statutory and contractual program mandates, concealed its failures, and falsely certified that it complied with these material requirements" in each state.  SAC ¶ 4.  To support these allegations, the Second Amended Complaint provides anecdotes and opinions from eight staffers working on ERAP programs in other states who opine that the programs could have been better trained or staffed.  Id. ¶¶ 71-80.  However, those programs were administered by the various states, and nowhere does the Second Amended Complaint allege that Horne had a "centralized structure and standardized, nationwide practices" that would support a "strong inference" of false claims submitted in other states. Cf. Kenley Emergency Med. v. Schumacher Group of Louisiana Inc., No. 20-cv-03274-SI, 2025 WL 1359065, at *9 (N.D. Cal. May 9, 2025).

The Court therefore finds that Plaintiff has failed to plausibly plead Horne submitted or caused false claims to be submitted outside of California, and dismisses Plaintiff's FCA claims to the extent they are premised on acts outside of California.

E.   Negligence Claim

Finally, Horne argues that Plaintiff's negligence claim, which seeks to hold Horne liable for her firing from HCD, should be dismissed because (1) there is no cause of action in

28

California for negligent interference with contractual relations; (2) Horne did not owe Plaintiff a duty to prevent HCD from firing her; and (3) Plaintiff's attenuated multi-step causation theory, which played out over several months and involved independent decisions by Plaintiff herself and by HCD, does not and cannot establish proximate cause.  Mot. at 14–15.

The Court agrees.  Plaintiff argues that the case law concerning contractual relations cited by Horne does not apply to her, as her "employment relationship with California is governed by statute and is not a contractual relationship."  Opp'n at 14.  Rather, she argues that she pleads a "cause of action for negligent interference with prospective economic advantage."  Id. Even assuming that is the case, the tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care.  Lange v. TIG Ins. Co., 68 Cal. App. 4th 1179, 1187-88 (1998).  Plaintiff argues that a duty exists here because "California allows individuals to sue non-employers for negligence when the non-employer's acts 'would injure [] reputation and employment status and would subject him to possible civil liability.'"  Opp'n at 14 (quoting Bastian v. Cnty. of San Luis Obispo, 199 Cal. App. 3d 520, 529–30 (Ct. App. 1988)).  In other words, "[o]ne who creates a foreseeable danger not readily discoverable by the endangered persons has the duty to warn them of the potential peril."  Bastian, 199 Cal. App. 3d at 530.

However, the Court finds that Plaintiff has not sufficiently pled how Horne's alleged fraudulent scheme created a foreseeable danger that Plaintiff would be fired for uncovering that scheme.

The Court agrees with Horne that Plaintiff could reasonably foresee the consequences of her actions at least as well as Horne.  Reply at 5.  Thus, Plaintiff has not sufficiently pled that Horne owed her a duty giving rise to a negligence claim and dismisses Plaintiff's seventh cause of action for negligence.

F.    Leave to Amend

In granting dismissal, a court must also decide whether to grant leave to amend.  Leave to amend should be freely given where there is no "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Cap., LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

The Court finds that Horne has not demonstrated that amendment is clearly futile and therefore dismisses Plaintiff's FCA conspiracy, reverse FCA, non-California FCA, and negligence claims against Horne with leave to amend.

**IV.   ORDER**

For the reasons above, Defendant BDO Government Services LLC, f/k/a Horne LLP's Motion to Dismiss (ECF No. 57) is GRANTED IN PART.  Plaintiff Heather Widen's third cause of action, fourth cause of action, and seventh cause of action are dismissed against Horne with leave to amend. Horne's Motion to Dismiss Plaintiff's first and second causes of action is DENIED except to the extent these claims are based on conduct outside of California.  If Plaintiff elects to file an amended complaint, she must do so within twenty (20) days of this Order.  Defendants

shall file their response to the amended complaint within twenty (20) days thereafter.

IT IS SO ORDERED.

Dated: July 14, 2026

JOHN A. MENDEZ,
SENIOR UNITED STATES DISTRICT JUDGE

31